# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

Jose Padilla,                                                   :
                                                               :     Case No. 2:07-cv-00410-HFF
  and                                                   :
                                                               :
Estela Lebron,                                                 :
  for herself and as next friend for Jose Padilla      :
                                                               :
*Plaintiffs*                                                   :
                                                               :
v.                                                             :
                                                               :
Donald H. Rumsfeld,  *Former Secretary of Defense,*:          **FIRST AMENDED COMPLAINT**
John Ashcroft, *Former Attorney General,*                     :
Robert M. Gates, *Secretary of Defense,*                      :
Paul Wolfowitz, *Former Deputy*                               :
*Secretary of Defense,*                                        :
Vice Admiral Lowell E. Jacoby,                                 :
*Director, Defense Intelligence Agency,*                       :
Michael H. Mobbs, *Special Advisor to*                         :
*Undersecretary of Defense for Policy,*                        :
C. T. Hanft,                                                   :
*Commander, Consolidated Naval Brig,*                          :
M.A. Marr,                                                     :
*Commander, Consolidated Naval Brig,*                          :
Senior Chief Keen, *Consolidated Naval Brig,*                  :
Dr. Craig Noble,                                               :
John Does, 1-50,                                               :
In their individual capacities,                                :
                                                               :
*Defendants.*                                                  :

## INTRODUCTION

1.        Plaintiff Jose Padilla is a United States citizen who was imprisoned as an "enemy combatant" in a military brig, without charge or any ability to defend himself, for three years and eight months.  Throughout those years, Mr. Padilla suffered gross physical and psychological abuse at the hands of federal officials as part of a scheme of abusive interrogation intended to break down Mr. Padilla's humanity and his will to live.  For nearly two years, Mr. Padilla was held in complete isolation and denied all access to the court system, legal counsel and his family.  He was subjected to mistreatment including but not limited to extreme and prolonged sleep and sensory deprivation designed to inflict severe mental pain and suffering; exposure to extreme temperatures; interrogation under threat of torture, deportation and even death; denial of access to necessary medical and psychiatric care; and interference with Mr. Padilla's ability to practice his religion.  In the year and a half Mr. Padilla remained in the brig after he was granted limited access to legal counsel, much of this severe abuse continued.

2.        Padilla's mistreatment during his unlawful detention violated, *inter alia*, his rights to procedural and substantive due process; his right to be free from cruel or unusual punishment; his right to freely exercise his religion; his right to access information; his right to association with family members and friends; his right of access to legal counsel; his right of access to court; his right against compelled self-incrimination; his right to be free from torture and from other cruel, inhuman and degrading treatment and from treatment that shocks the conscience; his right against arbitrary and unconstitutional seizure and detention; and his right to be free from governmental conspiracies intended to deprive him of his rights, privileges and immunities under the law.

3.        The grave violations suffered by Padilla were not isolated occurrences by rogue lower-level officials; to the contrary, Defendants Rumsfeld, Wolfowitz, Jacoby, Mobbs and Ashcroft deliberately removed Mr. Padilla from traditional due process protections normally available to U.S. citizens detained by their government and barred all access to the outside world, including access to counsel.  On information and belief, defendants Rumsfeld, Wolfowitz, Jacoby, Mobbs, and other senior defense and policy officials, John Does 1-10, then personally ordered and/or approved Mr. Padilla's detention and interrogation program, which was specifically designed to inflict severe physical and mental pain and suffering on Mr. Padilla for the purpose of extracting information from him and punishing him without due process of law. That program was supervised and/or implemented by Defendants Marr, Hanft, Keen and John Doe Defendants 11-50, unidentified military officials, legal and medical professionals, interrogators, and guards to be individually named upon further discovery.

4.        Mr. Padilla suffered and continues to suffer severe mental and physical harm as a result of the forty-four months he endured in Defendants' custody.  This harm is exacerbated by the fear that he may again be detained as an enemy combatant regardless of whether he is acquitted or convicted in his criminal trial, a possibility which the government has acknowledged.

5.        Ms. Lebron was also injured by Defendants' conduct by being deprived of the virtually all contact with her son, Mr. Padilla, for the duration of his illegal detention, in violation of her constitutional right to familial association.

6.        Plaintiffs Padilla and Lebron assert this complaint against Defendants in their individual capacities.  They seek monetary, injunctive and declaratory relief.

## JURISDICTION

7.        This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), and directly under the Constitution.

8.        Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e).

## PARTIES

9.        Mr. Padilla is an American citizen.  From on or about June 9, 2002 until on or about January 5, 2006 (the "Relevant Time Period"), Mr. Padilla was detained at Naval Consolidated Brig at the Naval Weapons Station in Charleston, South Carolina (hereinafter "Naval Brig") as an "enemy combatant."  On January 5, 2006, Mr. Padilla was transferred from the Naval Brig to a federal detention center in Miami, Florida, where he is currently undergoing trial on criminal charges before Hon. Marcia G. Cook of the U.S. District Court for the Southern District of Florida.

10.        Ms. Lebron is an American citizen and the mother of Mr. Padilla.  For the Relevant Time Period, Ms. Lebron was denied virtually all contact with her son, Mr. Padilla. She sues for herself and, if necessary, as next friend for Jose Padilla.  Plaintiff Jose Padilla's competence has been contested in the criminal proceeding in the U.S. District Court for the Southern District of Florida, and though he was found competent by that court on February 28, 2007, his competence may be the subject of appeal.

### Former Attorney General Ashcroft

11.        During the Relevant Period, Defendant John Ashcroft was the Attorney General, the highest-ranking official in the U.S. Department of Justice.  Upon information and belief, Defendant Ashcroft is a citizen of the United States and a resident of Virginia, where he maintains his primary residence.  He is sued in his individual capacity.

4

### Senior Military and Policy Defendants

12.        During the Relevant Period, Defendant Donald H. Rumsfeld was the Secretary of Defense, the highest-ranking civilian official in the U.S. Department of Defense.  Upon information and belief, Defendant Rumsfeld is a citizen of the United States and a resident of Illinois, where he maintains his primary residence.  He is sued in his individual capacity.

13.        During the Relevant Period, Paul Wolfowitz was the Deputy Secretary of Defense. Upon information and belief, Defendant Wolfowitz is a citizen of the United States and a resident of Maryland.  He is sued in his individual capacity.

14.        During the Relevant Period, Vice Admiral Lowell E. Jacoby was Director of the Defense Intelligence Agency.  Upon information and belief, Defendant Jacoby is a citizen of the United States and a resident of Virginia.  He is sued in his individual capacity.

15.        During part or all of the Relevant Period, Michael H. Mobbs was Special Advisor to Undersecretary of Defense for Policy.  Upon information and belief, Defendant Mobbs is a citizen of the United States and a resident of Virginia.  He is sued in his individual capacity.

16.        Robert Gates is currently Secretary of Defense.  He is sued for declaratory and injunctive relief only.  Upon information and belief, Defendant Gates is a citizen of the United States and a resident of Washington.  He is sued in his individual capacity.

17.        Plaintiffs do not know the true names and capacities of other Senior Military and Policy Defendants sued herein and therefore sue these defendants by fictitious names, John Does 1-10.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  John Does, 1-10, upon information and belief, are government officials (both

5

civilian and military) responsible for policy who exercised supervisory control over and/or provided legal, medical and other expert advice and assistance regarding Mr. Padilla's detention and interrogation that proximately caused the violations described below. Their identities have been deliberately concealed and/or treated as classified information by the government, and Plaintiffs through the exercise of reasonable diligence have not yet been able to ascertain their true names or specific involvement in the violations described herein.

**Supervisor Defendants**

18.        During part of the Relevant Period, Defendant C.T. Hanft was the Commander of the Consolidated Naval Brig in Charleston, South Carolina, and was responsible for Mr. Padilla's day-to-day treatment and conditions of confinement at the Naval Brig. Defendant Hanft is sued in her individual capacity. Upon information and belief, Defendant Hanft resides within the District of South Carolina.

19.        During part of the Relevant Period, Defendant Melanie Marr was the Commander of the Consolidated Naval Brig in Charleston, South Carolina, and was responsible for Mr. Padilla's day-to-day treatment and conditions of confinement at the Naval Brig. Defendant Marr is sued in her individual capacity. Upon information and belief, Defendant Marr resides within the District of South Carolina.

20.        During part or all of the Relevant Period, Senior Chief Keen was the senior non-commissioned officer at the Consolidated Naval Brig in Charleston, South Carolina, and was responsible for Mr. Padilla's day-to-day treatment and conditions of confinement at the Naval Brig. Senior Chief Keen is sued in his individual capacity. Upon information and belief, Defendant Keen resides within the District of South Carolina.

21.      Plaintiffs do not know the true names and capacities of other Supervisor Defendants sued herein and therefore sue these defendants by fictitious names, John Does 11-20. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. John Does 11-20 are the military and civilian personnel who provided day-to-day supervision of Padilla's confinement and interrogation sessions.  Their identities have been deliberately concealed and/or treated as classified information by the government, and Plaintiffs through the exercise of reasonable diligence have not yet been able to ascertain their true names and/or specific involvement in the violations described herein.  Upon information and belief, these persons were instructed to conceal their names from Mr. Padilla, and their name tags were covered up in his presence.

### Legal Professional Defendants

22.      Plaintiffs do not know the true names and capacities of the Legal Professional Defendants sued herein and therefore sue these defendants by fictitious names, John Does 21-30. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. John Does 21-25 directly interfered with counsel's access to Mr. Padilla and facilitated, aided and abetted Mr. Padilla's illegal conditions of confinement and interrogation described below. Their identities have been deliberately concealed and/or treated as classified information by the government, and Plaintiffs through the exercise of reasonable diligence have not yet been able to ascertain their true names and/or specific involvement in the violations described herein.

### Medical Professional Defendants

23.      On information and belief, Dr. Craig Noble was staff psychiatrist at the Naval Brig during part or all of the Relevant Period.  Plaintiffs do not know the true names and capacities of the other Medical Professional Defendants sued herein and therefore sue these

defendants by fictitious names, John Does 21-30.  Plaintiffs will amend this complaint to allege

their true names and capacities when ascertained.  John Does 26-30 are the military and civilian

medical and psychological personnel who provided day-to-day supervision of Mr. Padilla's

confinement and interrogation sessions and were responsible for his medical and psychiatric

care.  Their identities have been deliberately concealed and/or treated as classified information

by the government, and Plaintiffs through the exercise of reasonable diligence have not yet been

able to ascertain their true names and/or specific involvement in the violations described herein.

Upon information and belief, these persons were instructed to conceal their names from Mr.

Padilla, and their name tags were covered up in his presence.

### Interrogator Defendants

24.        Plaintiffs do not know the true names and capacities of Interrogator Defendants

sued herein and therefore sue these defendants by fictitious names, John Does 31-40.  Plaintiffs

will amend this complaint to allege their true names and capacities when ascertained.  John Does

21-40 directly participated in the interrogation and mistreatment of Mr. Padilla described below.

Their identities have been deliberately concealed and/or treated as classified information by the

government, and Plaintiffs through the exercise of reasonable diligence have not yet been able to

ascertain their true names and/or specific involvement in the violations described herein.  Upon

information and belief, these persons were instructed to conceal their names from Mr. Padilla,

and their name tags were covered up in his presence.

### Guard Defendants

25.        Plaintiffs do not know the true names and capacities of other Guard Defendants

sued herein and therefore sue these defendants by fictitious names, John Does 41-50.  Plaintiffs

will amend this complaint to allege their true names and capacities when ascertained.  John Does

41-50 directly participated in the day-to-day confinement and mistreatment of Mr. Padilla described below. Their identities have been deliberately concealed and/or treated as classified information by the government, and Plaintiffs through the exercise of reasonable diligence have not yet been able to ascertain their true names and/or specific involvement in the violations described herein. Upon information and belief, these persons were instructed to conceal their names from Mr. Padilla, and their name tags were covered up in his presence.

26.        The Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, and Guard Defendants are referred to collectively in this complaint as "Operational Defendants." Defendants Ashcroft and Gates are referred to individually.

## FACTUAL ALLEGATIONS

27.        On or about May 8, 2002, Mr. Padilla was arrested in Chicago O'Hare International Airport, pursuant to a material witness warrant issued by the U.S. District Court for the Southern District of New York. He was transported to New York where he was held in custody in a federal detention facility. He was assigned court-appointed counsel, and a motion to vacate the material witness warrant was filed.

28.        On June 9, 2002, President George W. Bush declared Mr. Padilla an "enemy combatant" and directed Defendant Rumsfeld to take Mr. Padilla into military custody. This action was taken pursuant to the recommendation of Defendants Rumsfeld, Wolfowitz and Ashcroft.

29.        Upon information and belief, under the direction of Defendant Rumsfeld, military agents seized Mr. Padilla from the federal detention center in New York and transported

him to the Naval Consolidated Brig at the Naval Weapons Station in Charleston, South Carolina (hereinafter "Naval Brig").

30.    Mr. Padilla was not apprised of the basis for his detention or given an opportunity to challenge the fact or conditions of his detention before a neutral decision-maker.

31.    From June 9, 2002 until January 5, 2006, Mr. Padilla was held in military custody at the Naval Brig as an "enemy combatant" without criminal charge. There was no statutory or constitutional authority for this detention, which was in violation of Plaintiff's right not to be deprived of liberty without due process of law.  Mr. Padilla is not an enemy combatant.

32.    During his military detention, Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, and Guard Defendants (collectively, "Operational Defendants") created, approved and/or implemented an interrogation and detention program whereby they systematically and repeatedly attempted to extract forced confessions from Plaintiff, through the use of the methods detailed below, without regard to the truth or plausibility of these statements.

33.    From June 9, 2002 until March 2, 2004, when Mr. Padilla was finally permitted to have sporadic access to his lawyers, he was kept in near-total isolation from other human beings and from virtually all sensory experiences, beyond that which normally accompanies incarceration.

34.    Even after Mr. Padilla was permitted limited access to counsel, his conditions of confinement, including the extreme isolation, remained essentially the same.

35.    Operational Defendants subjected Mr. Padilla to this profound isolation and sensory deprivation with the specific intent to cause him severe mental pain and suffering.  These procedures were calculated to and actually did disrupt profoundly his senses and personality.

10

They were intended to and actually did cause Mr. Padilla prolonged mental harm. Operational Defendants' specific intent was to destroy Mr. Padilla's ordinary emotional and cognitive functioning and break his will, in order to extract information from him and punish him.

36.        Mr. Padilla was kept in virtually total isolation in a 9 x 7 feet cell, containing a bed, sink and toilet and a small window. The window was covered and did not allow any sunlight or view of the outdoors.

37.        Mr. Padilla was kept in a unit comprising sixteen individual cells, none of which was occupied. His cell was electronically monitored twenty-four hours a day, eliminating the need for a guard to patrol his unit. Other than when he was being interrogated, the only human contact was when a guard would deliver and retrieve trays of food through a slot in his cell door.

38.        Operational Defendants subjected Mr. Padilla to virtually complete sensory deprivation, beyond that which normally accompanies incarceration. The only window in his tiny cell looked out on the cell block hallway, but even that window was covered. For the bulk of his captivity, Operational Defendants declined to give Mr. Padilla a clock or a watch and, deprived of any natural light, he could not tell day from night, and did not know the day of the week or even the season. Operational Defendants intentionally intensified Mr. Padilla's disorientation by periodically subjecting him to bright light or absolute darkness for 24 hours or more.

39.        On rare occasions when he was removed from his cell – once to visit the dentist, for example – his eyes and ears were covered to continue the sensory deprivation. There was no security reason for these constraints, as Mr. Padilla was a docile prisoner who did not violate prison disciplinary rules.

40.         Operational Defendants intentionally deprived Mr. Padilla of sleep for nearly all of his military captivity.  Until the tail end of his captivity, Mr. Padilla's cell contained only a cold steel bunk slab with no mattress or blanket or pillow.  Forced to sleep on a cold, steel slab with no blanket or mattress caused severe physical pain and discomfort, and made sleep virtually impossible.  Furthermore, Guard Defendants and Interrogator Defendants regularly caused loud noises to enter Mr. Padilla's cell throughout the night, either by banging on the walls and bars of his cell or by opening and shutting doors to empty cells adjacent to his cell.  His cell was kept at uncomfortable temperature extremes.  The prolonged sleep deprivation was intentionally designed to increase Mr. Padilla's disorientation and caused further profound disruption of his sense and personality.

41.         Operational Defendants denied Mr. Padilla sufficient exercise and recreation, and often permitted him to exercise only at night, thereby depriving him of sunlight for months at a time.  When he was allowed to exercise, Mr. Padilla was taken to a concrete "cage" that, exacerbated his feeling of complete isolation from the external world.

42.         Operational Defendants also subjected Mr. Padilla to great physical hardship and pain with the specific intent to cause severe physical and mental pain and suffering.  Mr. Padilla was forced to sit or stand in markedly uncomfortable (or "stress") positions for hours at a time.  He was sometimes kept shackled and manacled for hours.

43.         Upon information and belief, Operational Defendants frequently introduced noxious fumes into Mr. Padilla's cell, causing pain and discomfort to his eyes and nose, or manipulated the environment to keep the cell very cold.

44.         In addition to the conditions of extreme isolation and sensory deprivation in which Mr. Padilla was held, Interrogator Defendants—based, on information and belief, on

instructions and/or approval from Supervisor Defendants and Senior Military and Policy

Defendants—employed various techniques to overbear Mr. Padilla's will during lengthy

interrogation sessions.  In addition to lying to Mr. Padilla about his location and the identity of

his interrogators, Interrogator Defendants, with the specific intent to cause Mr. Padilla severe

mental pain or suffering, threatened the following,:

      a.   to remove him from the United States to another country, including the U.S.
Naval Base at Guantanamo, where they told him he would receive far worse
treatment, including severe physical and mental pain and suffering;

      b.   to subject him to physical abuse that would result in severe physical pain and
suffering, such as being cut with a knife and having alcohol poured in the wounds,
or death; and

      c.   to kill him immediately.

45.      Interrogator Defendants—based, on information and belief, on instructions

and/or approval from Supervisor Defendants and Senior Military and Policy Defendants—

physically abused Mr. Padilla during interrogation sessions with the specific intent to cause

severe physical or mental pain and suffering.  The forms of physical abuse included but were not

limited to:

      a.   Mr. Padilla was forced to sit or stand in uncomfortable (or "stress") positions for
prolonged periods during interrogations;

      b.   Mr. Padilla, upon information and belief, was administered what he believed to be
psychotropic drugs against his will during and prior to interrogations.

46.      From June 9, 2002 until March 4, 2004, Mr. Padilla was denied all contact with

persons outside the military brig, including his family and lawyers.  His only regular human

13

contact was with interrogators during interrogation sessions, or with guards when they delivered his meals or escorted him to the shower or the concrete cage.

47.        The fact that Mr. Padilla was allowed no contact with counsel or the courts, and was being imprisoned without due process of law for what the government asserted could be an indefinite period of time, exacerbated the severe mental pain and suffering caused by the isolation and sensory deprivation. Mr. Padilla exhibited obvious signs of distress as a result of his treatment. Brig personnel, including Brig Technical Director Sandy Seymour, observed Mr. Padilla weeping in his cell on multiple occasions.

48.        On March 4, 2004, Mr. Padilla was finally allowed to meet with his attorneys, but only under very restricted conditions. Even after this meeting, Operational Defendants deliberately kept Mr. Padilla in extreme isolation from the outside world and in conditions of solitary confinement that resulted in profound disruption of his senses and personality, resulting in severe mental pain and suffering. In the nearly two year period between March 4, 2004 and January 5, 2006, for example, he was permitted to receive only two telephone calls from his mother. Mr. Padilla was never permitted to initiate telephone calls to his mother or to any other member of his family.

49.        From June 9, 2002 until March 4, 2004, Senior Military and Policy Defendants, Supervisor Defendants, and Legal Professional Defendants purposely and systematically deprived Mr. Padilla of all access to legal counsel and all access to the courts. They intentionally denied Mr. Padilla access to counsel, *inter alia*, because, according to a declaration of Defendant Jacoby dated January 9, 2003, they believed that anything that could give him hope "that his ultimate release may be obtained through an adversarial civil litigation process" would destroy the complete psychological dependency on his interrogators they were trying to create.

50.     Padilla was allowed contact with his attorneys only when the habeas corpus petition filed by his counsel was pending in the U.S. Supreme Court, at which time the government argued that the demand in that case for access to counsel was moot.  The government announced this change in policy on February 11, 2004, but because of security clearance procedures, counsel were not allowed to meet with Mr. Padilla until March 4, 2004.

51.     Even after March 4, 2004, Senior Military and Policy Defendants, Supervisor Defendants, and Legal Professional Defendants continued to interfere with Mr. Padilla's communications with counsel and to intimidate Mr. Padilla from speaking freely with his attorneys.  Mr. Padilla was only permitted to meet his attorneys in a confined room, with his ankles cuffed and locked onto a metal handle on the floor.  A select group of government attorneys, the "Privilege Team," reviewed all communication he received from his attorneys prior to his receiving them and asserted the power to have the "Privilege Team" review all notes taken by his attorneys.  Furthermore, upon information and belief, some of the Legal Professional and/or Supervisor Defendants listened to and recorded Mr. Padilla's conversations with his attorneys.

52.     Mr. Padilla's counsel were forced to sign Access Procedures that severely restricted their discussions with Mr. Padilla while he was in the military brig.  The Access Procedures stated that the "Privilege Team" would terminate any discussions between counsel and Mr. Padilla that involved "conveying information concerning the internal operations of the Brig" or "information concerning intelligence sources and methods."  Because of this, counsel were essentially barred from discussing with Mr. Padilla how he had been treated during his months of incommunicado interrogation, as well as the ongoing operations of the brig including the details of his conditions of confinement.  The Access Procedures also stated that they

15

reflected no determination or acknowledgment of an attorney-client relationship between counsel and Mr. Padilla, leading counsel reasonably to fear that Mr. Padilla's communications with them were monitored and might not be legally protected. In a Rider that they insisted be attached to the Access Procedures, counsel objected to the Access Procedures and stated that they felt themselves ethically precluded from discussing any potentially privileged topic with Mr. Padilla while the procedures were in place.

53.      Upon information and belief, Operational Defendants told Mr. Padilla that his attorneys were not trustworthy and actually were government officials. Furthermore, upon information and belief, Operational Defendants threatened Mr. Padilla, warning him not to reveal the true conditions of confinement to his counsel. In addition, the harm to his mental well-being that Mr. Padilla suffered as the result of his interrogations and conditions of confinement made it impossible for him to share the information necessary to assist his attorneys in their representation of him.

54.      At no point did Mr. Padilla's counsel understand the full scope of Mr. Padilla's conditions of confinement. Plaintiff, terrified of retaliation by Operational Defendants, refused to discuss his treatment with his counsel in any detail during the Relevant Period. Furthermore, upon questioning by Mr. Padilla's counsel, government officials within Operational Defendants' chain of command, including Capt. A.G. Kaufman of Joint Forces Command, Brig Technical Director Sandy Seymour, and Assistant to the Solicitor General David P. Salmons gave numerous assurances that Mr. Padilla was being held in humane conditions.

55.      Nonetheless, Mr. Padilla's counsel were concerned by what they could ascertain of Mr. Padilla's conditions of confinement, in particular, his severe isolation from other human beings and outside stimuli. Mr. Padilla's counsel also noticed signs of psychological distress in

Mr. Padilla, including involuntary twitching and self-inflicted scratch wounds. On several occasions, Mr. Padilla's counsel brought these concerns to the attention of government officials, including Capt. A.G. Kaufman of Joint Forces Command, Brig Technical Director Sandy Seymour, and Assistant to the Solicitor General David P. Salmons, who assured them that these concerns would be passed throughout the chain of command. Upon information and belief, these concerns were communicated to other Supervisor Defendants, Legal Professional Defendants and Senior Military and Policy Defendants. Moreover, brig personnel, concerned about Mr. Padilla's psychological distress, requested that he be permitted to eat with another inmate. Senior Military and Policy Defendants, Supervisor Defendants and/or Legal Professional Defendants denied that request. In response to other requests by counsel for other modest improvements in Mr. Padilla's conditions of confinement – such as requests that Mr. Padilla be allowed to take continuing education classes from instructors already teaching other inmates in the Brig – Senior Military and Policy Defendants, Supervisor Defendants and/or Legal Professional Defendants engaged in prolonged stalling tactics.

56.     When Mr. Padilla was first detained, Operational Defendants granted him access to a Qur'an. Shortly thereafter, however, Operational Defendants revoked that privilege until March 2004, when Mr. Padilla's counsel provided him with a copy of the Qur'an.

57.     Other than the Qur'an, which was briefly provided but quickly taken back, Mr. Padilla was denied reading material from the time of his imprisonment without charge in the military brig until March 2004.

58.     Upon information and belief, by depriving Mr. Padilla of any sense of time, Operational Defendants deliberately intended to interfere with Mr. Padilla's ability to pray and to keep holidays according to the strictures of his faith.

59.        Mr. Padilla was not permitted access to radio or television from the time of his imprisonment without charge in the military brig until March 2004.

60.        Beginning in summer 2004, Operational Defendants permitted Mr. Padilla only very limited access to television and reading material, further depriving him of normal stimuli and a sense of time.

61.        Mr. Padilla was denied necessary medical care.

    a.  First, through the elaborate measures described above at paragraphs 30 to 60, Operational Defendants deliberately caused Mr. Padilla to undergo extreme psychiatric stress without providing any psychiatric care, even when it became apparent that Mr. Padilla was suffering acute psychiatric harm and even after Mr. Padilla's counsel informed them or those within their chain of command that they had observed signs of psychiatric distress in Mr. Padilla, such as involuntary twitching and self-inflicted scratch wounds on his body.

    b.  Second, Operational Defendants deliberately denied or provided inadequate responses to Mr. Padilla's repeated requests for access to medical care for serious and potentially life-threatening ailments, including chest pain and difficulty breathing, as well as for treatment of the chronic, extreme pain caused by being forced to endure stress positions.

    c.  Third, Medical Professional Defendants conducted inadequate examinations and provided wholly inadequate and deliberately indifferent care given the extreme circumstances of Mr. Padilla's interrogation and confinement.

62.         Mr. Padilla was never given any explanation for the severe conditions of confinement in which he was held.  Mr. Padilla never violated any prison disciplinary rules, nor was he ever given the opportunity to contest the conditions of his confinement.

63.         Upon information and belief, the above treatment and conditions of confinement were not imposed for prison disciplinary or other legitimate administrative goals.  Mr. Padilla was a model prisoner who was never even accused of violating Brig rules; indeed, he was described by Brig officials as being so passive as to be "like a piece of furniture."  Rather, Operational Defendants designed them as part of a comprehensive system of torture and intimidation to coerce information from Mr. Padilla and to punish him without due process of law and without affording him the rights of a criminal defendant.

64.         Operational Defendants' systematic program to intimidate and dehumanize Mr. Padilla was a success.  As a result of his unlawful detention and mistreatment, Mr. Padilla has suffered and continues to suffer severe psychological and physical pain.

65.         Defendants' actions proximately caused Mr. Padilla to suffer a marked and severe deterioration in and irreversible harm to his mental well-being.

66.         These harms are exacerbated by Mr. Padilla's fear that he will again be detained as an enemy combatant, a possibility which the government has acknowledged.  The threat of his re-detention as an enemy combatant causes Mr. Padilla concrete, ongoing and irreparable harm – to his mental well-being, to his ability to properly assist his counsel in his criminal defense, and to his exercise of constitutional rights including but not limited to First Amendment rights -- that can only be remedied by an injunction against this possibility.

67.         Plaintiffs seek to vindicate their constitutional rights and ensure that neither Mr. Padilla nor any other person is treated this way in the future

68.        Plaintiffs seek monetary, injunctive and declaratory relief.

## PERSONAL PARTICIPATION OF DEFENDANTS

69.        As described herein, all Defendants acted under color of law and in violation of

Plaintiffs' clearly established constitutional, statutory, treaty and common law rights.

70.        The Senior Military and Policy Defendants and Defendant Ashcroft

recommended and/or ordered that Mr. Padilla be seized from the civilian criminal system and

transferred to military detention, and, upon information and belief, did so, *inter alia*, in order to

shield illegal detention and interrogation practices from judicial review and to deprive Mr.

Padilla of due process of law.

71.        On or about June 9, 2002, Defendants Ashcroft, Rumsfeld and Wolfowitz

personally recommended that Mr. Padilla be designated an "enemy combatant."  Upon that

recommendation, President George W. Bush declared Mr. Padilla an "enemy combatant" and

directed Defendant Rumsfeld to take Mr. Padilla into military custody.

72.        Senior Military and Policy Defendants were personally responsible for

developing, authorizing, supervising, and/or implementing the policies, patterns and/or practices

governing the detention and interrogation of Mr. Padilla during the Relevant Period, including

but not limited to unlawful detention and denial of due process, intentional infliction of severe

physical and mental pain and suffering, procedures designed to profoundly disrupt the senses and

personality, physical abuse, threats of imminent execution and physical abuse, denial of access to

courts and legal counsel, interference with access to counsel, denial of association with family

members and others, administration of drugs for what Mr. Padilla perceived to be non-medical

purposes, inhumane conditions of confinement, disruption of sleep, deliberate interference with

religious rights, unreasonable restrictions on communications and receipt of information,

inadequate provision of medical attention, and de facto denial of adequate recreation.  They were personally responsible for his unlawful detention.  Upon information and belief, they personally approved and/or were deliberately indifferent to the conditions of Mr. Padilla's confinement. Moreover, they allowed the continuation of these policies and practices and exhibited deliberate indifference in the supervision of subordinates who committed unconstitutional acts.

73.     Defendant Rumsfeld exercised command and control over all members of the U.S. military, including all individual military personnel tasked with direct contact with or responsibility for detainees, including Mr. Padilla.  Upon information and belief, Defendant Rumsfeld was directly involved in the decision to detain Mr. Padilla as an enemy combatant and in establishing and/or approving policies regarding Mr. Padilla's detention, interrogation, and conditions of confinement that proximately caused the violations alleged herein.  Alternatively, on information and belief, Defendant Rumsfeld had actual and/or constructive knowledge of the violations alleged herein and gave his tacit approval by taking no action to remedy them.

74.     On June 12, 2002, Defendant Rumsfeld said, with respect to Mr. Padilla, "We are not interested in trying him at the moment or punishing him at the moment.  We are interested in finding out what he knows."

75.     In December 2002, Defendant Rumsfeld personally approved a list of illegal interrogation techniques for use on "enemy combatant" detainees at Guantanamo which included the following:  the use of "stress positions," 20-hour interrogations, the removal of clothing, deception to make the detainee believe the interrogator was from a country with a reputation for torture, the use of falsified documents and reports, isolation for up to 30 days, and sensory deprivation.  These techniques were contrary to the established rules and military standards governing detention and interrogation as set forth in Army Field Manual 34-52 and other legal

sources.  Many of these same techniques were used against Mr. Padilla by Defendant Rumsfeld's

subordinates, upon information and belief, with Defendant Rumsfeld's knowledge and approval.

76.    In April 2003, Defendant Rumsfeld revised the list of permissible interrogation

techniques, but again personally approved techniques that were used against Mr. Padilla,

including:  isolation for up to thirty days, environmental manipulation, "sleep adjustment," and

deception to make the detainee believe the interrogator was from a country with a reputation for

torture, none of which is consistent with the authorized interrogation techniques in Army Field

Manual 34-52 and other legal sources.

77.    During the Relevant Period, Vice Admiral Lowell E. Jacoby was Director of the

Defense Intelligence Agency and reported directly to Defendant Rumsfeld.  In a January 9, 2003

declaration to the U.S. District Court for the Southern District of New York, Defendant Jacoby

attested that he was "familiar" with the interrogations of Mr. Padilla and gave the following

reason for his severe isolation: "Only after such time as Padilla has perceived that help is not on

the way can the United States reasonably expect to obtain all possible intelligence information

from Padilla . . . Providing him access to counsel now . . . would break – probably irreparably –

the sense of dependency and trust that the interrogators are attempting to create."   Upon

information and belief, Defendant Jacoby was directly involved in the decision to detain Mr.

Padilla as an enemy combatant and in establishing and/or approving policies regarding Mr.

Padilla's detention, interrogation, and conditions of confinement that proximately caused the

violations alleged herein.  Alternatively, on information and belief, Defendant Jacoby had actual

and/or constructive knowledge of the violations alleged herein and gave his tacit approval by

taking no action to remedy them.

78.     During part or all of the Relevant Period, Michael H. Mobbs was Special Advisor to Undersecretary of Defense for Policy.  Beginning in mid-February 2002, Defendant Mobbs was "substantially involved" in the creation and oversight of policy regarding the detention and interrogation of detainees, according to his declaration to the U.S. District Court for the Southern District of New York on August 27, 2002.  In that declaration, he attested to the basis for Mr. Padilla's designation as an "enemy combatant."  Upon information and belief, Defendant Mobbs was directly involved in establishing and/or approving policies regarding Mr. Padilla's detention, interrogation, and conditions of confinement that proximately caused the violations alleged herein.  Alternatively, on information and belief, Defendant Mobbs had actual and/or constructive knowledge of the violations alleged herein and gave his tacit approval by taking no action to remedy them.

79.     Supervisor Defendants were directly responsible for creating Mr. Padilla's day-to-day conditions of confinement.  Upon information and belief, Supervisor Defendants established, implemented and/or approved the unconstitutional policies alleged herein.  Alternatively, upon information and belief, they either personally directed subordinate guards to commit wrongful acts, and/or were deliberately indifferent to Mr. Padilla's constitutional and other rights by failing to act on actual or constructive knowledge that wrongful, unlawful and unconstitutional acts were occurring.  Upon information and belief, Supervisor Defendants had actual or constructive knowledge of the inappropriate and unconstitutional activities of their subordinates and nevertheless failed to act to stop such activities or to properly discipline their subordinates.  The Supervisor Defendants therefore deliberately and unlawfully supervised and participated in the creation and continuation of inhumane conditions of confinement for Plaintiff, including but not limited to unlawful detention and denial of due process, intentional infliction of

severe physical and mental pain and suffering, physical abuse, threats of imminent execution and physical abuse, denial of access to courts and legal counsel, interference with access to counsel, denial of association with family members and others, administration of drugs for what Mr. Padilla perceived to be non-medical purposes, inhumane conditions of confinement, disruption of sleep, deliberate interference with religious rights, unreasonable restrictions on communications and receipt of information, inadequate provision of medical attention, and de facto denial of adequate recreation.

80.     Upon information and belief, Legal Professional Defendants were directly responsible for interfering with Mr. Padilla's access to counsel and the courts and aiding and abetting the illegal detention, treatment and interrogation of Plaintiff. Upon information and belief, Legal Professional Defendants had actual or constructive knowledge of the unconstitutional conditions of Mr. Padilla's confinement. The Legal Professional Defendants therefore deliberately and unlawfully participated in the creation and continuation of inhumane conditions of confinement for Plaintiff, including but not limited to unlawful detention and denial of due process, intentional infliction of severe physical and mental pain and suffering, denial of access to courts and legal counsel, interference with access to counsel, denial of association with family members and others, inhumane conditions of confinement, disruption of sleep, deliberate interference with religious rights, unreasonable restrictions on communications and receipt of information, inadequate provision of medical attention, and de facto denial of recreation.

81.     Upon information and belief, Medical Professional Defendants provided expert assistance and advice and/or otherwise facilitated the creation, establishment and/or supervision of the unconstitutional detention and interrogation practices alleged herein. The Medical

Professional Defendants conducted inadequate examinations of Mr. Padilla and provided wholly inadequate and deliberately indifferent care given the extreme circumstances of his interrogation and confinement.  For example, in 2004, defendant Noble performed a wholly inadequate evaluation of Mr. Padilla's mental health, purporting to assess Mr. Padilla's mental health by conducting a short conversation through a slot in the door of his cell.  The Medical Professional Defendants therefore deliberately and unlawfully supervised and participated in the creation and continuation of inhumane conditions of confinement for Plaintiff.

82.      Interrogator Defendants directly infringed on Mr. Padilla's constitutional rights, and participated in the illegal interrogation methods and inhumane conditions of confinement challenged here.  In particular, Interrogator Defendants deliberately and unlawfully engaged in physical, psychological and/or verbal abuse against Mr. Padilla, including but not limited to: intentionally inflicting severe physical and mental pain and suffering, intentionally implementing procedures designed to profoundly disrupt Mr. Padilla's senses and personality, including isolation and sensory deprivation, forcing Mr. Padilla to remain in stress positions for long periods of time; administering what Mr. Padilla perceived to be drugs for non-medical purposes; subjecting Mr. Padilla to extreme cold; depriving Mr. Padilla of sleep for prolonged periods; and threatening Mr. Padilla with imminent execution and torture.  Furthermore, upon information and belief, Interrogator Defendants directed Guard and Supervisor Defendants to perpetrate additional violations of Mr. Padilla's constitutional rights, including but not limited to interference with access to counsel and the courts, inhumane conditions of confinement, intentionally inflicting severe physical and mental pain and suffering, intentionally implementing procedures designed to profoundly disrupt Mr. Padilla's senses and personality, including isolation and sensory deprivation, disruption of sleep, deliberate interference with religious

rights, unreasonable restrictions on communications and receipt of information, denial of association with family members and others, inadequate provision of medical attention, and/or de facto denial of adequate recreation.

83.        Upon information and belief, Guard Defendants directly infringed on Mr. Padilla's constitutional rights, and participated in the creation of the inhumane conditions of confinement challenged here, including but not limited to interference with access to counsel and the courts, administration of drugs for what Mr. Padilla perceived to be non-medical purposes, inhumane conditions of confinement, intentionally inflicting severe physical and mental pain and suffering, intentionally implementing procedures designed to profoundly disrupt Mr. Padilla's senses and personality, including isolation and sensory deprivation, disruption of sleep, deliberate interference with religious rights, unreasonable restrictions on communications and receipt of information, denial of association with family members and others, inadequate provision of medical attention, and/or de facto denial of adequate recreation.

84.        Plaintiffs have no administrative remedies or other effective means of enforcing his rights other than seeking relief from the Court.

## CLAIMS

85.        Mr. Padilla incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

86.        By adopting, promulgating, and implementing the policy and practice under which Mr. Padilla was unlawfully detained without due process of law, denied access to legal counsel and the courts, deprived of all contact with the outside world, denied the ability to practice his religion, and subjected to torture, outrageous, excessive, cruel, inhumane, and degrading treatment that shocks the conscience, Defendants, acting under color of law and their

authority as federal officers, have injured Mr. Padilla by violating numerous clearly established constitutional, statutory and treaty rights including, but not limited to, the following:

1.      The right of access to legal counsel, protected by the First, Fifth and Sixth Amendments to the U.S. Constitution. (Defendant John Ashcroft, Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants)

2.      The right of access to court, protected by the First and Fifth Amendments to the U.S. Constitution, Article III of the U.S. Constitution, and the Habeas Suspension Clause of Article I of the U.S. Constitution. (Defendant John Ashcroft, Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants)

3.      The right not to be deprived of life, liberty or property without due process of law, guaranteed by the Fifth Amendment of the U.S. Constitution, including multiple aspects of both procedural and substantive due process. (Defendant John Ashcroft, Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, Guard Defendants)

4.      The right to be free from coercive and involuntary custodial interrogation that is designed to overcome the will and to coerce involuntary and incriminating statements, and that shocks the conscience, all in violation of the Self-Incrimination and Due Process Clauses of the Fifth Amendment to the U.S. Constitution.  (Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, Guard Defendants)

5.        The right to be free from cruel or unusual punishment, guaranteed by the Eighth Amendment to the U.S. Constitution.  (Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, Guard Defendants)

6.        The right not to be subject to torture or to outrages on personal dignity, in particular, humiliating and degrading treatment, protected by the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the Eighth Amendment to the U.S. Constitution, federal statutes and regulations, Common Article 3 of the 1949 Geneva Conventions, the Torture Convention, and the International Covenant on Civil and Political Rights.  (Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, Guard Defendants)

7.        The right to free exercise of religion guaranteed under the First Amendment to the U.S. Constitution, as well as the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb.  (Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Interrogator Defendants, Guard Defendants)

8.        The right to information guaranteed under the First Amendment to the U.S. Constitution. (Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, Guard Defendants)

9.        The right to association with family and others guaranteed under the First Amendment to the U.S. Constitution. (Senior Military and Policy Defendants,

Supervisor Defendants, Legal Professional Defendants, Medical Professional

Defendants, Interrogator Defendants, Guard Defendants)

10.      The right not to be subject to illegal and arbitrary detention, guaranteed by

the Fourth and Fifth Amendments to the U.S. Constitution. (Defendant John Ashcroft,

Senior Military and Policy Defendants, Supervisor Defendants, Legal Professional

Defendants)

87.      In addition, Defendants have injured Ms. Lebron by adopting, promulgating,

and implementing the policy and practice under which she was unlawfully denied virtually all

contact with her son in violation of her right to association under the First Amendment of the

U.S. Constitution.

## PRAYER FOR RELIEF

88.      Plaintiffs therefore respectfully request that the Court enter a judgment for all

types of relief to which they are legally entitled under the facts of this case, including but not

limited to the following:

a.   A declaration that the acts alleged herein are unlawful and violate the Constitution;

b.   A declaration that the policy, pattern, or practice of the Defendants alleged herein is

unlawful and violates the Constitution;

c.   Damages in the amount of one dollar against each Defendant;

d.   An injunction against Mr. Padilla's re-detention as an enemy combatant;

e.   Attorneys' fees and costs; and

f.   All other appropriate relief as may be just and proper.

Respectfully submitted,

<u>S/Michael P. O'Connell</u>
Michael P. O'Connell
STIRLING & O'CONNELL
145 King Street, Suite 410
P.O. Box 882
Charleston, SC  29402
(843) 577-9890
South Carolina Identifications 4260

Jenny S. Martinez (*pro hac vice forthcoming)*
559 Nathan Abbot Way
Stanford, CA  94305
(650) 725-2749

Jonathan M. Freiman (*pro hac vice forthcoming*)
National Litigation Project
Allard K. Lowenstein International Human Rights Clinic
Yale Law School
P.O. Box 208215
New Haven CT 06520-8215
(203) 498-4584

*Of Counsel:*
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510-7001

\16771\2\649253.3