## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

Jose Padilla,                              :
                                           :       Case No. 2:07-cv-00410-HFF
  and                                  :
                                           :
Estela Lebron,                             :
                                           :
Plaintiffs                                 :
                                           :
v.                                         :
                                           :
Donald H. Rumsfeld, *Former Secretary of Defense,* :       **THIRD AMENDED COMPLAINT**
John Ashcroft, *Former Attorney General,*
Paul Wolfowitz, *Former Deputy*            :
*Secretary of Defense,*
Vice Admiral Lowell E. Jacoby,             :
*Former Director, Defense Intelligence Agency,* :
Michael H. Mobbs, *Special Advisor to*     :
*Undersecretary of Defense for Policy,*    :
William Haynes, Former *General Counsel,*  :
*Department of Defense,*                   :
Catherine T. Hanft,                        :
*Former Commander, Consolidated Brig,*     :
Melanie A. Marr,                           :
*Former Commander, Consolidated Brig,*     :
Stephanie L. Wright,                       :
*Commander, Consolidated Brig,*            :
Mack D. Keen, *Senior Chief, Consolidated Brig,* :
Sandy Seymour, *Technical Director,*       :
*Consolidated Brig*                        :
Dr. Craig Noble,                           :
John Does, 1-48,                           :
IN THEIR INDIVIDUAL CAPACITIES,            :
                                           :
  and                                  :
                                           :
Robert M. Gates, *Secretary of Defense,*   :
IN HIS OFFICIAL & INDIVIDUAL CAPACITIES:   :
                                           :
Defendants.                                :

## INTRODUCTION

1.     Plaintiff Jose Padilla is a United States citizen who was imprisoned in a military brig in Charleston, South Carolina, without charge, and without ability to defend himself or to challenge his conditions of confinement.  During his military detention, which lasted three years and eight months, Mr. Padilla suffered gross physical and psychological abuse upon the orders of high-ranking government officials as part of a systematic program of abusive interrogation mirroring the abuses committed at Guantanamo Bay, including but not limited to: extreme isolation; interrogation under threat of torture, deportation, and even death; prolonged sleep adjustment and sensory deprivation; exposure to extreme temperatures and noxious odors; denial of access to necessary medical and psychiatric care; substantial interference with his ability to practice his religion; and almost two years without any access to family, counsel, or the courts.

2.     Mr. Padilla's designation as an enemy combatant, military detention, conditions of confinement, and program of interrogation were unlawful and violated, *inter alia*: his rights to procedural and substantive due process; his right not to be subjected to cruel or unusual punishment or treatment that shocks the conscience or otherwise violates United States laws and regulations; his right freely to exercise his religion; his right to access information; his right to association with family members and friends; his right of access to legal counsel; his right of access to court; his right against compelled self-incrimination; and his right against arbitrary and unconstitutional seizure and military detention.

3.     Mr. Padilla suffered and continues to suffer severe mental and physical harm as a result of the forty-four months of unlawful military detention and interrogation that Defendants planned, authorized, and/or implemented, as well as ongoing deprivation of liberty, stigmatization, and psychological trauma from the "enemy combatant" designation, which

remains in effect, and upon the basis of which the government has reserved the right to re-detain Mr. Padilla at any time.

4.    Plaintiff Estela Lebron, Mr. Padilla's mother, was deprived of virtually all contact with him, in violation of her constitutional rights to familial association and communication.  Ms. Lebron was injured by the continued denial of her right to association with her son during his prolonged, unlawful military detention.

5.    Defendants Rumsfeld, Haynes, Jacoby, Wolfowitz, Mobbs, and John Does 1-10, with deliberate indifference to an obvious risk of serious harm to Mr. Padilla and his mother, conspired to bring about a regime of extreme and unlawful detention and interrogation of suspected enemy combatants, to cloak those practices with the appearance of legality and to immunize from prosecution those who broke the law by implementing them, and then authorized or permitted the application of those unlawful policies even to U.S. citizens held on U.S. soil, thereby proximately and foreseeably causing the harms to Plaintiffs alleged herein.

6.    Defendant Ashcroft, with deliberate indifference to an obvious risk of serious harm to Mr. Padilla and his mother,  personally approved the decision to designate Mr. Padilla an "enemy combatant," and failed to take steps to prevent the formulation and approval of unlawful interrogation techniques, including by his own subordinates at OLC, thereby proximately and foreseeably causing Mr. Padilla to be removed from the civilian justice system, deprived of access to courts, counsel and the outside world, and subjected to unlawful and coercive interrogation.

7.    Defendants Hanft, Wright, Keen, Seymour, Noble and interrogators, guards, and legal and medical professionals John Does 11-48, with deliberate indifference to an obvious risk of

serious harm to Mr. Padilla and his mother, implemented the unlawful regime devised and authorized by Senior Defense Policy Defendants.

8.    Defendant Gates, with deliberate indifference to a substantial risk of harm to Mr. Padilla, has failed to take steps: to rescind the suspected "enemy combatant" designation that still attaches to Mr. Padilla; to declare that the Department of Defense will not militarily re-detain Mr. Padilla pursuant to that designation; to promulgate, train his subordinates in, and enforce, policies requiring that the conditions of confinement applicable to suspected "enemy combatants" imprisoned by the military in the United States be consistent with the Constitution, laws of the United States and military regulations; or to pursue known violations of the requirements for conditions of confinement and interrogation of military detainees imposed by military regulations, including, but not limited to, the Department of the Navy Corrections Manual, SECNAV Instruction 1640.9c, and Army Regulation 190-8.    By these inactions, Defendant Gates has proximately and foreseeably subjected Mr. Padilla to an imminent risk of redetention under the very same unlawful conditions, and to ongoing deprivation of liberty, stigmatization, and psychological trauma.

9.    Plaintiffs Padilla and Lebron assert this complaint against all Defendants in their individual capacities and against Defendant Gates in both his individual and official capacities. Plaintiffs seek monetary damages in the amount of $1 dollar from each Defendant, except Defendant Gates, who is sued for injunctive and declaratory relief only.

## JURISDICTION

10.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 42 U.S.C. § 2000bb (Religious Freedom Restoration Act), 5 U.S.C. § 702

3

(Administrative Procedures Act), and directly under the Constitution, as interpreted by *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e).

## PARTIES

12.     Mr. Padilla is an American citizen.  From on or about June 9, 2002 until on or about January 5, 2006 (the "Relevant Period"), Mr. Padilla was detained as an "enemy combatant" at the Naval Consolidated Brig at the Naval Weapons Station in Charleston, South Carolina ("Brig").   On January 5, 2006, Mr. Padilla was transferred from the Brig to a federal detention center in Miami, Florida, where he stood trial before Hon. Marcia G. Cooke of the U.S. District Court for the Southern District of Florida on criminal charges unrelated to the allegations that had been used to justify his military detention without charge.  On August 16, 2007, the jury returned a verdict of guilty; the judgment is currently subject to appeal.

13.     Ms. Lebron is an American citizen and the mother of Mr. Padilla.  For the Relevant Period, Ms. Lebron was denied virtually all contact with her son, Mr. Padilla.[1]

### Senior Defense Policy Defendants

14.     During the Relevant Period, Defendant Donald H. Rumsfeld was Secretary of Defense, the highest-ranking civilian official in the U.S. Department of Defense.  As such, Defendant Rumsfeld exercised command and control over all members of the U.S. military, including all individual military personnel tasked with direct contact with or responsibility for individuals designated as "enemy combatants," including Mr. Padilla.   Upon information and belief,

---

[1] Plaintiff Lebron originally sued for herself and as next friend for her son Plaintiff Jose Padilla. Mr. Padilla was found competent to stand trial by the U.S. District Court for the Southern District of Florida, on February 28, 2007, though that may be the subject of appeal.  In light of the district court's ruling, there is currently no need for this Court to resolve the next friend issue.

Defendant Rumsfeld is a citizen of the United States and a resident of Illinois, where he maintains his primary residence. He is sued in his individual capacity.

15.    During the Relevant Period, Defendant William J. Haynes was General Counsel to the Department of Defense. Upon information and belief, Defendant Haynes is a citizen of the United States and a resident of California. He is sued in his individual capacity.

16.    During most of the Relevant Period, Paul Wolfowitz was Deputy Secretary of Defense. Upon information and belief, Defendant Rumsfeld expressly assigned Defendant Wolfowitz responsibility for questions regarding individuals detained as suspected "enemy combatants," as head of Detainee Affairs. Upon information and belief, Defendant Wolfowitz is a citizen of the United States and a resident of Maryland. He is sued in his individual capacity.

17.    During the Relevant Period, Vice Admiral Lowell E. Jacoby was Director of the Defense Intelligence Agency ("DIA") and reported directly to Defendant Rumsfeld. The DIA houses the Defense HUMINT Service ("DHS") which handles all human-source intelligence collection within the Department of Defense, including gathering intelligence on suspected "enemy combatants" by interrogation, and developing intelligence techniques. Upon information and belief, Defendant Jacoby is a citizen of the United States and a resident of Virginia. He is sued in his individual capacity.

18.    During part or all of the Relevant Period, Michael H. Mobbs was Special Advisor to the Undersecretary of Defense for Policy, a position which included heading the Detainee Policy Group. Upon information and belief, Defendant Mobbs is a citizen of the United States and a resident of Virginia. He is sued in his individual capacity.

19.    Plaintiffs do not know the true names and capacities of other Senior Defense Policy Defendants sued herein and therefore sue these defendants by fictitious names, John Does 1-10.

Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. John Does 1-10, upon information and belief, are government officials (both civilian and military) responsible for policy who created and/or approved and/or provided legal, medical, or other expert advice and assistance regarding the designation of Mr. Padilla as an "enemy combatant," and the program of detention and interrogation applied to Mr. Padilla, which proximately caused the violations described below. The identities of these Defendants have been deliberately concealed and/or treated as classified information by the government, and Plaintiffs through the exercise of reasonable diligence have not yet been able to ascertain their true names or specific involvement in the violations described herein.

### Secretary of Defense Robert Gates

20.     Robert Gates is currently Secretary of Defense, the highest-ranking civilian official in the U.S. Department of Defense. He is sued in his individual and official capacities for declaratory and injunctive relief only. Upon information and belief, Defendant Gates is a citizen of the United States and a resident of Washington.

### Former Attorney General John Ashcroft

21.     During most of the Relevant Period, Defendant John Ashcroft was Attorney General, the highest-ranking official in the U.S. Department of Justice, with supervisory authority over, and ultimate responsibility for the work product of, the Office of Legal Counsel. Upon information and belief, Defendant Ashcroft is a citizen of the United States and a resident of Virginia, where he maintains his primary residence. He is sued in his individual capacity.

### Military Supervisor Defendants

22.     During part of the Relevant Period, Defendant Catherine T. Hanft was the Commander of the Brig and was responsible for supervising lower-ranking Brig personnel, overseeing Mr.

Padilla's day-to-day treatment and conditions of confinement, and for receiving, and implementing orders from higher-ranking members of the chain of command with respect to Mr. Padilla's detention and interrogation. Defendant Hanft is sued in her individual capacity. Upon information and belief, Defendant Hanft resides within the District of South Carolina.

23.    During part of the Relevant Period, Defendant Melanie A. Marr was the Commander of the Brig, and was responsible for supervising lower-ranking Brig personnel, overseeing Mr. Padilla's day-to-day treatment and conditions of confinement, and for receiving, and implementing orders from higher-ranking members of the chain of command with respect to Mr. Padilla's detention and interrogation. Defendant Marr is sued in her individual capacity. Upon information and belief, Defendant Marr resides within the District of South Carolina.

24.    During part of the Relevant Period, Defendant Stephanie L. Wright was the Commander of the Brig, and was responsible for supervising lower-ranking Brig personnel, overseeing Mr. Padilla's day-to-day treatment and conditions of confinement, and for receiving, and implementing orders from higher-ranking members of the chain of command with respect to Mr. Padilla's detention and interrogation. Defendant Wright is sued in her individual capacity. Upon information and belief, Defendant Wright resides within the District of South Carolina.

25.    During part or all of the Relevant Period, Defendant Sandy Seymour was Technical Director of the Brig, and was responsible for supervising lower-ranking Brig personnel, overseeing Mr. Padilla's day-to-day treatment and conditions of confinement, and for receiving, and implementing orders from higher-ranking members of the chain of command with respect to Mr. Padilla's detention and interrogation.  Defendant Seymour is sued in his individual capacity. Upon information and belief, Defendant Seymour resides within the District of South Carolina.

26.     During part or all of the Relevant Period, Defendant Mack D. Keen was the senior non-commissioned officer at the Brig and was responsible for supervising lower-ranking Brig personnel, overseeing Mr. Padilla's day-to-day treatment and conditions of confinement, and for receiving, and implementing orders from higher-ranking members of the chain of command with respect to Mr. Padilla's detention and interrogation.  Defendant Keen is sued in his individual capacity.  Upon information and belief, Defendant Keen resides within the District of South Carolina.

27.     Plaintiffs do not know the true names and capacities of other Military Supervisor Defendants sued herein and therefore sue these defendants by fictitious names, John Does 11-18. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Upon information and belief, John Does 11-18 exercised supervisory authority over lower-ranking Brig personnel and shared responsibility for Mr. Padilla's day-to-day treatment and conditions of confinement, and for receiving, and implementing orders from higher-ranking members of the military chain of command with respect to Mr. Padilla's detention and interrogation.  Their identities have been deliberately concealed and/or treated as classified information by the government, and Plaintiffs through the exercise of reasonable diligence have not yet been able to ascertain their true names and/or specific involvement in the violations described herein.  Upon information and belief, these persons were instructed to conceal their names from Mr. Padilla, and their name tags were covered up in his presence.

**Legal Professional Defendants**

28.     Plaintiffs do not know the true names and capacities of the Legal Professional Defendants sued herein and therefore sue these defendants by fictitious names, John Does 19-23.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Upon

information and belief, John Does 19-23 are legal professionals who assisted in formulating the program of confinement and interrogation applied to suspected "enemy combatants," including Mr. Padilla, and/or directly interfered with Mr. Padilla's access to counsel, the courts, and his family. Their identities have been deliberately concealed and/or treated as classified information by the government, and Plaintiffs through the exercise of reasonable diligence have not yet been able to ascertain their true names and/or specific involvement in the violations described herein.

**Medical Professional Defendants**

29.    Upon information and belief, Dr. Craig Noble was staff psychiatrist at the Brig during part or all of the Relevant Period and was responsible for monitoring and treating or supervising the monitoring and treatment of Mr. Padilla's psychiatric health while confined at the Brig.

30.    Plaintiffs do not know the true names and capacities of the other Medical Professional Defendants sued herein and therefore sue these defendants by fictitious names, John Does 24-28. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Upon information and belief, John Does 24-28 are the military and civilian medical and psychiatric personnel who were responsible for Mr. Padilla's medical and psychiatric care and/or supervised and/or assisted with medical aspects of Mr. Padilla's interrogation sessions. Their identities have been deliberately concealed and/or treated as classified information by the government, and Plaintiffs through the exercise of reasonable diligence have not yet been able to ascertain their true names and/or specific involvement in the violations described herein. Upon information and belief, these persons were instructed to conceal their names from Mr. Padilla, and their name tags were covered up in his presence.

### Interrogator Defendants

31.     Plaintiffs do not know the true names and capacities of Interrogator Defendants sued

herein and therefore sue these defendants by fictitious names, John Does 29-38.  Plaintiffs will

amend this complaint to allege their true names and capacities when ascertained.  John Does 29-

38 directly participated in and/or knew of but took no steps to prevent the illegal interrogation

practices and other mistreatment of Mr. Padilla described below.  Their identities have been

deliberately concealed and/or treated as classified information by the government, and Plaintiffs

through the exercise of reasonable diligence have not yet been able to ascertain their true names

and/or specific involvement in the violations described herein.  Upon information and belief,

these persons were instructed to conceal their names from Mr. Padilla, and their name tags were

covered up in his presence.

### Guard Defendants

32.     Plaintiffs do not know the true names and capacities of the Guard Defendants sued herein

and therefore sue these defendants by fictitious names, John Does 39-48.  Plaintiffs will amend

this complaint to allege their true names and capacities when ascertained.  John Does 39-48 were

military or civilian personnel assigned to guard Mr. Padilla during his detention who directly

participated in the abuses detailed herein or demonstrated deliberate indifference to Mr. Padilla's

constitutional rights by failing to act on actual or constructive knowledge of the illegal conditions

of confinement and abusive interrogation practices described below.  Their identities have been

deliberately concealed and/or treated as classified information by the government, and Plaintiffs

through the exercise of reasonable diligence have not yet been able to ascertain their true names

and/or specific involvement in the violations described herein.  Upon information and belief,

these persons were instructed to conceal their names from Mr. Padilla, and their name tags were covered up in his presence.

33.     The Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, and Guard Defendants are referred to collectively in this complaint as "Operational Defendants."

34.     Unless otherwise stated, the collective term "Defendants" is intended to refer to all Defendants except Defendant Gates, who will be referred to individually.

## FACTUAL ALLEGATIONS

### Mr. Padilla's Illegal Seizure and Military Detention

35.     On or about May 8, 2002, Mr. Padilla was arrested in Chicago O'Hare International Airport, pursuant to a material witness warrant issued by the U.S. District Court for the Southern District of New York.  He was transported to New York where he was held in custody in a federal detention facility.  He was assigned court-appointed counsel, and a motion to vacate the material witness warrant was filed.

36.     Government lawyers, with the knowledge and participation of Defendants Rumsfeld and Ashcroft and, upon information and belief, Defendants Haynes, Jacoby, Wolfowitz, Mobbs and Senior Defense Policy Defendants John Does 1-10, developed an extra-judicial, ex parte assessment of enemy combatant status followed by indefinite military detention, without notice or opportunity for a hearing of any sort, which completely precluded judicial review of the designation.

37.     Under the policy developed by Senior Defense Policy Defendants and described by Alberto Gonzales ("Gonzales") in a speech to the American Bar Association given on February 24, 2004 ("Gonzales Speech"), attached hereto as Exhibit 1, a U.S. citizen apprehended on U.S. soil thousands of miles from any battlefield but suspected of terrorist activity could be consigned

to indefinite military detention without notice or opportunity for a hearing of any sort and without access to counsel, courts, or family, on the basis of extra-judicial, ex parte assessment of secret intelligence information by a handful of executive officials.

38.     Consistent with the procedure described by Gonzales, Defendants Rumsfeld, Ashcroft and, upon information and belief, Haynes, Jacoby, Wolfowitz, Mobbs and Senior Defense Policy Defendants John Does 1-10, personally approved Mr. Padilla's designation and military detention as an "enemy combatant" without access to counsel, courts, or family, and without due process of law.

39.     Upon information and belief, a significant portion of the evidence upon which Defendants Rumsfeld, Ashcroft and, upon information and belief, Haynes, Jacoby, Wolfowitz, Mobbs and Senior Executive Officials John Does 1-10, relied in recommending that Mr. Padilla be deprived of his freedom was, and was known to Defendants to be, a constitutionally inadequate basis for seizure, consisting of plainly unreliable and uncorroborated statements by two suspected terrorists detained and interrogated outside of the United States, at least one of whom had been questioned while under treatment with various kinds of medication. *See* Declaration of Michael J. Mobbs, Special Advisor to the Under Secretary of Defense for Policy, August 27, 2002, attached as Exhibit 2.

40.     There was no statutory or constitutional authority for Mr. Padilla's designation as an "enemy combatant" and seizure and detention by the military, which were in violation of his constitutional rights to be free from arbitrary seizure and detention and deprivation of liberty without due process of law.

41.    Senior Defense Policy Defendants and Defendant Ashcroft knew or intentionally disregarded that this extra-judicial ex parte procedure for designating a U.S. citizen as an enemy combatant without notice or opportunity for a hearing of any kind violated U.S. law.

42.    Upon the recommendations of Senior Defense Policy Defendants and Defendant Ashcroft, President George W. Bush issued an order dated June 9, 2002, attached hereto as Exhibit 3, declaring Mr. Padilla an "enemy combatant" and directing Defendant Rumsfeld to take Mr. Padilla into military custody.

43.    Defendant Rumsfeld then caused Mr. Padilla to be militarily detained by "order[ing] the U.S. Armed Forces to take control of Padilla as an 'enemy combatant' and hold him at the Naval Consolidated Brig, Charleston, South Carolina."  *See* Mobbs Declaration, Ex 2.

44.    Mr. Padilla is not an "enemy combatant" and the factual basis for his designation as such has never been reviewed by any court.

45.    Mr. Padilla was held in military custody at the Brig for more than three and a half years (from June 9, 2002, until January 5, 2006).

**Senior Defense Policy Defendants Developed a Program of Illegal Interrogation and Detention of Suspected Enemy Combatants.**

46.    Upon information and belief, Defendants Rumsfeld, Haynes, Jacoby, Wolfowitz, Mobbs, and Senior Defense Policy John Does 1-10, purposely designed, approved and/or ordered the use of extreme methods of detention and interrogation prohibited by the U.S. Constitution, statutes and military regulations, as well as international treaties and customary international law.  Upon information and belief, Senior Defense Policy Defendants knew or intentionally disregarded that such policies would be unlawful and feared that government agents implementing such policies could face criminal prosecution.  Upon information and belief, Senior Defense Policy Defendants nonetheless worked to bring about the desired but unlawful detention and

13

interrogation regimes, to cloak them with the appearance of legality, and to immunize from prosecution those who broke the law by implementing them.

47.    According to Deputy Assistant Attorney General John Yoo in his book "War by Other Means," as early as December 2001, "senior lawyers from the attorney general's office, the White House counsel's office, the Departments of State and Defense, and the NSC," began to meet "to develop policy in the war on terrorism." According to former Assistant Attorney General Jack Goldsmith ("Goldsmith"), this group styled itself the "War Council" and was both secretive and highly-influential in setting policy. Members of the War Council included Alberto Gonzales, John Yoo, then-Counsel to the Vice President David Addington, as well as Defendant Haynes.

48.    During the winter of 2001, in accordance with U.S. law and military regulations, the U.S. Central Command was extending Geneva Convention protections to those captured in Afghanistan. Defendants Rumsfeld, Haynes, Jacoby, Wolfowitz, Mobbs, and Senior Defense Policy John Does 1-10, along with members of the War Council, conspired to have the President declare the Conventions inapplicable to suspected members of the Taliban and al Qaeda, a conclusion that former Undersecretary of Defense for Policy Douglas Feith has admitted was designed to free U.S. agencies from the Conventions' prohibition on torture and cruel and degrading treatment. As Newsweek reported in a January 25, 2008 article attached hereto as part of Exhibit 4, "orders came down the political chain at DOD that the Geneva Conventions were to be reinterpreted to allow tougher methods of interrogation." Concerned by this development, Judge Advocate Generals "went to see Scott Horton, a specialist in international human-rights law," and told him that the chain of command at the Department of Defense was engaged in "a

calculated effort to create an atmosphere of legal ambiguity" about the interpretation and application of the Conventions.

49.      In furtherance of the unlawful detention and interrogation policies developed by Senior Defense Policy Defendants, Defendants Haynes and Rumsfeld directed Mr. Yoo to draft a series of legal memoranda (the "Memos") crafted to provide a veneer of legality for those policies and to provide immunity from prosecution for those who implemented them.   For example, an October 17, 2007 Newsweek article, attached hereto as part of Exhibit 4, reports that an August 2002 memo prepared by Mr. Yoo and concluding that acts of interrogation would not constitute torture unless they caused pain "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death," was prepared as a follow-up to a July 2002 War Council meeting at which the War Council "discussed in great detail how to legally justify" "pressure techniques proposed by the CIA," including waterboarding, mock burial, and open-handed slapping of suspects.

50.      The Memos included but were not limited to:

        a.      A memorandum dated October 23, 2001 to Gonzales  and Defendant Haynes regarding *Authority for Use of Military Force to Combat Terrorist Activities Within the United States*, which concluded, inter alia, that "the Fourth Amendment had no application to domestic military operations," and "restrictions outlined in the Fifth Amendment simply do not address actions the Executive takes in conducting a military campaign against the nation's enemies." Though the memorandum involves the use of military force within the United States, the Executive branch has so far refused to release the memorandum to the American public;

        b.      A memorandum dated December 21, 2001 to Defendant Haynes regarding *Possible Criminal Charges Against American Citizen Who Was a Member of the Al Qaeda*

*Terrorist Organization or the Taliban Militia.* The Executive branch has so far refused to release the memorandum to the public;

    c.     A draft memorandum dated January 9, 2002 to Defendant Haynes on the *Application of Treaties and Laws to al Qaeda and Taliban Detainees* (attached hereto as Exhibit 5);

    d.     A memorandum dated January 22, 2002 to Gonzales on the *Application of Treaties and Laws to al Qaeda and Taliban Detainees*, signed by Jay Bybee but drafted by Yoo (attached hereto as Exhibit 6);

    e.     A memorandum dated February 26, 2002 to Defendant Haynes on *Potential Legal Constraints Applicable to Interrogations of Persons Captured by U.S. Armed Forces in Afghanistan*, signed by Bybee but, upon information and belief, created by Mr. Yoo (attached hereto as Exhibit 7);

    f.     Upon information and belief, an OLC memorandum drafted in or about May 2002 regarding access to counsel and legal mail by detainees held at the naval brigs in Norfolk and Charleston;

    g.     A memorandum dated June 27, 2002 to Assistant Attorney General Bryant of the Office of Legislative Affairs regarding *The Applicability of 18 U.S.C. Sec. 4001(a) to Military Detention of United States Citizens.* The Executive branch has so far refused to release the memorandum to the public;

    h.     A memorandum dated August 1, 2002 to Gonzales on *Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A*, signed by Bybee but, upon information and belief, created by Yoo, attached hereto as Exhibit 8, concluding, inter alia, that an interrogation

technique must cause damage that rises "to the level of death, organ failure, or the permanent impairment of a significant body function," in order to be considered torture;

      i.     Upon information and belief, a second memorandum produced during August 2002 addressing the legality of particular interrogation techniques that the CIA wished to employ. The Executive branch has so far refused to release the memorandum to the public;

      j.     An opinion dated March 14, 2003 to Defendant Haynes, on *Military Interrogation of Alien Unlawful Combatants Held Outside the United States*, extending authority to use harsh interrogation techniques against high-level prisoners held at Guantanamo Bay and other facilities under DOD control (attached hereto as Exhibit 9).

51.    In furtherance of the unlawful detention and interrogation policies devised by Senior Defense Policy Defendants, the Memos advised inter alia that there were no legal constraints — either domestic or international — on the Executive's policies with respect to the detention and interrogation of suspected terrorists. According to the Memos, neither the Fourth nor Fifth Amendments placed any limitations on the President's power to capture, interrogate or detain or terrorism suspects whether held abroad or within the United States. Likewise, the memoranda instructed that the Geneva Conventions were inapplicable to detention and interrogation of terrorism suspects.

52.    The Memos did not provide the fair and impartial evaluation of the law required by OLC tradition and the ethical obligation of an attorney to provide the client with an exposition of the law adequate to make an informed decision. Rather, as former CIA director James Woolsey, Defense Policy Board member Professor Ruth Wedgwood, and former Assistant Attorney General Goldsmith have variously observed, the Memos are "deeply flawed: sloppily reasoned, overbroad, and incautious," "rest on cursory and one-sided legal arguments," "lack the tenor of

detachment and caution that usually characterizes OLC work," and patently "bend and twist to avoid any legal restrictions." Goldsmith has further observed that "[i]n their redundant and one-sided effort to eliminate any hurdles posed by the torture law, and in their analysis of defenses and other ways to avoid prosecution for executive branch violation of federal laws, the opinions could be interpreted as if they were designed to confer immunity for bad acts." According to Alberto Mora, then-General Counsel to the Navy, Yoo's memo on interrogation techniques was "fundamentally in error." Mora went on explain that "[b]ecause [the memo] identifies no boundaries to action – more it alleges there are none – it is virtually useless as guidance as now drafted and dangerous in that it might give a false sense of comfort." *See* Alberto J. Mora, *Memorandum for Inspector General, Department of the Navy*, July 7, 2004 ("Mora Memo"), attached hereto as Exhibit 10.

53.    Upon information and belief, the Memos intentionally were not circulated to other government agencies with relevant expertise, such as the State Department but, as Goldsmith concluded, "were deliberately withheld from other agencies in order to control the outcome and minimize resistance."

54.    Senior Defense Policy Defendants' instrumental use of OLC work-product to further their policy agenda was an open secret in the administration: Defendant Ashcroft privately nicknamed Mr.Yoo "Dr. Yes," and Goldsmith was warned that his opinion on a legal question related to Iraqi insurgents would be unwelcome in the White House because "[t]hey've never been told 'no.'"

55.    As head of the Justice Department until 2005, Defendant Ashcroft was responsible for the OLC opinions purporting to provide legal sanction for aggressive military detention and interrogation programs. Defendant Ashcroft failed to supervise appropriately the production of

these opinions, and wilfully ignored the fact that they provided legal advice that was plainly contrary to well-established legal precedents and patently created a substantial risk that lower-ranking government agents would subject detainees to serious physical harm.

56.     Defendants Rumsfeld, Ashcroft, Haynes, Wolfowitz, Jacoby, and John Does 1-10 were personally involved in making decisions about the range of interrogation techniques that should be generally permitted and even the specifics of individual detainees' conditions of detention and interrogation.

57.     According to recent news report, Defendant Ashcroft participated in meetings of senior Executive branch officials at which specific and clearly illegal interrogation techniques were discussed, at which he asked aloud: "Why are we talking about this in the White House?  History will not judge this kindly."

58.     In approximately 2001, Defendant Haynes expressly instructed those responsible for interrogating John Walker Lindh to "take the gloves off."

59.     In mid-2002, Defendant Rumsfeld personally approved the interrogation plan for Guantanamo detainee Mohammed al-Qahtani and followed up with a personal memo to Major General Dunlavey, the head of Joint Task Force 170, which was charged with overseeing interrogation operations at Guantanamo, suggesting interrogation approaches.

60.     Major General Dunlavey also received suggestions on interrogation practices from Defense Human Intelligence Services (DHS), a component of the Defense Intelligence Agency directed by Defendant Jacoby.

61.     According to a declassified FBI email dated January 1, 2004, attached hereto as Exhibit 12, Defendant Wolfowitz personally approved specific interrogation techniques in use at Guantanamo Bay.

62.    Defendant Haynes and high-ranking government lawyers visited Guantanamo Bay, Cuba on September 25, 2002 to observe the ongoing interrogation of al-Qahtani.  During that trip, the visitors suggested certain interrogation techniques and brought the message, on information and belief from Defendant Rumsfeld, that interrogators were to "do whatever needed to be done."

63.    The following day, Defendant Haynes and the same group of high-ranking government lawyers, visited the Brig and received an hour-long tour and briefing in connection with Mr. Padilla's detention.

64.    Several weeks later, on October 11, 2002, Major General Dunlavey submitted a request for authorization of additional interrogation techniques not permitted under the standards set by FM 34-52 and Common Article 3 of the Geneva Conventions.    Exhibit 11.    As the correspondence around the request makes clear, the proposed techniques were developed in consultation with the Office of the Secretary of Defense.

65.    On November 27, 2002, Defendant Haynes provided Defendant Rumsfeld with a memo (Haynes Memo), attached hereto as Exhibit 13, recommending that Rumsfeld immediately authorize a majority of the previously prohibited interrogation techniques listed in Dunlavey's request.

66.    The Haynes Memo further advised that waterboarding, threats of death, and exposure to cold weather and water "may be legally available" but should not be the subject of a "blanket approval . . . at this time."

67.    Also on November 27, 2002, an FBI special agent sent a memorandum to FBI legal counsel, attached hereto as Exhibit 14, stating that the techniques recommended for implementation by the Haynes Memo were unlawful under the U.S. Constitution and could violate the U.S. Torture Statute, exposing agents who used them to criminal liability.  Upon

information and belief, these concerns were shared with Defendant Haynes who wilfully ignored them.

68.    Upon information and belief, Defendant Haynes deliberately failed to subject the Haynes Memo to the normal process of consultation with other military components.  In particular, the Haynes Memo was not signed by the Chairman of the Joint Chiefs of Staff, General Myers, a fact that was remarked upon by Defendant Rumsfeld's senior military assistant, Lieutenant General Craddock.

69.    Despite the concerns of the FBI and the absence of signatures from key parties, on December 2, 2002, Secretary Rumsfeld accepted the Haynes Memo and authorized the use of the following interrogation techniques:

     a)  Yelling;

     b)  Deception;

     c)  Stress positions for up to four hours;

     d)  Falsified documents and reports;

     e)  Use of isolation facilities for renewable periods of up to 30 days;

     f)  Interrogation in an environment other than the standard interrogation room;

     g)  Deprivation of light and auditory stimuli;

     h)  Hooding;

     i)  20-hour interrogations;

     j)  Removal of all comfort items, including religious items;

     k)  Removal of clothing;

     l)  Forced grooming;

     m) Using individual phobias to induce stress;

n)  Dietary manipulation;

o)  Environmental manipulation, including by adjusting the temperature or introducing an unpleasant smell;

p)  Sleep adjustment, including by reversing sleep cycles from night to day; and

q)  Grabbing, poking in the chest, and pushing.

70.    In approving Defendant Haynes' recommendations, Defendant Rumsfeld annotated his authorization with the comment "However, I stand for 8-10 hours a day.  Why is standing limited to 4 hours?"

71.    Upon information and belief, the novel interrogation techniques approved by Senior Defense Policy Defendants and Defendant Ashcroft were based on methods used to train U.S. special forces to "Survive, Evade, Resist, and Escape," otherwise known as "SERE" methods. Upon information and belief, professional interrogation experts including Colonel Steve Kleinman, the former head of the air force's strategic interrogation program, and Dr. Michael Gelles, the navy's top forensic psychologist, were alarmed by the adoption of these techniques for interrogation purposes because it was widely understood that these methods, which U.S. troops were being trained to resist, were developed by enemy nations to brainwash U.S. forces for propaganda purposes, not to extract accurate intelligence information.

72.    Several months later, in February 2002, Defendant Rumsfeld was forced to rescind the December 2, 2002 authorization after Navy General Counsel Alberto Mora told Defendant Haynes that the techniques violated U.S. and international law, military tradition, and American values and were causing detainees at Guantanamo to be subjected to abusive and degrading treatment.

73.    After rescinding the December 2, 2002 authorization, Secretary Rumsfeld directed Defendant Haynes to convene a Working Group on Detainee Interrogations in the Global War on Terrorism ("Working Group").  In addition to Defendant Haynes, the Working Group was made up of representatives of the Office of the Undersecretary of Defense for Policy, at which Defendant Mobbs was head of the Detainee Policy Group, the Defense Intelligence Agency, headed by Defendant Jacoby, and the General Counsels and Judge Advocate Generals of the various departments of the military.  Its work product was submitted for approval to Defendants Rumsfeld and Wolfowitz.

74.    Defendant Rumsfeld expressly instructed the Working Group that the Memos were binding upon it and provided definitive guidance for its deliberations.  Sections of the March 6 draft of the Working Group Report, attached hereto as Exhibit 15, pertaining to the interpretation of the Torture Statute and the availability of the defenses of necessity and self-defense were copied verbatim from Yoo's August 1, 2002 OLC Memo on *Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A.*

75.    In January 2003, then-General Counsel of the Navy, Alberto Mora, saw a draft of the Yoo memo on interrogation techniques upon which the Working Group had been instructed to rely.  Mora wrote to the Chair of the Working Group, warning that Yoo's legal analysis was "fundamentally in error," "identifies no boundaries to action" and was therefore "useless as guidance . . . and dangerous in that it might give a false sense of comfort."  Mora Memo, Ex. 10.

76.    In February 2003, Mora met face to face with Defendant Haynes and told him that Yoo's memo and consequently the draft report of the Working Group were deeply flawed, and that Defendant Haynes should "stick the report in a drawer, and never let it see the light of day again." *Id.*

77.     Defendant Haynes assured Mr. Mora that his concerns would be addressed but, on information and belief, nonetheless deliberately directed the Working Group to consider the Yoo memo binding and concealed the final conclusions of the Working Group from Mora and Judge Advocate Generals who had raised similar concerns.

78.     On April 1, 2003, despite the concerns expressed by the FBI and Mora, the Working Group produced a report, attached hereto as Exhibit 16, recommending that all the techniques previously approved be re-approved for use on detainees outside of the United States. On April 16, 2003, Defendant Rumsfeld issued a memorandum to the Commander of the U.S. Southern Command, attached hereto as Exhibit 17, authorizing for use at Guantanamo Bay the techniques recommended by the Working Group.

**Defendants' Actions Proximately and Foreseeably Caused Mr. Padilla to Endure Abusive and Unlawful Interrogations and Conditions of Confinement.**

79.     During his detention in the Brig, Mr. Padilla was subjected to a systematic program of unlawful interrogation methods and conditions of confinement, which proximately and foreseeably caused Mr. Padilla to suffer extreme isolation, sensory deprivation, severe physical pain, sleep deprivation, and profound disruption of his senses and personality, all well beyond the physical and mental discomfort that normally accompanies incarceration.

80.     As stated in the Declaration of Stephanie L. Wright appended hereto as Exhibit 18, and an email by Defendant Wright attached hereto as Exhibit 19, the command and control structure within the Brig and between the Brig and higher levels of military and civilian command was tightly organized and Defendants Wright and Seymour conducted regular, unannounced inspections of the wing where Mr. Padilla was housed, so that it was impossible for Interrogator, Guard, Legal Professional, or Medical Defendants to act without the knowledge of Defendants Hanft, Marr, Wright, Keen, Seymour, and John Does 11-18.

81.     During Mr. Padilla's detention, Defendants subjected him to many of the interrogation techniques and conditions of confinement that Senior Defense Policy Defendants and Defendant Ashcroft caused to be used against detainees held at Guantanamo Bay, including:

    a.    Extreme and prolonged isolation;

    b.    Deprivation of light;

    c.    Exposure to prolonged periods of artificial light;

    d.    Extreme variations in temperature;

    e.    Sleep adjustment;

    f.    Threats to subject him to physical abuse resulting in severe physical pain and suffering, or death, including threats to cut him with a knife and pour alcohol into the wounds;

    g.    Threats to kill him immediately;

    h.    Threats to transfer him to a location outside the United States, to a foreign country or Guantanamo, where he was told he would be subjected to far worse treatment, including severe physical and mental pain and suffering; and

    i.    Against his will, administering to him or making him believe that he was being administered psychotropic drugs;

    j.    Shackling and manacling for hours at a time;

    k.    Forcing him into markedly uncomfortable and painful (or "stress") positions;

    l.    Requiring him to wear earphones and black-out goggles during movement to, from, and within the Charleston Brig;

    m.    Introduction into his cell of noxious fumes that caused pain to eyes and nose;

    n.    Lying to him about his location and the identity of his interrogators;

o.   Loud noises at all hours of the night, caused by government agents banging on the walls and bars of his cell or opening and shutting the doors to nearby empty cells;

p.   Withholding of any mattress, pillow, sheet or blanket, leaving him with nothing to sleep or rest on except a cold steel slab;

q.   Extreme and deliberate variations in the temperature of his cell;

r.   Forced grooming;

s.   Sudden and unexplained suspension of showers;

t.   Sudden and unexplained removal of religious items; and

u.   Constant surveillance, including during use of toilet facilities and shower.

82.   From June 9, 2002 until March 4, 2004, Defendants also denied Mr. Padilla all contact with persons outside the military brig, including his family and legal counsel.

83.   The express purpose of denying Mr. Padilla access to counsel, courts, or family, as explained by Defendant Jacoby in his January 9, 2003, Declaration to the United States District Court for the Southern District of New York ("Jacoby Declaration"), attached hereto as Exhibit 20, was to render Mr. Padilla completely psychologically dependent on his interrogators in order to break Mr. Padilla's spirit and extract from him potentially self-incriminating information.  In that Declaration, Defendant Jacoby stated that he was "familiar" with the interrogations of Mr. Padilla and that it was necessary to subject Mr. Padilla to severe isolation because "[o]nly after such time as Padilla has perceived that help is not on the way can the United States reasonably expect to obtain all possible intelligence information from Padilla . . . Providing him access to counsel now . . . would break - probably irreparably - the sense of dependency and trust that the interrogators are attempting to create."

84.    Beginning on March 4, 2004, while a habeas petition filed on his behalf was pending in the U.S. Supreme Court, Mr. Padilla was finally permitted contact with his attorneys. However, that contact was sporadic, and subject to severe restrictions including: recording of conversations; review of all legal correspondence and even attorney notes by a group of Legal Professional Defendants known as the "Privilege Team;" and obliging counsel to sign "Access Procedures allowing the Privilege Team to terminate any discussions deemed to "convey[] information concerning the internal operations of the Brig" or "intelligence sources and methods."

85.    In addition, Mr. Padilla was only permitted to meet his attorneys in a confined room, with his ankles cuffed and locked onto a metal handle on the floor.

86.    Operational Defendants also interfered with Mr. Padilla's access to counsel by telling Mr. Padilla that his attorneys were not trustworthy and actually were government officials and threatening Mr. Padilla with unpleasant consequences if he revealed the true conditions of confinement to his counsel.

87.    As a result of this intereference with access to counsel, Mr. Padilla's attorneys felt unable to discuss any potentially privileged topic with Mr. Padilla and could not find out how Mr. Padilla had been treated during his months of incommunicado interrogation.

88.    In addition to the direct interference with Mr. Padilla's access to counsel detailed above, Mr. Padilla's access to counsel was indirectly hampered by the abusive conditions of confinement and interrogation imposed upon him, which rendered Mr. Padilla incapable of communicating to his attorneys all of the information necessary to effective legal representation of Mr. Padilla's interests.

89.     Upon information and belief, the restrictions imposed on Mr. Padilla's access to counsel were authorized by Defense Policy Defendants and approved by an OLC memorandum written by Yoo in or about May 2002.

90.     For the first nearly two years of confinement, Mr. Padilla's only human contact was with interrogators during interrogation sessions, or with guards when they delivered his meals through a slot in his cell door, or escorted him to the shower or the concrete cage in which he was intermittently permitted to exercise.

91.     For ten months after Mr. Padilla's transfer to military detention military, the government also denied Ms. Lebron any information about her son.  After almost a year of agonizing uncertainty, a Pentagon official finally brought Ms. Lebron a very brief greeting card that Mr. Padilla had been permitted to write to let her know that he was alive.

92.     Mr. Padilla's extreme isolation and harsh conditions of confinement remained largely unchanged by the limited access to counsel granted in March 2004.  In the nearly two year period between March 4, 2004, and January 5, 2006, Mr. Padilla was permitted to receive only three twenty-minute telephone calls and one visit from his mother; during these interactions, Mr. Padilla was forbidden to discuss the interrogations to which he was being subjected.

93.     In tandem with severe isolation, Mr. Padilla was subjected to sensory deprivation far exceeding the ordinary levels attendant upon incarceration which caused him to suffer profound disorientation and psychological distress.

94.     For most of his detention, the interior and exterior windows of Mr. Padilla's cell were intentionally blacked out, depriving him of any natural light or view of either the outdoors or the inside of the Brig.  On rare occasions when Mr. Padilla was removed from his cell - once to visit

the dentist, for example - his eyes and ears were covered as illustrated in the photographs entered as exhibits in Mr. Padilla's criminal trial and attached hereto as Exhibit 21.

95.    Mr. Padilla was periodically subjected to absolute light or darkness for periods in excess of twenty-four hours.

96.    Deepening his disorientation, Mr. Padilla was further denied access to any form of information about the outside world, including radio, television, and newspapers from the time of his imprisonment without charge in the military brig until summer 2004, at which time he was permitted very limited access to such materials.

97.    For most of his confinement, officials also denied Mr. Padilla sufficient exercise and recreation.  Mr. Padilla was permitted to exercise only intermittently and then only in a concrete "cage" and often at night.

98.    Despite the fact that officials knew that Mr. Padilla was a practicing Muslim, for the bulk of his captivity, Mr. Padilla was denied either a clock or a watch and, deprived of any natural light, he could not tell day from night, and did not know the day of the week or the season, or the direction of Mecca. Upon information and belief, the express request of a representative of the International Committee of the Red Cross that Mr. Padilla be given access to a time-piece with which he could ascertain the time for prayer was denied by Brig officials and/or other government agents.

99.    When Mr. Padilla was first detained, he was permitted access to a Koran.  Shortly thereafter, however, Mr. Padilla's access to religious texts was revoked until March 2004, when Mr. Padilla's counsel provided him with a new copy of the Koran.

100.    By depriving Mr. Padilla of any method of ascertaining the time of day, the season of the year, or the direction of Mecca, and by removing his copy of the Koran, Defendants substantially

burdened Mr. Padilla's ability to pray, keep holidays, study religious texts, and otherwise observe the strictures of his faith.

101.    Mr. Padilla was denied adequate medical care.  Although he made repeated requests for access to medical care for serious and potentially life-threatening ailments, including chest pain and difficulty breathing, as well as for treatment of the chronic, extreme pain caused by being forced to endure stress positions, these requests were either denied or met with grossly inadequate responses.

102.    Mr. Padilla was also denied adequate psychiatric care.  The conditions of confinement and interrogation techniques described above were calculated to, and did, subject Mr. Padilla to extreme psychiatric stress which a reasonable person would understand to necessitate the provision of psychiatric care.  In fact, Mr. Padilla's counsel reported signs of psychological distress, including involuntary twitching and self-inflicted scratch wounds, to officials in the chain of command, including Capt. A.G. Kaufman of Joint Forces Command, Defendant Sandy Seymour, and Assistant to the Solicitor General David P. Salmons.  Similarly, Brig personnel, including Defendant Sandy Seymour, observed Mr. Padilla weeping in his cell on multiple occasions and, concerned about Mr. Padilla's psychological state, sent a request up the chain of command that Mr. Padilla be permitted to eat with another inmate.  That request was denied.

103.    These reports relating to Mr. Padilla's mental health were either ignored or met with grossly inadequate responses. Upon information and belief, at the time that Mr. Padilla was first removed from civilian custody to the Brig in June 2002, Defendant Noble conducted a cursory initial evaluation of Mr. Padilla's mental health.  Despite the extreme isolation and other extraordinary conditions of Mr. Padilla's confinement, Dr. Noble did not examine Mr. Padilla again for nearly two years. On or about May 14, 2004, Defendant Noble purported to conduct a

second evaluation of Mr. Padilla's mental health. This "evaluation" consisted entirely of a short conversation through a slot in the door of Mr. Padilla's cell. This examination, like the first, was wholly inadequate in light of Defendant Noble's knowledge of the conditions under which Mr. Padilla was being detained and the concerns of lay Brig staff about Mr. Padilla's state of health.

104.    In May 2004, on orders from Defendant Rumsfeld, Vice Admiral Church conducted a review of detainee conditions at the Brig and reported his findings in a slideshow attached hereto as Exhibit 22 (Church Slides). The Church Slides confirm the use at the Brig of interrogation techniques including removal of Koran, mattress, pillow, and warm meals, noting, inter alia, that: "[One] detainee has Koran removed from cell as part of JFCOM-approved interrogation plan. Muslim chaplain not available"; "One detainee . . has mattress removed as part of JFCOM-approved interrogation plan"; "One detainee . . . not authorized ICRC visits due to interrogation plans in progress"; and "One detainee in Charleston has Koran, mattress, and pillow removed and is fed cold MREs as part of interrogation plan approved by JFCOM. (SECDEF Memo of 16 Apr 03 addresses GTMO only)".

105.    Upon information and belief, Mr. Padilla was subjected to these abuses both as a result of express authorization by Senior Defense Policy Defendants and because their approval of harsh interrogation techniques for Guantanamo sent the message through military ranks that Senior Defense Policy Defendants wanted intelligence results fast and that use of harsh techniques was acceptable for that purpose. As explained by Colonel Lawrence Wilkerson, former Chief of Staff to Secretary of State Colin Powell, "I'm privy to the paperwork, both classified and unclassified, that the Secretary of State asked me to assemble on how this [abuse of detainees] all got started . . . [and] it was clear to me that there was a visible audit trail from the Vice President's office through the Secretary of Defense down to the commanders in the field that in

carefully couched terms . . . to a soldier in the field meant two things: We're not getting enough good intelligence and you need to get that evidence, and oh, by the way, here's some ways you probably can get it."

106.    The Church Slides also noted "potential issues" with "unauthorized interrogation techniques" at the Brig, and provided "amplification" on this issue.  The Executive branch has not yet released to the public the part of the Church Slides providing this "amplification."

107.    Upon information and belief, Brig officials were under orders to conform all of the procedures and conditions of confinement applicable to suspected enemy combatants detained at the Brig to the operating procedures devised for the detainee mission at Guantanamo Bay, Cuba.  In April 2002, those responsible for the domestic detention of alleged enemy combatant Yaser Hamdi were instructed that "DOD does not want this detainee to have any privileges that the detainees at Camp X-Ray don't have."  April 17, 2002 Email, Exhibit 23.  In June 2005, Brig staff denied a request by detainee Abdul al-Marri for a copy of the Geneva Conventions because "JTF-GTMO [does] not provide GCs to their detainees.  Accordingly, neither will the NAVCONBRIG."  June 21, 2005 Email, Exhibit 24.  The situation was summed up in a July 2006 email exchange as follows: "You have every right to question the 'lash-up' between GTMO and Charleston – it was the first thing I ask[ed] about a year ago when I came on board.  Our use of GTMO on everything . . . appears to be driven by OSD [Office of Secretary of Defense] Detainee Affairs."  July 2006 Email, Exhibit 25.

108.    Upon information and belief, interrogation plans for detainees at the Brig were devised and approved by Defendant Jacoby's agency, DIA/DHS, a component of the Department of Defense ultimately under the authority of Defendant Rumsfeld, which also had a hand in interrogations at Guantanamo Bay.  DHS was responsible for interrogations of detainees and

oversaw day-to-day decisionmaking regarding detainees' conditions. January 8, 2003 Email,
Exhibit 26. Defendant Jacoby's DIA/DHS determined the range of privileges that Brig staff
could extend to detainees to reward compliance and maintain morale.

109. Upon information and belief, just as Defendants Haynes and Rumsfeld had given specific
instructions for the interrogations of John Walker Lindh and Mohammed al-Qahtani, Senior
Defense Policy Defendants gave specific instructions for the interrogations and conditions of
confinement applicable to detainees held at the Norfolk and Charleston Brigs, including Mr.
Padilla. For example, in May 2002, Norfolk Brig staff responsible for Mr. Hamdi "received
written direction . . . that the detainee is not permitted visit from legal counsel, family members
or others unless specifically authorized by SECDEF [Rumsfeld] or his designee." May 31, 2002
Email, Exhibit 27. In May 2002, Defendant Haynes' office instructed Norfolk Brig staff to
"deny access to detainee if [federal public defender] happens to show up at the brig, and in June
2002, Brig staff were instructed to withhold legal correspondence directed to Mr. Hamdi because
"DOD GC [Haynes] and DEPSECDEF [Wolfowitz] still have that for action." May 17 and June
27, 2002 Emails, Exhibit 28. The June 27 email observed that "[n]o one thinks these are small
issues – quite the contrary – which is why we are seeing the very highest levels of Government
considering the answers." *Id.* Similarly, in June 2003, Norfolk Brig staff were told "[y]ou can
assure Hamdi that no one has forgotten about him. Very high level folks every day discuss what
to do with him and when." June 4, 2003 Email, Exhibit 29.

110. Defendant Wolfowitz's Detainee Affairs was consulted by Military Supervisor
Defendants on matters including whether and when Mr. Padilla could see his mother, and
whether and what reading materials he should be allowed.

111.    Upon information and belief, Senior Defense Policy Defendants were on notice of but deliberately indifferent to the harmful effects of the methods of interrogation and conditions of confinement applied to Mr. Padilla.

112.    Military Supervisor Defendants sent detailed reports up the chain of command relating day to day detention and interrogation activity as well as the physical and mental health of the detainees at the Brig. Upon information and belief, Defendants Rumsfeld, Haynes, Wolfowitz, Jacoby, and John Does 1-10 were privy to these reports.

113.    As stated by Defendant Wright in a speech describing the mission of the Brig given on February 16, 2006, the Brig is also closely supervised by the White House and the Secretary of Defense.  According to Defendant Wright "we are the only confinement facility on US soil to confine Enemy Combatants.  That adds a special 'flavor' to our entire environment because if something goes wrong anywhere in our facility, it gets immediate visibility not only with the Secretary of Defense but in the White House."

114.    As early as June 2002, staff responsible for the detention at the Naval Brig in Norfolk, Virginia of Hamdi sent an email up the chain of command stating "[Hamdi] is going through another depression stage . . . After eight months of incarceration in detention facilities . . . with no potential end in si[ght] . . . I can understand how he feels. . . . I will continue to do what I can to help this individual maintain his sanity, but in my opinion we're working with borrowed time." June 26, 2002 Report, Exhibit 30.

115.    On September 6, 2002, Norfolk brig staff informed the chain of command that, according to the chaplain who had visited both detainees, Hamdi was handling prolonged isolation "so much better" than Padilla despite Hamdi's precarious state of mind.  September 6, 2002 Email, Exhibit 31.

116.    Norfolk brig staff also repeatedly sent messages up the chain of command explaining that the isolation of a detainee at the Brig was much more severe than that of detainees at Camp X-Ray, who had opportunities to communicate with other detainees.  For example, a June 18, 2002 email from a senior officer at Norfolk up the chain of command states "[I] know discussion has been to the extent possible we are to remain consistent with the procedures that were/are in place at Camp X-Ray, but we are not Camp X-Ray with 300+ other detainees who do have the ability to communicate with one another."  June 18, 2002 Email, Exhibit 32.

117.    The fact that isolation at the brigs was even more extreme than the isolation at Camp X-Ray was brought directly to Defendant Rumsfeld's attention by the Church Slides, which observed that "[t]he limited number and unique status of detainees in Charleston precludes interaction with other detainees.  Argument could be made that this constitutes isolation."

118.    Mr. Padilla's counsel and Brig staff noted and reported up the chain of command the fact that Mr. Padilla was suffering severe effects of prolonged isolation.

119.    Defendant Seymour indicated to Mr. Padilla's habeas counsel that, based on his long experience in corrections, he was concerned about the long-term effect on Mr. Padilla of the extreme and prolonged isolation and sensory deprivation to which Mr. Padilla was being subjected.

120.    Defendant Seymour's concerns about the potential for harm from isolation and sensory deprivation are supported by a substantial body of clinical literature and expert opinion which holds that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning, and that even a few days of solitary confinement predictably causes brain patterns to become measurably abnormal. One of the recorded effects of severe isolation

and deprivation of environmental stimuli is that individuals become hypersensitive to, and tend to find intensely disturbing, any external stimuli to which they are exposed.

121.    According to a recent report by the Office of the Inspector General for the Department of Justice, friction occurred between the FBI and DOD regarding the interrogation methods applied by DHS interrogators to Mr. Padilla.  OIG Report, at 113, Exhibit 33.

122.    Mr. Padilla was never given any explanation for the abusive treatment and severe conditions of confinement to which he was subjected.  Upon information and belief, the measures described above were not imposed on Mr. Padilla for prison disciplinary or other legitimate prison administrative goals.  Mr. Padilla was a model prisoner who was never even accused of violating Brig rules; indeed, he was described by Brig officials as being so passive as to be "like a piece of furniture."

123.    Defendants' systematic program to punish Mr. Padilla, to subject him to severe mental and physical pain, and to destroy his ordinary emotional and cognitive functioning was a success and proximately and foreseeably caused Mr. Padilla to suffer marked harm to his mental well-being.

124.    Despite actual or constructive knowledge of the unlawful conditions of confinement, interrogation practices, and violations of constitutional rights to which Mr. Padilla was subjected and of the injuries resulting therefrom, Senior Defense Policy Defendants and Operational Defendants failed to take steps to halt those violations, thereby proximately and foreseeably causing the harms alleged herein.

125.    Despite actual or constructive knowledge that the authorization of aggressive interrogation techniques for use at Guantanamo Bay was being interpreted to permit the use of such techniques against suspected terrorists detained elsewhere, Senior Defense Policy

Defendants and Defendant Ashcroft failed to take steps to negate that interpretation and in fact continued to encourage harsh interrogation practices, thereby proximately and foreseeably causing the harms alleged herein.

126.    In addition to the harm caused to Mr. Padilla by his detention and interrogation, Mr. Padilla continues to suffer deprivation of liberty, public stigmatization, serious ongoing psychological harm, and other collateral effects from the unlawful "enemy combatant" designation, including the threat that he will once again be militarily detained in the Brig and subjected there to unconstitutional interrogations and conditions of confinement.

127.    The threat of re-detention is not a figment of Mr. Padilla's imagination. On or about November 23, 2005 – shortly after the criminal indictment against Mr. Padilla was made public – Deputy Solicitor General Gregory Garre informed Mr. Padilla's counsel, Jonathan Freiman, that it was the government's position that the "enemy combatant" designation had not been rescinded and that the government could therefore militarily detain Mr. Padilla at any time based on his alleged past acts.

128.    The possibility of being returned to his captors in the Brig and forced to relive his experiences there causes Mr. Padilla to suffer immediate and ongoing trauma distinct from and in addition to the psychological harm that he suffered during his detention in the Brig.

129.    The threat of redetention has also chilled Mr. Padilla's exercise of his right to counsel by preventing him from fully communicating the details of his mistreatment.

130.    Despite actual or constructive knowledge of the unlawful treatment to which individuals detained as "enemy combatants" have been subjected, Defendants, including Defendant Gates, have taken no steps to punish past violations or to prevent future repetition of such abuses.

131.    The actions and inactions of Defendants, including Defendant Gates, proximately and foreseeably deprive Mr. Padilla of liberty and expose him to a very real threat that he will once again be thrown into the Brig and subjected there to unconstitutional conditions of confinement and unconstitutional interrogations.

132.    The continuing threat of redetention as a suspected "enemy combatant" at a military facility causes Mr. Padilla concrete, ongoing and irreparable harm - to his mental well-being, to his ability properly to assist counsel in his criminal defense, and to exercise other constitutional rights including but not limited to First Amendment rights - that can only be remedied by an injunction against the possibility of another round of military detention.

133.    Plaintiffs seek to vindicate their constitutional rights and ensure that neither Mr. Padilla nor any other person is treated this way in the future.

134.    Plaintiffs seek monetary, injunctive and declaratory relief.

135.    Plaintiffs have no administrative remedies or other effective means of enforcing their rights other than seeking relief from the Court.

## CLAIMS

136.    Mr. Padilla incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

137.    By the allegations incorporated above, Defendants proximately and foreseeably injured Mr. Padilla by violating numerous clearly established constitutional and statutory rights including, but not limited to, the following:

    a.      **Denial of Access to Counsel.**  Senior Defense Policy Defendants, Defendant Ashcroft, Supervisor Defendants, Legal Professional Defendants, Interrogator Defendants, and Guard Defendants, acting under color of law and their authority as federal officers, violated Mr.

Padilla's right of access to legal counsel protected by the First, Fifth, and Sixth Amendments to the U.S. Constitution.

  b.  **Denial of Access to Court.** Senior Defense Policy Defendants, Defendant Ashcroft, Supervisor Defendants, Legal Professional Defendants, Interrogator Defendants, and Guard Defendants, acting under color of law and their authority as federal officers, violated Mr. Padilla's right of access to court protected by the First and Fifth Amendments to the U.S. Constitution, Article III of the U.S. Constitution, and the Habeas Suspension Clause of the U.S. Constitution.

  c.  **Unconstitutional Conditions of Confinement.** Senior Defense Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, and Guard Defendants, acting under color of law and their authority as federal officers, caused Mr. Padilla to be subjected to illegal conditions of confinement and treatment that shocks the conscience in violation of Mr. Padilla's Fifth Amendment rights to procedural and substantive due process, as well as his Eighth Amendment right to be free of cruel and unusual punishment, including torture, outrages on personal dignity, and humiliating and degrading treatment.

  d.  **Unconstitutional Interrogations.** Senior Defense Policy Defendants, Defendant Ashcroft, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, and Guard Defendants, acting under color of law and their authority as federal officers, caused Mr. Padilla to be subjected to coercive and involuntary illegal interrogations, both directly and through unlawful conditions of confinement designed to aid the interrogation, all in violation of Mr. Padilla's Fifth Amendment rights to procedural due process, freedom from treatment that shocks the conscience, and freedom from self-

incrimination, as well as his Eighth Amendment right to be free from cruel and unusual punishment, including torture, outrages on personal dignity, and humiliating and degrading treatment.

     e.     **Denial of Freedom of Religion.**  Senior Defense Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Interrogator Defendants, and Guard Defendants, acting under color of law and their authority as federal officers, violated Mr. Padilla's right to the free exercise of religion guaranteed under the First Amendment to the U.S. Constitution, as well as the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb.

     f.     **Denial of the Right to Information.**  Senior Defense Policy Defendants, Defendant Ashcroft, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, and Guard Defendants, acting under color of law and their authority as federal officers, violated Mr. Padilla's right to information guaranteed under the First Amendment to the U.S. Constitution.

     g.     **Denial of the Right to Association.**  Senior Defense Policy Defendants, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, and Guard Defendants, acting under color of law and their authority as federal officers, violated Mr. Padilla's right to association with family and others guaranteed under the First Amendment to the U.S. Constitution.

     h.     **Unconstitutional Military Detention.**  Senior Defense Policy Defendants, Defendant Ashcroft, Supervisor Defendants, and Legal Professional Defendants, and Defendant Gates acting under color of law and their authority as federal officers, violated Mr. Padilla's right to be free from military detention guaranteed by the Fourth Amendment to the U.S. Constitution,

the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the Habeas Suspension and Treason Clauses of the U.S. Constitution, and Article III of the U.S. Constitution.

       i.      **Denial of the Right to Be Free from Unreasonable Seizures.**  Senior Defense Policy Defendants and Defendant Ashcroft, acting under color of law and their authority as federal officers, violated Mr. Padilla's right to be free from unreasonable seizures guaranteed by the Fourth Amendment to the U.S. Constitution.

       j.      **Denial of Due Process.** Senior Defense Policy Defendants, Defendant Ashcroft, Legal Professional Defendants, and Defendant Gates, acting under color of law and their authority as federal officers, have violated Mr. Padilla's Fifth Amendment right not to be detained or subjected to the collateral effects of designation as an "enemy combatant" without due process of law.

       k.      **Denial of Substantive Due Process by Defendant Gates**.  Defendant Gates has demonstrated deliberate indifference to both a substantial risk that Mr. Padilla will be subjected to a recurrence of the violations detailed in subparagraphs (c) and (d) of this paragraph,  and to the ongoing deprivation of liberty, psychological harm, and other collateral effects of the unlawful "enemy combatant" designation, which remains in effect,  all in violation of Mr. Padilla's Fifth Amendment substantive due process rights.  Defendant Gates has accordingly harmed and aggrieved Mr. Padilla within the meaning of the Administrative Procedures Act, and is entitled to judicial review of Defendant Gates' failure to act and to injunctive relief therefore.

138.    By the allegations incorporated above, Senior Defense Policy Defendants, Defendant Ashcroft, Supervisor Defendants, Legal Professional Defendants, Medical Professional Defendants, Interrogator Defendants, and Guard Defendants, acting under color of law and their authority as federal officers, also proximately injured Ms. Lebron by causing her to be denied of

virtually all contact with her son in violation of her clearly established rights to association and communication under the First and Fifth Amendments of the U.S. Constitution.

## PRAYER FOR RELIEF

139.    Plaintiffs therefore respectfully request that the Court enter a judgment for all relief to which they are legally entitled under the facts of this case, including but not limited to the following:

      a.  A judgment declaring that the acts alleged herein are unlawful and violate the Constitution and laws of the United States;

      b.  A declaration that the policy, pattern, or practice of the Defendants alleged herein is unlawful and violates the Constitution;

      c.  An injunction to prevent Mr. Padilla from being redetained by the Department of Defense as an "enemy combatant;"

      d.  Damages in the amount of one dollar against each Defendant except Defendant Gates;

      e.  Attorneys' fees and costs; and

      f.  All other appropriate relief as the Court may determine to be just and proper.

Respectfully submitted,

S/Michael P. O'Connell
Michael P. O'Connell
STIRLING & O'CONNELL
145 King Street, Suite 410
P.O. Box 882
Charleston, SC  29402
(843) 577-9890
South Carolina Identifications 4260

Jonathan M. Freiman (*pro hac vice*)
Hope R. Metcalf (*pro hac vice*)
National Litigation Project
Allard K. Lowenstein International Human Rights Clinic
Yale Law School
P.O. Box 208215
New Haven CT 06520-8215
(203) 498-4584

*Of Counsel:*
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510-7001