# Exhibit 1

resulted in the detention of Messrs. Hamdi and Padilla as enemy combatants. The U.S. Supreme Court has accepted the cases of Messrs. Hamdi and Padilla for review during its current term.

So that all my colleagues and the American public may be informed on this important matter, I ask unanimous consent that the address by Judge Gonzales be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

REMARKS BY ALBERTO R. GONZALES, COUNSEL TO THE PRESIDENT

AMERICAN BAR ASSOCIATION, STANDING COMMITTEE ON LAW AND NATIONAL SECURITY

In 1862, President Abraham Lincoln composed a letter to Eliza P. Gurney in which the President considered how God could allow the horrors of the Civil War to occur. In his correspondence, our 16th President wrote:

"We must believe He permits it [this war] for some purpose of his own, mysterious and unknown to us; and though with our limited understanding we may not be able to comprehend it, yet we cannot but believe, that he who made the world still governs it."

Lincoln's faith would not permit him to doubt that the specter of American sons killing American sons was providential. Many Americans surely had similar thoughts about God's plan as we watched American Airlines Flight 11, and then United Airlines Flight 175, slam into the Twin Towers of the World Trade Center on the morning of September 11th. On that day, America was subjected to a brutal and treacherous attack by an enemy that had declared war on our society.

Whether consciously or not, we all realized on September 11th that some things would never be the same. We all realized that the country now faced an unprecedented threat that, in ways yet to be known, would alter the way we live our lives and would alter the way the government goes about protecting American lives. Over time, some of the ways September 11th has changed our lives have become routine- such as the longer security screenings we all now build into plans when we are going to the airport. In part because these changes have become routine, and particularly because there have been, thankfully, no subsequent attacks on American soil, some may be tempted to become complacent, and may no longer be concerned about future acts of terrorism.

But we should make no mistake about it: Despite our successes in capturing many al Qaeda leaders, in destroying their base of operations in Afghanistan, and in preventing domestic attacks, the threat posed by al Qaeda is still very real. Al Qaeda is a fluid, adaptable, and resourceful enemy that continues actively to plan attacks both against American interests and our allies abroad and against targets within the United States. As you all know from the period of the heightened threat level that we all experienced around the holidays, we continue to get specific intelligence about planned al Qaeda attacks. We know from their previous practices that members of al Qaeda are very patient, willing to spend years to plan, train for, and then execute an attack. It would be foolish for anyone now to declare that, given two-plus years free from attacks within the U.S., the domestic phase of the conflict with al Qaeda is somehow "over." I can assure you that no one in the Government is complacent about the threat posed by al Qaeda.

In response to this ongoing threat, President Bush, like other Presidents during times of war, has taken strong, sometimes difficult, action to protect American lives and preserve the long-term survival of this country.

A few people- probably some in this audience- are uncomfortable with the balance struck by this Administration between protecting our country and preserving our freedoms. They are uneasy with the idea of applying the law of war to the enemy combatants waging war against this country, including enemy combatants who are American citizens. Citing the necessity of protecting our reputation in the international community, our critics insist that these combatants should receive the benefit of the rules and procedures of our criminal justice system, those tried and true methods that we use to deal with criminals such as car thieves and drug dealers. They demand that our judges- even though untrained in executing war plans- have a substantive role in the war decisions of the Commander-in-Chief.

In spite of the massive and horrific loss of life on September 11th, the skeptics assert it is obvious that America is not at war, much less engaged in warfare on American soil. In their view, it is obvious that every American citizen- even a citizen who, as a member of a terrorist group, wages war against our sons and daughters- is entitled to be] dealt with solely according to the rules and presumptions of the criminal justice system, including the right to counsel, the right to remain silent, and the general right to judicial supervision of their detention. It is obvious, they say, that foreign fighters, captured overseas and detained by our military outside the United States, have a right to challenge, in our civilian courts, the scope and terms of their detention.

Respectively, these propositions are not at all obvious as a matter of law; to the contrary, they lack any valid foundation in domestic or international law. The Administration's detractors fundamentally misunderstand the nature of the threat this country is facing. America confronts a lethal but unfamiliar enemy, sometimes hidden here in our neighborhoods, waiting to hurt innocent people. Our enemies are not constrained by civilian authority or by any government. Nor are they inhibited by ordinary human concerns for their own safety or lives. Some are fanatics who believe their greatest power can lie precisely in their disregard for human life and their willingness to resort to indiscriminate violence, as we witness nearly every day in bombings and shootings around the world. They do not love liberty, they do not respect law, they do not cherish life.

Certain propositions are, in my view, clear. First, the brutal attacks of September 11th- which killed nearly three thousand people from more than ninety countries- were not only crimes but acts of war. Since at least that day, the United States has been at war with al Qaeda. While al Qaeda may not be the traditional armed force of a single nation state, al Qaeda is clearly a foreign enemy force. It has central direction, training, and financing and has members in dozens of countries around the world who are committed to taking up arms against us. It has political goals in mind. Al Qaeda has attacked not only one of our largest cities, killing thousands of civilians, but also has attacked our embassies, our warships, and our government buildings. While different in some respects from traditional conflicts with nation states, our conflict with al Qaeda is clearly a war.

As a practical matter, this state of war is not in dispute- not by the United Nations Security Council, which passed a resolution in response to the September 11th attacks recognizing the right of states to act in self-defense; not by members of NATO, or the Rio or ANZUS treaties, all of which unanimously invoked their treaty clauses regarding collective defense from armed attack; and not by the United States Congress, which acted to support the President's use of all necessary and appropriate military force against al Qaeda.

Second, the President is determined to win this war and has directed that all instruments of national power be directed to this new type of enemy. Because the threat is not only against our military abroad, but also against civilians here, the Department of Justice and the Department of Homeland Security share responsibility with the Department of Defense for the successful prosecution of this war. To suggest that an al Qaeda member must be tried in a civilian court because he happens to be an American citizen- or to suggest that hundreds of individuals captured in battle in Afghanistan should be extradited, given lawyers, and tried in civilian courts- is to apply the wrong legal paradigm. The law applicable in this context is the law of war- those conventions and customs that govern armed conflicts.

Under these rules, captured enemy combatants, whether soldiers or saboteurs, may be detained for the duration of hostilities. They need not be "guilty" of anything; they are detained simply by virtue of their status as enemy combatants in war. This detention is not an act of punishment but one of security and military necessity. It serves the important purpose of preventing enemy combatants from continuing their attacks. Thus, the terminology that many in the press use to describe the situation of these combatants is routinely filled with misplaced concepts. To state repeatedly that detainees are being "held without charge" mistakenly assumes that charges are somehow necessary or appropriate. But nothing in the law of war has ever required a country to charge enemy combatants with crimes, provide them access to counsel, or allow them to challenge their detention in court- and states in prior wars have generally not done so.

It is understandable, perhaps, that some people, especially lawyers, should want to afford the many due process protections that we have grown accustomed to in our criminal justice system to the individuals captured in our conflict with al Qaeda. It has been many years, fortunately, since the United States has been in a conflict that spans the globe, where enemy combatants have been captured attempting to attack our homeland. But the fact that we have not had occasion to apply the well-established laws of war does not mean that they should be discarded. The United States must use every tool and weapon- including the advantages presented by the laws of war- to win the war against al Qaeda.

Within this framework, today I would like to discuss what some may consider the most controversial of the President's actions, namely the detention of American citizens as enemy combatants, wherever those persons may have been seized, and more specifically the determination that a person- particularly an American citizen- captured in the United State is an enemy combatant. As you know, we have detained two American citizens as enemy combatants.

The first, Yaser Hamdi, is a Saudi national who was a part of Taliban military unit that surrendered to Northern Alliance forces in a battle near Konduz, Afghanistan in late 2001. He was armed with an AK-47 assault rifle when he surrendered. He has admitted that he went to Afghanistan to train with and fight for the Taliban. Following his capture, a U.S. military screening team confirmed

that Hamdi indeed met the criteria for enemy combatants over whom the U.S. forces were taking control. Afterwards, military authorities learned of records indicating that Hamdi, although a Saudi national, had been born in Louisiana. He was transferred to a naval brig in the United States where he remains detained.

The second, Jose Padilla, also an American citizen, was among those who sought to bring terror to our soil. Padilla has served time in the U.S. for murder and for a handgun charge. In 1998, following his release from prison, he moved to Egypt, where he took the name Abdullah Al Muhajir. In 2001 and 2002, Al Muhajir, or Padilla, met with al Qaeda officials and senior operatives, and proposed to conduct terrorist operations within the United States- includinga plan to detonate a dirty bomb- as well as the detonation of explosive devices in hotel rooms and gas stations. Padilla received training from al Qaeda operatives, and was directed by al Qaeda members to return to the United States to explore and advance plans for further attacks against the United States. Multiple intelligence source separately confirmed Padilla's involvement in planning terrorist attacks by al Qaeda against United States citizens and interests. Like Hamdi, Padilla has been detained in a naval brig in the United States.

The President's legal authority to detain American citizens as enemy combatants is, in my view, clear. The practice of capturing and detaining those engaged in hostilities is as old as war itself, and is ingrained in this Nation's military history. The detention of enemy combatants serves two vital objectives in the global war on terror: preventing killers from rejoining the enemy and continuing to fight, and enabling the collection of intelligence about the enemy. The Supreme Court's 1942 decision in Ex parte Quirin acknowledged that the President's war powers include the authority to capture and detain enemy combatants at least for the duration of a conflict, and authority that was well-settled by the time of that decision. More to the point with respect to Hamdi and Padilla, the Supreme Court has made clear that this power extends to enemy combatants who are United States citizens. As the Court observed in Quirin, in which one of the detained Nazi saboteurs was a United States citizen: "citizenship in the United States of an enemy belligerent does not relieve him from the consequences of a belligerency which is unlawful."

The course of action that we have taken with respect to Mr. Hamdi and Mr. Padilla- and the arguments that we have made in defending those actions in the courts- draw upon these well-established precedents. The Executive's determination that an individual is an enemy combatant is a quintessentially military judgment- indeed, deciding who is the enemy is in many senses the fundamental, threshold decision that the Commander-in-Chief makes, the decision from which all other military decisions flow. Accordingly, the traditional deference owed by courts to military judgments is at its broadest with respect to the President's determination that an individual is an enemy combatant. While courts may review (by habeas corpus) the Executive's determination that an American citizen (whether captured abroad or on U.S. soil) is an enemy combatant, that review must be deferential. Specifically, in view of the great deference owed to the President's enemy combatant determinations and the serious separation-of-powers concerns that would attend any searching judicial inquiry into the factual underpinnings of the President's judgment, a factual review of the President's determination can extend no further than ensuring that it has evidentiary support. That framework focuses exclusively on the factual support presented by the Executive and entails confirming the existence of some evidence supporting its determination that the individual is an enemy combatant.

The Government's record in the courts on the scope of the President's authority, as you probably know, has been mixed. The Fourth Circuit in Hamdi agreed that the President may detain enemy combatants, including American citizens, and further agreed that judicial review should be highly deferential. The Court reasoned that the designation of Hamdi as an enemy combatant bears the closest imaginable connection to the President's constitutional responsibility during the actual conduct of hostilities, and that while judicial review does not disappear during wartime, the review of battlefield capture in overseas conflicts is a highly deferential one.

Applying this deference to the facts of the case, the Fourth Circuit concluded that- despite his status as an American citizen currently detained on American soil- Hamdi is not entitled to challenge the facts presented by the United States. The Court held that where as here, a petitioner has been designated as an enemy combatant and it is undisputed that he was captured in a zone of activity combat operations abroad, further judicial inquiry is unwarranted when the government has responded to the petition by setting forth factual assertions which would establish a legally valid basis for the petitioner's detention.

The Second Circuit reached a different conclusion with respect to Jose Padilla. There, a divided panel held that the President does not have inherent authority under the Constitution to detain as an enemy combatant an American citizen seized within this country away from a zone of combat. The Court also held that the President could detain an American citizen only with the express authorization of Congress, and that the Congressional resolution to use force against members of al Qaeda did not give such authorization.

You will not be surprised to learn that we found the Fourth Circuit decision to be brilliant, and the panel's reasoning incisive and unimpeachable. We found the decision by the Second Circuit panel on the other hand, to be less brilliant, less supportable by the facts, and contrary to legal precedent.

I am constrained by my time this morning from elaborating further on our legal arguments in both cases. In any event, they are a matter of public record and have been fully set out in our briefs. The Supreme Court will hear arguments in both the Padilla and Hamdi cases this spring. We are hopeful that the Court will agree with the government's position in each case.

What I would like to turn to is something that has not been made a matter of public record. Until today, the Government has been reticent about discussing in any detail the decision-making steps that may result in an American citizen being designated as an enemy combatant or how an American detainee held in the United States may be provided access to counsel.

As a result, while we have set forth our legal authorities clearly in legal briefs, in the debate over the fairness and prudence of the Government's actions in the war on terror, the voice of the Government has remained essentially unheard. Our silence has been largely for reasons of national security. The deliberations that underpin any decision that a person already within the United States is, in reality, an enemy combatant, invariably include extraordinarily sensitive intelligence information that we are loathe to reveal for fear that it may jeopardize the future capture of enemy combatants and future prevention of terrorist attacks. We realize that our relative silence on this issue has come at a cost. Many people have characterized- mischaracterized, in our view- our actions in the war on terrorism as inconsistent with the rule of law. Indeed, because of our silence, many critics have assumed the worst. They have assumed that there is little or no analysis- legal or otherwise- behind the decision to detain a particular person as an enemy combatant. To them, the decision making process is a black box that raises the specter of arbitrary action.

While some of these criticisms are understandable, they are wrong. With two years of experience, we now believe that our concerns for national security can be accommodated with a greater public disclosure of the steps we have taken behind the public actions you already know about. And so today, we will begin to take a more active role in the debate about the fairness of our acts of detention of U.S. citizen enemy combatants. This discussion builds on Secretary Rumsfeld's speech eleven days ago in Miami, where he revealed the review mechanisms that had long been in place with respect to detentions of non-U.S. citizen enemy combatants being held at Guantanamo Bay, Cuba. Today I am going to explain the decision-making that led to our enemy combatant determinations with respect to U.S. citizens.

Yaser Hamdi, in my view, presents a relatively easy case. Hamdi was seized in a combat zone in Afghanistan. He was armed with an AK-47 when his Taliban unit surrendered to Northern Alliance forces. The Northern Alliance subsequently made him available for an interview by U.S. military personnel. A U.S. military screening team confirmed that Hamdi met the criteria for enemy combatants over whom the United States was taking control, and Hamdi was transferred to U.S. control. In such a situation in a foreign zone of combat, that determination was quite properly made by military personnel on the ground. These facts and other details relating to the circumstances of Hamdi's case were memorialized in a declaration, the so-called Mobbs declaration, which was made available for review by the courts in connection with Hamdi's habeas petition.

As for enemy combatants who are American citizens and are captured here in the U.S., as a matter of prudence and policy the decision-making steps we have employed have been far more elaborate. They have included a thoughtful, deliberate and thorough analysis of the relevant facts and law at many levels of the Executive branch. In the one case in which the President has exercised his authority as Commander-in-Chief to detain a U.S. citizen in the United States as an enemy combatant, we have employed a thorough- indeed, painstaking- mechanism to ensure multiple layers of scrutiny before even proposing any action to the President.

What follows is a general description of the mechanism that was employed before the President exercised this presidential power. I should caution, however, that there is no rigid process for making such determinations- and certainly no particular mechanism required by law. Rather, these are the steps that we have taken in our discretion to ensure a thoroughly vetted and reasoned exercise of presidential power.

In any case where it appears that a U.S. citizen captured within the United States may be an al Qaeda operative and thus may qualify as an enemy combatant, information on the individual is developed and numerous options are considered by the various relevant agencies (the Department of Defense, CIA and DOJ), including the potential for a

criminal prosecution, detention as a material witness, and detention as an enemy combatant. Options often are narrowed by the type of information available, and the best course of action in a given case may be influenced by numerous factors including the assessment of the individual's threat potential and value as a possible intelligence source. This explains why persons captured in the U.S. may be processed differently depending on the totality of the circumstances the particular case presents.

For example, we could have abundant information indicating that the individual has committed a crime- such as material support for terrorism- but the information may come solely from an extremely sensitive and valuable intelligence source. To use that information in a criminal prosecution would mean compromising that intelligence source and potentially putting more American lives at risk. Those are the sort of considerations that have to be weighed in deciding how we proceed against a particular individual in any given case.

When it appears that criminal prosecution and detention as a material witness are, on balance, less-than-ideal options as long-term solutions to the situation, we may initiate some type of informal process to present to the appropriate decision makers the question whether an individual might qualify for designation as an enemy combatant. But even this work is not actually commenced unless the Office of Legal Counsel at the Department of Justice has tentatively advised, based on oral briefings, that the individual meets the legal standard for enemy combatant status. That standard was articulated by the Supreme Court in Quirin, where the Court made clear that, at a minimum, "citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance, and direction enter this country bent on hostile acts are enemy belligerents within the meaning of . . . the law of war," and thus may be detained. The important factor, therefore, is that the person has become a member or associated himself with hostile enemy forces, thereby attaining the status of enemy combatant.

It is worth noting, I think, that on more than one occasion OLC has advised that the facts relating to a certain individual did not support an enemy combatant determination, or were so close to the line as to present a very doubtful case. In those cases the United States did not proceed further in the process of determining whether to designate the persons as enemy combatants, but rather pursued different, legally available options for addressing the threat. In a very real sense, the Executive branch in these cases declined to take a particular action against suspected terrorists because it concluded that the action was not clearly legally supportable.

Once initial assessments indicate that an enemy combatant designation may be the best legally available way to deal with a particular U.S. citizen, we have proceeded to take the following steps to assist the President in making a final decision.

First, the Director of Central Intelligence makes a written assessment of all available CIA intelligence information concerning the individual and transmits a recommendation and request to DoD recommending that the person be taken into custody as an enemy combatant.

The Secretary of Defense then makes his own independent evaluation, based upon the information provided by the CIA and other intelligence information developed within DoD. That evaluation is embodied in a written assessment concerning enemy combatant status.

The Secretary's assessment is provided to the Attorney General with a request for the Attorney General's opinion concerning: (1) whether the assessment comports with applicable law; (2) whether the individual may lawfully be taken into custody by the Department of Defense; and (3) whether the Attorney General recommends as a matter of policy that that course be pursued. This ensures that DOJ can formally provide input on the law-enforcement equities related to the individual. DoD's request to the Attorney General includes the intelligence information from both the CIA and DoD.

In addition to the materials forwarded by the DoD, the Attorney General relies on two documents in responding to DoD's request: the first is a memorandum from the Criminal Division setting out all the information available to it from the FBI and other sources concerning the individual; and the second is a formal legal opinion from OLC analyzing whether the individual meets the legal standard to be held as an enemy combatant- the Quirin standard I just discussed.

Following his review, the Attorney General forwards a letter with his legal advice and recommendations back to DoD, along with the Criminal Division fact memo and the OLC opinion.

The Secretary of Defense then transmits a package of information to the President, recommending that the President designate the individual as an enemy combatant. The package of information recommending the enemy combatant designation includes six items: (i) the written assessment and recommendations of the CIA; (ii) the recommendation and preliminary assessment by the Secretary of Defense; (iii) the DoD intelligence information; (iv) the Attorney General's letter to DoD, including his legal opinion and recommendation; (v) the Criminal Division's fact memo; and (vi) the OLC opinion.

Lawyers at the White House review the DoD package and recommendations, and the Counsel to the President forwards it to the President along with his written recommendations to the President.

Finally, the President reviews the DoD package and is briefed by his Counsel. If the President concludes that the person is an enemy combatant, the President signs an order to that effect directing the Secretary of Defense to take him into his control. In the case of Padilla, the President concluded that Padilla "is, and at the time he entered the United States in May 2002 was, an enemy combatant." The President also determined that he "possesses intelligence, including intelligence about personnel and activities of al Qaeda that, if communicated to the U.S., would aid U.S. efforts to prevent attacks by al Qaeda."

As you can see executive branch decision making is not haphazard, but elaborate and careful. And although these specific steps are not required by law, we have followed them in our discretion, in order to make sure that- in this context as in all others- the President's Commander-in-Chief authority is exercised in a reasoned and deliberate manner.

In part because of the reluctance that I spoke about earlier to articulate our position and procedures, there appears to be some confusion about whether the Government is willing to permit American enemy combatants access to our courts to challenge their detention. The reality, of course, is that they do have such access: the detentions of Hamdi and Padilla have been challenged in the courts and indeed are slated for review by the Supreme Court this Spring. And, of course, from the outset, those challenges on Hamdi's and Padilla's behalf have been pursued by qualified counsel.

But can there be meaningful access to our courts and a meaningful right to file a habeas challenge without direct access to counsel? To the average American, this may appear to be a legitimate question. But those who question the government's position on access to counsel operate under a fundamental misunderstanding of the legal nature of the detention of virtually all of these terrorists.

It is the position of this Administration that, in the case of citizens who take up arms against America, any interest those individuals might have in obtaining the assistance of counsel for the purpose of preparing a habeas petition must give way to the national security needs of this country to gather intelligence from captured enemy combatants. Although the right to counsel is a fundamental part of our criminal justice system, it is undeniably foreign to the law of war. Imagine the burden on our ability to wage war if those trying to kill our soldiers and civilians were given the opportunity to "lawyer up" when they are captured. Respectfully, those who urge the extension of the right to counsel to these combatants, for the purpose of filing a habeas petition, confuse the context of war with that of the criminal justice system.

When we are at war, debriefing of enemy combatants is a vital source of intelligence. But the stream of intelligence would quickly dry up if the enemy combatant were allowed contact with outsiders during the course of an ongoing debriefing. The result would be the failure to uncover information that could prevent attacks on our military and on American citizens. This is an intolerable cost, and we do not believe it is one required by the Constitution. For these reasons, we have urged that interrogations of captured enemy combatants should be allowed to proceed, as they historically have, uninterrupted by access to counsel.

We have also recognized, however, that in every case we need not maintain the most restrictive conditions on detention that the law of war permits. Constraints imposed on a particular U.S. citizen held as an enemy combatant should be and are constantly reevaluated as a matter of policy, to make sure that the terms and conditions of confinement are necessary to meet the needs of national security.

The Department of Defense employs a deliberate and thorough procedure, as a matter of policy, when making this decision about access to counsel. The stated policy of the Department- which it detailed publicly last December- is to permit any enemy combatant who is a United States citizen and who is being detained by DoD in the United States access to counsel: (1) after DoD has determined that such access will not compromise the national security of the United States; and (2) after DoD has completed intelligence collection from that enemy combatant or after DoD has determined that such access will not interfere with intelligence collection from that enemy combatant.

The policy is initiated when DoD officials in charge of interrogations make an initial determination that intelligence collection is completed or that access to counsel would not interfere with intelligence collection. This determination is made after coordination with the Department of Justice, including the FBI, and the CIA. DoD officials prepare a memo for the Deputy Secretary of Defense seeking authorization for access to counsel. That draft is coordinated within DoD and with officials at the White House, DOJ, and CIA.

Once this coordination is complete, and a consensus reached, the memo is forwarded to the Deputy Secretary of Defense for his consideration. The Deputy Secretary then makes a final decision whether the two prongs of the DoD access to counsel policy are satisfied.

As you can see, the decision to provide counsel is made after careful consideration of national security implications. These decisions are guided by thorough legal analysis at various levels of our government.

That is precisely the course we have followed both with Yaser Hamdi and Jose Padilla. When officials at DoD determined that intelligence collection from Hamdi was complete, they announced last December that he would be allowed access to a lawyer, subject to appropriate security restrictions. Hamdi has now met with his lawyer. Earlier this month DoD officials concluded that national security would not be harmed by permitting Padilla to have access to counsel, and he too will be given access to a lawyer. As these decisions show, we have an interest in restricting access to counsel to the extent necessary to advance an important intelligence-gathering interest. When that interest no longer exists, we have no further need to restrict access to counsel and will allow U.S. citizens that access to assist in their challenge to their detention in the courts by means of habeas corpus. We believe strongly that access to counsel needs to occur at an appropriate time. What we will not do is put American lives at risk and jeopardize intelligence-gathering by recognizing a non-existent right for enemy combatants to consult with lawyers.

I am pleased to have had the opportunity this morning to provide you with some more details about the decisionmaking process that we have followed in dealing with enemy combatants who are U.S. citizens. The way in which this Administration has made its decisions, in my judgment, vividly illustrates the President's commitment to wage war on terror aggressively and relentlessly while fully respecting the bounds of law.

Recent press accounts and editorials have suggested that the Bush Administration- fearing losses in the courts- has revised its approach to dealing with terrorists. As I hope my remarks this morning have made clear, that is not the case. The extensive procedures and safeguards that I have described today are ones that we have followed from the outset in determining whether certain individuals qualify as enemy combatants. All along, the Administration's actions have been uniformly grounded in historical practice and legal precedent and have been based on careful and continuous consideration of the facts and circumstances of each case. What is new is our willingness to share more information about our procedures, as Secretary Rumsfeld did two weeks ago in Miami and as I am doing today. Our flexibility in this regard has been constrained by the demands of national security. At this point in time, however, we have decided that there are ways that we can share some of this information, and that doing so- as I have today- is both consistent with the demands of national security and in furtherance of our interest in showing the American people that their government is one that respects the law even as it fights aggressively an enemy dedicated to our destruction.

Because ours is a free society, the actions taken by the Administration have been (and will continue to be) challenged in the courts. These are important issues, and courts exist to resolve such disputes. Our independent judiciary will help determine how long-standing practice applies to the first conflict of the 21st Century. It is possible that the courts may disagree with a particular decision or policy; indeed, the Second Circuit has already done so in Padilla (although the Supreme Court will now be reviewing that case and providing the final word on the issues presented). I am confident in the legality of the measures the Administration has employed in seeking to defend Americans from our enemies in the war on terror- but in our system the courts will have their say. What cannot be denied, however, is that in protecting the American people from our terrorist enemies, the Administration has carefully examined the Constitution and laws of the United States, as applied in historically analogous situations.

In closing, when I walk into the Oval Office to brief the President, I am always reminded of the awesome responsibility that the President has- and the corresponding duty on all of us who serve him. But the burden of protecting this country and of securing the rights embodied in our Constitution is not ours alone.

Yes, those of us in government have a direct hand in executing power under our Constitution. But American citizens- including members of the bar- also play an important role in protecting and defending the Constitution's precious precepts. The vigilance and work of American citizens in this endeavor arguably is no less patriotic than the actions of our soldiers on the battlefield- both are in defense of our freedoms . . . and both should be respected.

Thank you very much.

### IN MEMORY OF GOVERNOR BOB ORR

Mr. LUGAR. Mr. President, I rise today to pay tribute to a tremendous Hoosier and dear friend Bob Orr, who has recently passed away.

Bob Orr was our Governor during 8 years of record growth in Indiana jobs, Indiana exports, and increased interest in public education. As a scholar, businessman, political leader, State legislator, and Lieutenant Governor, he was superbly qualified to be the 45th Governor of Indiana. His extraordinary success brought new idealism, energy, and pride to the Hoosier State.

I was privileged to share a myriad of wonderful experiences with Bob Orr during the past 40 years of our work together in public service, but two will be indelible in my memories. In June of 1989, Bob was nominated by President George H. W. Bush to be United States Ambassador to Singapore. He proceeded to his post after a hearing by the U.S. Senate Foreign Relations Committee and confirmation by the U.S. Senate. Shortly thereafter, Char and I visited Ambassador Orr in Singapore. We were thrilled by his vision of the great opportunities our country could enjoy if we utilized our collective imagination and inventive genius to expand exports and to provide constructive economic and political leadership in Asia. Bob Orr was tireless in leading Indiana and the United States to have an international perspective and a clear vision of how our business and educational opportunities could flourish if we sought to compete more effectively.

My second indelible memory is my last visit with Bob and Mary Kay Orr last September at a dinner in Indianapolis featuring an address by President George W. Bush. It was exciting to compare political notes with both of them and to catch up on family news. I had the privilege of once again introducing a great Governor, world statesman, and very dear friend. I had introduced, nominated, and spoken about Bob Orr innumerable times, but the last time I had the honor to do so was very special. The assembled crowd rose in cheers and sustained applause. Strongly assisted by Mary Kay, Governor Orr arose, a living legend for a legion of Hoosiers inspired by his life of achievement and service.

### EXPRESSING SYMPATHY FOR THE VICTIMS OF THE MADRID BOMBINGS

Mrs. FEINSTEIN. Mr. President, I rise today to support the resolution submitted by Senator DODD to express our condolences to the families of the victims of today's Madrid bombings and our strong solidarity with the Spanish people in the fight against terror. This is a sad and tragic day.

This morning, nearly 200 innocent people were killed and 1,000 injured when 10 near-simultaneous explosions hit 3 separate trains at the height of the city's rush hour.

Spanish police found and detonated 3 other bombs. One official described it as the worst terrorist attack in Spain's history.

I condemn in the strongest possible terms this vicious and bloody terrorist attack.

The Madrid bombings appear to be part of an ongoing terror campaign by the Basque separatist group ETA, a group designated by the United States and the European Union as a terrorist organization.

Our thoughts and prayers go out to the victims and their families.

Americans know all too well the pain and destruction caused by terror and we stand shoulder to shoulder with our Spanish friends at this difficult hour just as they stood with us on September 11.

We two peoples share the values of democracy, freedom, and respect for human rights. We have worked and we will continue to work together in the fight against terror and in bringing those responsible for this brutal attack to justice. Terrorists must know that we will not back down in the face of their crimes.

I urge my colleagues to support the resolution.

### IRAN

Mrs. BOXER. Mr. President, as the ranking member of the Senate Foreign Relations Subcommittee on Near Eastern and South Asian Affairs, I want to express my deep concern about recent developments in Iran.

Today, the International Atomic Energy Agency is meeting to discuss a proper response to findings that Iran has failed to disclose many nuclear related activities in violation of the Non-Proliferation Treaty. This is a serious issue. There is no doubt that Iran is in violation of its commitments under the NPT. The IAEA Board of Governors