1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF SOUTH CAROLINA
2

3   JOSE PADILLA                :

            vs.                 :
4

5   COMMANDER C.T. HANFT        : C/A No. 2:04-2221-26AJ

6        Status Conference in the above matter held

7   on Tuesday, September 14, 2004, commencing at

8   10:05 a.m., before the Hon. Robert S. Carr, in

9   the United States Courthouse, 85 Broad Street,

10  Charleston, South Carolina, 29401.

11

12  APPEARANCES:

13              ANDREW G. PATEL, ESQUIRE, 111 Broadway,
                New York, NY, appeared for petitioner.

14              JONATHAN M. FREIMAN, ESQUIRE, P.O. Box
                1832, New Haven, CT, appeared for
15              petitioner.

16              MICHAEL O'CONNELL, ESQUIRE, appeared
                via telephone for petitioner.
17
                MILLER SHEALY, ESQUIRE, P.O. Box 978,
18              Charleston, SC, appeared for the
                Government.
19
                DAVID SALMONS, ESQUIRE, appeared via
20              telephone for the Government.

21              SRI SRINIVASAN, ESQUIRE, appeared via
                telephone for the Government.
22

23  RECORDED BY GILBERT O'BRIEN, ESR OPERATOR
    TRANSCRIBED BY DEBRA L. POTOCKI, RDR, CRR
    85 Broad Street, Charleston, SC, 29401
24  843-723-2208
    Proceedings recorded by electronic sound recording;
25  transcript produced by computer-aided transcription.

1    THE COURT:  All right, good morning.

2    MR. PATEL:  Good morning, Your Honor.

3    MR. SHEALY:  Good morning.

4    MR. SALMONS:  Good morning.

5    THE COURT:  Let's see, let me get everybody to

6    notice their appearance for the record.  I'll start

7    with Mr. Shealy, and then we'll -- I've got the

8    names, but I want to make sure I hear their voices,

9    too, and know who's who.

10    MR. SHEALY:  May it please the Court, Your

11    Honor, we're here this morning on Jose Padilla

12    versus Commander C.T. Hanft, of the United States

13    Navy Commander.  The case number civil number

14    2:04-2221-26AJ.

15    Your Honor, I'm here appearing as local counsel

16    and as counsel for the Department of Justice, and my

17    co-counsel, who are on the telephone, are Mr. David

18    Salmons of the Solicitor General's office, and also

19    Mr. Sri Srinivasan, also of the same office.  And I

20    will allow defense counsel to introduce themselves.

21    THE COURT:  Okay.

22    MR. PATEL:  Your Honor, on the telephone is

23    Michael O'Connell, who is acting as our local

24    counsel.  My name is Andrew Patel; I have been

25    admitted pro hac vice to appear for Mr. Padilla in

1    this matter. And standing with me is Mr. Jonathan

2    Freiman, whose application to be admitted pro hac

3    vice is pending in the District Court.

4        THE COURT: Okay, good. Thank y'all very much.

5    Mr. O'Connell, can you hear us?

6        MR. O'CONNELL: Yes, sir.

7        THE COURT: And Mr. Salmons and Mr. --

8        MR. SRINIVASAN: Srinivasan. Hear you fine,

9    Your Honor, thank you.

10       THE COURT: Okay, good. I want to first of all

11   thank all of you for taking time to be here and be

12   on the phone, because we all know this is an

13   important case for everybody involved. And, you

14   know, Senator Thurmond used to say -- Senator

15   Thurmond used to call everybody great Americans, so

16   I'm glad to have all you great Americans with us

17   here today.

18       I understand that this is just the beginning of

19   a long long process with this case, and I think the

20   best thing I can do here to start with is to make

21   sure that we manage the case properly, accurately,

22   that we frame the issues, develop whatever facts

23   need to be developed and so forth. So I need

24   y'all's help, and I'd like you to give me your

25   recommendations with regard to the procedural

4

```
1   handling of this case.  And I know that, Mr. Patel,
2   you and your brethren originally asked for an
3   evidentiary hearing within ten days after the -- not
4   an evidentiary hearing -- oral arguments within ten
5   days after the filing of the petitioner's reply.
6   And I read in your reply that you want to file a
7   motion for summary judgment.  So ten days doesn't
8   really sound very practical -- didn't sound
9   practical then, doesn't sound practical now.  Tell
10  me what you envision.
11       MR. PATEL:  Your Honor, if I may, we've
12  actually -- that is, the Government and we have had
13  a chance to discuss this, and we have a schedule to
14  propose for Your Honor's consideration, which is
15  that we would file our motion for summary judgment
16  which addresses the President's authority to do
17  this, on October 18th; the Government's response
18  would be filed on November 22nd; our reply would be
19  filed on December 13th, and -- which gets us right
20  before the winter holidays.
21       And at that point, Your Honor, we're not sure
22  whether you would want us to schedule oral argument,
23  or whether Your Honor might like to set that down
24  for another status conference.  And I think our
25  thinking behind that was, as we sit here today, one
```

1    can never be sure what the future holds.  And what

2    our -- the concern is that there may be some issue

3    that Your Honor would want us to file additional

4    briefs on.  So we could either have a date, you

5    know, the week before Christmas or the week -- you

6    know, sometime after our reply, either for oral

7    argument, or if there's some other issue that Your

8    Honor feels that additional briefing would be

9    helpful to the Court, to schedule that.  We leave

10   that -- that's what we would propose, and the end of

11   that schedule is somewhat open as Your Honor feels

12   fit.

13        THE COURT:  And you think though that oral

14   arguments rather than deciding it on the pleadings

15   would be appropriate?

16        MR. PATEL:  Your Honor, we leave that entirely

17   up to you.

18        THE COURT:  Okay.  How does the Government feel

19   about that?  Mr. Patel says y'all talked about it,

20   and I know you have, but I'd just like to hear, Mr.

21   Shealy, how do you feel about oral arguments and

22   this schedule?

23        MR. SHEALY:  Yes, sir.  I think I tend to agree

24   with Mr. Patel, and I believe Mr. Salmons and Mr.

25   Srinivasan do as well.  I think perhaps the best

1    thing to do is proceed with the schedule, if the

2    Court accepts it, we have laid out for you this

3    morning.  And maybe consider, after all the

4    pleadings are in pursuant to that, perhaps have

5    another one of these hearings or a telephone

6    conference, or everyone come to Charleston and

7    decide what we need to do.  I think at that point

8    everything will be much more clear in terms of

9    whether or not we even need oral argument.

10       MR. SALMONS:  Your Honor, this is David Salmons

11   from the Department of Justice.  We agree with that.

12   And just so that -- just so that everything is

13   clear, the idea here is that the petitioner's

14   counsel have an argument that they would like to

15   present to the Court initially, that would assume

16   the Government's facts as set forth in our return

17   and the attached declaration, and that would say

18   even under those facts, the President lacked the

19   authority to detain Mr. Padilla as an enemy

20   combatant.

21       And we have no objection to proceeding with that

22   legal argument first, and proceeding along the lines

23   that have been laid out.  We just wanted to make

24   clear that the way that the proceedings would go

25   forward would be that for purposes of that motion,

1    the Court would assume the accuracy and the

2    correctness of the facts asserted by the Government

3    in their return.

4         THE COURT:  All right, I understand what you've

5    said.  There are a number of issues, there are three

6    or four issues raised in the petition, and this only

7    involves one of the four issues.

8         Two of the issues, one of them has to do with

9    interrogations, and one has to do with attorney-

10   client relationships.  I gather from the pleadings,

11   that the interrogation issue is now moot.  Is that

12   agreed or not agreed?  The Government represents

13   that -- in the pleadings and their return that they

14   are no longer interrogating Mr. Padilla, so is that

15   issue now moot?

16        MR. FREIMAN:  Your Honor --

17        THE COURT:  Yes, sir.

18        MR. FREIMAN:  -- we have two concerns with the

19   Government's averments in its response.  The first

20   is that their language is that they have no plans at

21   present to interrogate Mr. Padilla.  Our concern is

22   that their plans may change.  And so we do not

23   believe that issue is moot.  We believe --

24        THE COURT:  Well, let me see if we can resolve

25   that issue though.  Mr. Shealy or Mr. Salmons or Mr.

1    Srinivasan, what can you tell us about

2    interrogations, and is there some way we can resolve

3    this issue and take it off the table?

4        MR. SALMONS:  Your Honor, this is David Salmons.

5    What I would like and what I think we can say now is

6    that at the present time there are no ongoing

7    interrogations or interviews with Mr. Padilla.  It's

8    difficult for us to rule out absolutely any

9    possibility that circumstances might arise where the

10   national security or other interests would warrant

11   resuming those.

12       What we can say, however, is that we would be

13   happy to provide notice to the other side and to the

14   Court, if we have an intent to resume any such

15   interviews, and we could deal with that issue at

16   that time in the context of whatever those

17   circumstances might be.

18       So what I would say is at least for now that the

19   issue is not moot; it's at least not ripe.  And that

20   we could put that issue on the back burner, if you

21   will, and if it comes up, we could deal with it at

22   that time.

23       THE COURT:  Are you saying that the Court would

24   have some role other than just notice?

25       MR. SALMONS:  Well, I'm assuming, Your Honor,

1    that at that point the relief that they were seeking

2    with that -- I don't have their petition in front of

3    me -- but as I recall it was essentially an

4    injunction ordering the Government not to have

5    further interrogations or interviews with Mr.

6    Padilla, would become ripe; they would then want to

7    prep that in some sort of expedited way, would be my

8    assumption, and then we could deal with that issue,

9    if it arises, under the context and specific facts

10   that we would have present at that time.

11       We don't have an issue of putting issues before

12   the Court just for the sake of its resolution.  The

13   only reason that I can foresee where that need would

14   arise, this would not be the decision obviously made

15   by attorneys in this case, this would be based on

16   the folks that are involved in the national security

17   issues and the intelligence issues that, you know, a

18   particular plot or particular circumstance has come

19   up where they think there may be a justification for

20   resuming those, and we could deal with that issue at

21   that time.

22       THE COURT:  Well, I guess what I'm saying is,

23   are you willing to agree or stipulate or consent,

24   however you want to put it, that there will be no

25   further interrogations of Mr. Padilla, without

1  giving notice and an opportunity for a hearing in

2  the Court?

3      MR. SALMONS:  Yes, Your Honor, I think that is

4  what I'm representing.  Now, there may be, you know,

5  depending on the urgency of the situation, there may

6  be some need for an expedited handling of that or

7  the like, but -- because at this point in time we

8  don't foresee it even coming up, but if it were, I

9  would think we would provide notice and then we

10  would try to get it resolved as quickly as possible.

11      THE COURT:  Okay.  And I certainly would do

12  everything I could to expedite it, and I'm sure

13  counsel for the petitioner would do the same.  Would

14  that suit you, would that remove that issue from the

15  table, if they make that concession?

16      MR. FREIMAN:  Yes, I believe it would, Your

17  Honor.

18      THE COURT:  Okay.  So can we put that in stone

19  and make that the rule of the case now, that there

20  will be no more interrogations of Mr. Padilla

21  without giving notice and opportunity for a hearing

22  in court, and with the agreement that everyone will

23  expedite it at the Government's request.

24      MR. SALMONS:  That's fine with the Government,

25  Your Honor.

1    MR. FREIMAN:  That's fine with petitioner, Your

2  Honor.

3    THE COURT:  Okay, good.  Now then, let me talk

4  about representation.  What is -- I am not positive

5  that I understand what the extent of attorney-client

6  relations are at this point in time; maybe you can

7  tell me, Mr. Patel.

8    MR. PATEL:  Your Honor, I've actually had some

9  discussions on this issue with members of the

10  Department of Justice, as well as with members of

11  the military JAG officers that we've been dealing

12  with.  And I think the clearest statement of the

13  current status of that attorney-client relationship

14  is it seems to be in transition right now.

15    But I think for the purposes of what we need to

16  do today, Your Honor, is that issue, as well as the

17  issue of whatever discovery might be necessary, if

18  we were to proceed with a fact hearing, that that

19  can be tabled, because the issue that we'll be

20  briefing that Your Honor will eventually decide,

21  would ultimately be, if granted, dispositive of the

22  attorney-client issue as well.

23    THE COURT:  You have greater faith in the power

24  of my decisions than I do.  I don't think it will

25  be, and I think this will be an issue that continues

1    to linger.

2        What is the Government's position with regard to

3    representation, or attorney-client relations, I

4    guess I should say.

5        MR. SALMONS:  Your Honor, again, this is David

6    Salmons.  Our understanding at this time is that

7    petitioner's counsel have been -- have the ability

8    to visit with him, that those visits are currently

9    not being monitored in any sort of realtime way.

10        There is a question that Mr. Patel raised with

11    us, we're going to undertake to try and get some

12    clarification on, as to whether or not -- had to do

13    with the handling of attorney notes.

14        The concern, Your Honor, has to do with his

15    classification issues with regard to national

16    security-related information.  And if the counsel

17    were to take notes from their meeting, there may be

18    a need to house those notes in a secured facility

19    and treat them as national security-related

20    information, or to at least have them submitted to a

21    privilege team that would be walled off from any of

22    the litigation issues related to Mr. Padilla, so

23    that they could be properly classified.  If they're

24    unclassified, then they could be handled by the

25    attorneys as such in their offices and the like.

1    And so there are a couple of issues we're

2    working out.  For the most part though I think it's

3    clear that they do have access to Mr. Padilla, and

4    for purposes of the way in which petitioner's

5    counsel represented they want to produce, they're

6    comfortable with, I think -- they can clarify this

7    -- but I believe they're comfortable with the access

8    issues, at least with regard for the motions they're

9    intending to file first.  And as we continue to try

10   and sort out some of the details with regard to

11   national security information, we're hopeful that we

12   can do so without the need for any further

13   involvement of the Court.

14       THE COURT:  You said a lot there, so let me go

15   back to the beginning.  First of all, you said that

16   counsel at this time may visit and not be monitored

17   in a realtime way.  What do you mean?

18       MR. SALMONS:  Your Honor, all I meant by that is

19   that there's no audio monitoring of petitioner's

20   counsel visits at this time.  There were initially

21   when the visits first started, to make sure that

22   information that was being conveyed were within

23   security clearance levels of the counsel, and to

24   make sure that there weren't any attempts to further

25   ongoing terrorist activities through passing coded

1    messages and the like.

2        After a period of time, it's my understanding,

3    Your Honor, that both the Department of Defense

4    personnel and the counsel were comfortable with the

5    way in which the interviews and the counsel visits

6    were proceeding, and a determination was made,

7    because of that, there was no continuing need to

8    monitor. And so that has now ceased. And so the

9    visits at this time are not monitored, they're, you

10   know, as they normally would be.

11       There are, I believe, and Mr. Patel can clarify

12   this, I think there are Department of Defense

13   personnel outside the door in case there are any

14   security issues. And I think they reserve the

15   ability to have a video monitor, again, for the same

16   reason, without any audio, but the actual content of

17   the communications are not being monitored.

18       THE COURT: Mr. Salmons, I appreciate your

19   response. It's clear that you're well suited for

20   the Solicitor General's office, because you give me

21   more information than I need at this low level. All

22   I really want to know is this. Are they currently

23   recording -- apparently what you're telling me is

24   they're not, in a realtime sense, that is, not at

25   the same time they're meeting, monitoring the

1    conversations between counsel and client.  Are they

2    recording conversations between counsel and client,

3    audio or video?  And if you can give me that answer

4    in thirty words or less, that would be great.

5        MR. SALMONS:  Your Honor, I apologize if I was

6    not clear.

7        THE COURT:  No, you were --

8        MR. SALMONS:  My understanding is there is no

9    audio recording of the counsel visits, and that -- I

10   don't know whether there is any video recording.  If

11   there is video -- I don't think they're recording

12   it, but I think there are -- there may be videos in

13   the room, and there's, you know, someone there that

14   just makes sure that there's no harm to the counsel

15   or anyone else.  I'm not sure whether that is still

16   ongoing or not.

17       THE COURT:  When you say there's someone there,

18   are they in the room or outside the room?

19       MR. SALMONS:  I believe they are outside the

20   room.  Mr. Patel may be in the best position to tell

21   us how that has worked.  My understanding is there

22   is no one in the room, that there is no audio

23   recording of the conversation.

24       THE COURT:  Let me ask you this.  Mr. Patel, I

25   assume, has top secret clearance now, is that right?

1        MR. PATEL:  Your Honor, I have -- clearances are

2    given out on as-needed basis.  What I have been told

3    by the security people at the Department of Justice

4    is that the Department of Defense said that we

5    needed secret clearance, although we've been

6    cleared, and if that changes and they need top

7    secret -- we need top secret, that is a matter of

8    signing a form, and it can be accomplished in a

9    matter of minutes.

10       THE COURT:  What I'm trying to do is this; find

11   out if there is an objection to having counsel for

12   the petitioner who have the appropriate level of

13   Department of Defense clearance, which I suppose

14   is -- or national security clearance, which I

15   suppose from what Mr. Patel says is secret, meeting

16   in an unmonitored and unfettered way with his

17   client, under appropriate security conditions.  By

18   that, security, I mean safety for the parties

19   involved, as well as prevention of escape and that

20   sort of thing with regard to the petitioner.

21       Is there any objection to that, Mr. Salmons?

22       MR. SALMONS:  Your Honor, my understanding is

23   that's precisely where we are at.  Mr. Patel, I

24   don't know if he'll so stipulate, that was my

25   understanding of how he chose as well, but he can

1    clarify that.

2        THE COURT:  Tell me, Mr. Patel, how is it

3    working?

4        MR. PATEL:  Believe it or not, Your Honor, the

5    reason I hesitate to answer is I'm not quite sure.

6    Brig operations are somewhat different from national

7    security operations, and they're rather touchy about

8    that.  My understanding -- I have been meeting in a

9    room with Mr. Padilla -- which is how his mother

10   tells me his last name is actually pronounced.

11       THE COURT:  Thank you.

12       MR. PATEL:  He is -- we are alone in the room,

13   there is a video camera in the room.  My

14   understanding is that camera was not being used in

15   any way.  He is secured in place, although his hands

16   are free.  And outside one -- outside the door there

17   is a wall, a glass, although darkened glass, window,

18   and that there are two military people standing

19   outside the hallway.  It's my understanding that

20   they cannot hear our conversations.  And that's the

21   physical structure of how that's working.

22       To date, the way we have handled the national

23   security issues, or the potential national security

24   issue is, we have agreed not to take notes.

25       And the reason for that is, in the normal

1    national security, when you're dealing with

2    classified information, it's rather clear.  A

3    document has been determined by the appropriate

4    Government official that this is classified

5    material, and it is stamped with its classification

6    rating.  So it would be stamped secret or top secret

7    or whatever is determined to be appropriate.

8        In the situation where we're talking to an

9    individual who clearly does not have classification

10   authority, that is, Mr. Padilla does not have the

11   authority to say what is or is not classified, it

12   becomes a little more difficult.

13       And this is -- and I think what -- for our

14   current purposes we can continue to work on the

15   model that we have been working on, but if we

16   proceed further, then we will have to revisit this

17   promptly.  There's something else that I think Mr.

18   Freiman, I think, wanted to add on this.

19       THE COURT:  Mr. Freiman?

20       MR. FREIMAN:  Thank you, Your Honor.  There are

21   two things that I would add.  One is vis-a-vis the

22   notes.  There are a couple of federal statutes that

23   could at least plausibly be thought to govern this

24   situation, the Classified Information Procedures Act

25   and the National Security Act.

```
 1        The guidance that Mr. Patel and Ms. Newman

 2   initially received by way of the documents setting

 3   the conditions for their terms of access, was a

 4   document that did not seem to draw on those

 5   statutory backgrounds.

 6        THE COURT:  Well, you know, I'd rather be

 7   prospective than retrospective.  I'm trying to set

 8   out some guidelines for us to go forward with in the

 9   future.  And, you know, I don't want to rehash old

10   wounds.

11        MR. FREIMAN:  Fair enough.

12        THE COURT:  If there are old wounds there.

13        MR. FREIMAN:  Understood.

14        THE COURT:  What I'd like to know is, is this

15   arrangement satisfactory for the time being.  Mr.

16   Patel?

17        MR. PATEL:  For the time being, it is, Your

18   Honor.

19        THE COURT:  All right.  Now then, can you agree

20   and the Government agree that there will be no

21   change in these current arrangements without an

22   opportunity for notice and a hearing in court?

23        Mr. Shealy, you wanted to say something.

24        MR. SHEALY:  Yes, sir.  I think we can agree to

25   that.
```

```
1        THE COURT:  Mr. Patel?

2        MR. PATEL:  Your Honor, I would agree with that,

3   except I actually have some good news to inform Your

4   Honor.  There seems to be, as I said initially, some

5   evolution going on here, and I view it as positive,

6   that it's increasing our ability to have access and

7   communicate with Mr. Padilla.

8        To the extent that that -- the changes are in

9   that nature, is really, I would submit, really not

10  necessary for us to burden the Court with good news.

11       THE COURT:  Well, I certainly agree.  I

12  certainly agree.  All I'm saying, I'm trying to set

13  a minimum standard, and that if it drops below that

14  minimum standard, that you will then have the

15  opportunity, before it is enacted, before it is

16  imposed, to be told about it and have a chance to

17  bring it before the Court.  Is that agreeable?

18       MR. PATEL:  It is, thank you, Your Honor.

19       THE COURT:  Okay.  Now, does that resolve in

20  large part the issue on the -- in your petition?

21       MR. PATEL:  It certainly tables it sufficiently

22  for the time being, Your Honor.

23       THE COURT:  Okay.  Now, the elephant in the room

24  that nobody wants to talk about is the factual

25  basis, factual -- the opportunity that the Supreme
```

1    Court said that Mr. Hamdi has, and that we all --

2    that is the touchstone of all of these hearings, and

3    that is the opportunity to challenge an erroneous

4    detention on the part of the Executive.

5        I understand that you gentlemen are -- everyone

6    is eager to go forward with the legal issues.  What

7    I would like to do is talk about some method of

8    assuring that Mr. Padilla's due process rights are

9    protected, that he has notice, that he has

10   opportunity at least for some preliminary type of

11   review of the factual issues.

12       So far, the Government has submitted its

13   affidavit.  The only thing from the petitioner is in

14   his -- if I'm -- if -- unless I've overlooked

15   something -- is the assertion in the petition that

16   he denies all of the facts.  I understand that

17   there's concern about the nature of the evidence

18   that's been presented to the Court, its hearsay

19   nature, but hearsay evidence is not no evidence.  I

20   mean, every day of the week we put people in jail on

21   hearsay evidence, because that's what is allowed at

22   a preliminary hearing and detention hearings; in

23   many administrative hearings, hearsay evidence is

24   admissible.  So that doesn't mean the evidence is

25   inadmissible, it just means that it may not be of as

1    high quality. And the Supreme Court seemed to
2    indicate in Hamdi that hearsay evidence was -- might
3    be appropriate.
4        I'd like to know -- I'd like to either, one,
5    have some representation that Mr. Hamdi does not
6    want that type of hearing, or at least talk to y'all
7    about proceeding with some sort of preliminary
8    hearing for him. Because if he's wrongfully
9    detained, factually wrongfully detained, we all do
10   him a disservice by not providing him that due
11   process hearing.
12       Now, I'd be glad to hear y'all's comments on it.
13   Mr. Shealy, do you want to say something?
14       MR. SHEALY: I guess Mr. Patel addressed this.
15   My discussions with Mr. Salmons and Sri Srinivasan,
16   who are still on with us, is that for purposes of a
17   summary judgment motion or something like that,
18   which they intend to file very soon, in the next few
19   weeks, that the Court rely upon the facts as stated
20   in the Government's response and attachments at this
21   time to resolve that. If they are willing --
22       THE COURT: But as I understand it, the summary
23   judgment motion will be directed solely at the
24   presidential authority, it will not be addressed at
25   whether or not Mr. Padilla has been wrongfully

1    detained factually by the Executive.  That's all I'm

2    saying.  And here he's been there for two years and

3    nobody has -- he denies it, and nobody has said, you

4    know, well, maybe there's a mistake.

5        MR. SHEALY:  I understand that.  And I -- maybe

6    Mr. Patel can do that.  I think they're representing

7    their client diligently, and --

8        THE COURT:  I certainly don't imply that.

9        MR. SHEALY:  And I think that he can certainly

10   correct me, but my understanding is, for purposes of

11   that legal issue, to the extent the facts

12   are relevant to that issue --

13       THE COURT:  I understand that, but I'm not

14   addressing that legal issue.  I'm addressing the

15   second claim in their petition, which is that he has

16   been denied his due process rights because he has

17   not been given notice, and he has not had an

18   opportunity to contest the facts.

19       MR. PATEL:  Here is the problem, Your Honor.

20   The discovery issues, the access to counsel issues,

21   are enormous.

22       THE COURT:  Well, first of all, let me interrupt

23   you, if I may.  The Supreme Court in Hamdi says

24   that -- suggests that the Court approach these

25   things in a -- and this is my word -- a stepped

```
 1    manner, a manner that might increase from the lesser
 2    to the greater.  And I understand that discovery
 3    before a full blown evidentiary hearing may be a
 4    problem.  However, there has to be -- the Government
 5    has presented facts tending to show, even in the
 6    form of hearsay and affidavits, tending to support
 7    his position.  So far there's been nothing, and your
 8    petition says no opportunity for you to present
 9    anything.  And I want to give you that opportunity
10    and find out how to meet that allegation.
11         Because, quite frankly, I don't want this case
12    to be, two years from now, before the United States
13    Supreme Court, with your saying he's been before the
14    District Court in New York, the Appellate Court in
15    New York, the District Court in South Carolina, the
16    Appellate Court in South Carolina, and never had an
17    opportunity to contest these charges.  That's what I
18    don't want.  I want him to have that opportunity, or
19    I want you to do something to remove that issue.
20         MR. PATEL:  I cannot remove that issue, Your
21    Honor.
22         THE COURT:  I didn't think you would.  I didn't
23    expect you to, but I can't remove the other one.
24         MR. PATEL:  And if we're going to -- the first
25    step in addressing that issue is we have to address
```

1    the counsel issue.

2        THE COURT:  Well, that's what I -- that's why I

3    addressed it.

4        MR. PATEL:  Right.

5        THE COURT:  And I thought you said you were

6    happy with it.

7        MR. PATEL:  But, Your Honor, I'm happy with it

8    for the purposes of dealing with the critical legal

9    issue of presidential authority.

10       THE COURT:  Tell me what you need to address it

11   from the other standpoint.

12       MR. PATEL:  Attorney-client privilege.

13       THE COURT:  Well, what's the Government's

14   position with regard to attorney-client privilege?

15       MR. SALMONS:  Your Honor, I'm not sure I

16   understand exactly what the concern is.

17       THE COURT:  Well, as I understand attorney-

18   client privilege, that means that anything that Mr.

19   Padilla tells Mr. Patel or any of his other

20   attorneys that are properly secured, cannot be

21   divulged by those attorneys.  Is that not your

22   understanding of it, Mr. Patel?

23       MR. PATEL:  Yes, Your Honor.

24       THE COURT:  Okay.

25       MR. SALMONS:  Again, Your Honor, I'm not sure

1   exactly why it is that the procedures that we worked

2   out today, I understand that there are still some

3   questions Mr. Patel had raised, and we're trying to

4   work through with regard to the handling of national

5   security-related information, but given that there's

6   no monitoring presently, I'm not sure why it is that

7   current counsel access would be viewed as deficient,

8   from the standpoint of attorney-client privilege.

9       THE COURT:  We're not talking about access,

10  we're talking about privilege.  And that is whether

11  Mr. Patel, for example, has the right not to answer

12  your questions as to what his client told him.

13      Of course, there are exceptions to the

14  attorney-client privilege, there's the crime/fraud

15  exception and all sorts of exceptions.  But basic

16  common law attorney-client privileges, I don't

17  know -- the reason I asked the Government is, I

18  don't know where this comes from, what his fear is,

19  but apparently there's some fear that the

20  Government -- that the attorney-client privilege

21  will not lie.

22      Mr. Shealy, do you want to add something to

23  this?

24      MR. SHEALY:  Your Honor, I think that going back

25  to what Mr. Patel said and what Mr. Salmons is

1    articulating, those are difficult issues.  We both

2    understand that, both sides, Mr. Patel and

3    ourselves.  And I think that's why we have proposed

4    what we have proposed to the Court today, pursuant

5    to Hamdi, is to deal first on a very limited basis

6    with presidential authority.  Indeed, the defendant,

7    the petitioner, is willing to proceed that way.

8         THE COURT:  Well, let me ask this then.  Will

9    the petitioner consent or agree that he will not, in

10   the future, argue that Mr. Patel has not been

11   given -- Mr. Padilla has not been given an

12   opportunity to exercise his due process rights?

13        MR. FREIMAN:  Your Honor, we would agree not to

14   make that as a tactical point before a Circuit

15   Court, claiming that the justice system had somehow

16   failed our client, given Your Honor's willingness

17   and enthusiasm for conducting an evidentiary

18   hearing.

19        We would not, of course -- and I don't think you

20   meant to intend this; I say this out of an abundance

21   of caution -- we would not, of course, in some way

22   withdraw our claim that he is entitled to a due

23   process -- to an appropriate hearing consistent with

24   due process, should Your Honor find what the

25   President does, in fact, have the power to detain

1    him.

2        THE COURT:  Well, does not due process involve

3    timeliness?  Is not the famous statement that

4    justice delayed is justice denied?

5        MR. FREIMAN:  Yes, it does, Your Honor.

6        THE COURT:  Then how can you take that position?

7    And if you think he has a right to a due process

8    hearing, how can you give it up so cavalierly?

9        MR. FREIMAN:  We don't intend to give it up, we

10   intend simply to have --

11       THE COURT:  Well, you're delaying it, denying

12   it, which is the same as giving it up.

13       MR. FREIMAN:  We're --

14       MR. PATEL:  Your Honor, our intention -- it is

15   our belief that the fastest way we can obtain relief

16   for our client is to have the issue of presidential

17   authority determined.

18       MR. O'CONNELL:  Your Honor, this is Michael

19   O'Connell.  May I offer something?

20       THE COURT:  Yes.

21       MR. O'CONNELL:  My perception of this is that in

22   order to test his detention, they're going to have

23   -- we're going to have to have extensive discovery,

24   which is going to take, I'm gathering, a long period

25   of time.

1    If we approach it the way that's been suggested,

2    everything as far as the presidential authority is

3    concerned, will have been submitted either to the

4    Court in late November, and the decision can then be

5    made.

6    If we have to test -- if we have a due process

7    hearing now, it's not going to be now, it's going to

8    be months and months while we all engage in

9    discovery.

10    THE COURT:  Well, it depends on the nature of

11    the due process hearing, Mr. O'Connell.

12    MR. O'CONNELL:  That's right, but --

13    THE COURT:  And depends on the structured

14    approach.  I don't see why we can't -- you know,

15    I -- there are lots of ways to skin this cat, and

16    there are lots of ways to proceed with these types

17    of hearings.  And I don't frankly -- I'll throw this

18    out.  It is unfair to the Government to require them

19    to have their witnesses on hold for years and years,

20    while this matter is litigated on a legal issue.

21    Memories fade, witnesses die, people disappear, and

22    it's just as unfair to them as it is to Mr. Padilla.

23    Now then, if there is some -- if what you're

24    saying, and I don't mean to put words in your mouth,

25    and I don't think this is what you're saying, you

```
 1    admit the matters in the Government's petition, and
 2    that that admission will lie in any future
 3    evidentiary hearing, well, that's fine.  And that
 4    you don't want -- and that you waive contesting it.
 5    But so far, Mr. Padilla has submitted zero, no
 6    affidavits, no hearsay, nothing, to -- except, as I
 7    said, the denial in the petition you submitted for
 8    him.
 9        MR. PATEL:  Your Honor, it is not our intention
10    to do what you just suggested.  We do it not --
11        THE COURT:  And as you also note, the Supreme
12    Court is loath to reach a constitutional issue if it
13    doesn't need to.
14        MR. FREIMAN:  Yes, Your Honor.  It may be that
15    we read the Hamdi decision somewhat differently than
16    you do.
17        THE COURT:  Well, listen, I think all nine of
18    the justices read it differently than each other, so
19    that's not a surprise.
20        MR. FREIMAN:  Yes, Your Honor, so as to the
21    questions of the appropriate process in a hearing,
22    while Justice O'Connor's plurality does say that
23    hearsay is appropriate, presumptions could be
24    appropriate under certain circumstances, it's also
25    true that she was speaking only for four justices at
```

1   that point.  Her resolution of the issue of

2   presidential power to detain was joined by Justice

3   Souter and Justice Ginsburg, thereby creating the

4   majority.  On the process issues there was no fifth

5   voice joining her, so those issues are entirely

6   undecided at this point.

7       THE COURT:  And I -- if you're telling me that

8   the Supreme Court does not give complete guidance to

9   the lower courts, that's not a new issue, not a new

10  statement, so I'm fully aware of that.

11      MR. FREIMAN:  Yes, Your Honor.  So I raise this

12  only to say that we would, in fact, intend to

13  vigorously litigate the question of whether hearsay

14  would be acceptable in a hearing, and as well to

15  vigorously litigate the availability of discovery

16  prior to any such hearing.  Adequate discovery.

17      THE COURT:  Let me ask you this.  Can you

18  forecast in any type of legal manner, that there is

19  evidence to dispute the Government's factual

20  assertions?

21      MR. FREIMAN:  Your Honor, it is impossible to

22  know until we have an opportunity to conduct

23  discovery.

24      THE COURT:  Wait a minute.  You answered, you've

25  raised the issue in your petition that he denies it.

1      MR. FREIMAN:  That's the basis that we have,

2   Your Honor.

3      THE COURT:  And so I asked you if there is any

4   factual basis for that denial.

5      MR. FREIMAN:  There is a footnote in the -- in

6   the pleading presented by the -- by what was Deputy

7   Attorney General James Comey's remarks, is that

8   where the footnote initially appears?  Saying that

9   Mr. Padilla disagrees with what the Government sets

10  forth as the facts.  That is our factual basis, the

11  Deputy Attorney General's own statement.

12     MR. PATEL:  Your Honor, we're a little bit

13  between a rock and a hard place here, because other

14  than a general denial, we get back to whatever Mr.

15  Padilla says is potentially classified and has to go

16  through screening process.

17     THE COURT:  That's not stopping anything else  in

18  this case.

19     MR. PATEL:  Well, actually --

20     THE COURT:  Or in any of the other cases.  I've

21  got -- you know, we all have gotten secret

22  information.

23     MR. PATEL:  It's -- it has stopped us, Your

24  Honor.  And one of the first --

25     THE COURT:  Well, that's what I want to do is

1    open it up for you so that you can proceed.

2        MR. PATEL:  Well, one of the first issues is the

3    process that Mr. Salmons has outlined, we believe,

4    is unlawful and intrusive, and that there is no --

5        THE COURT:  What process is that?

6        MR. PATEL:  The process of a screening team or

7    privilege team.  We believe that whatever Mr. --

8        THE COURT:  Well, then why didn't you say so?

9        MR. PATEL:  Your Honor, that's one of the

10   myriad of issues that we can speedily sidestep by

11   resolving the authority issue.  I mean, we could

12   be --

13       THE COURT:  Speedily sidestepping is not the

14   nature of a democracy.  Speedily sidestepping is

15   what got you to South Carolina.  Okay?  So we don't

16   want to do that; we want to do what's right.  And if

17   I'm all wrong, Mr. Salmons, tell me, because I don't

18   want to be the -- you know, the wild card or the odd

19   man out.  Is there something wrong with wanting Mr.

20   Padilla to have his due process?

21       MR. SALMONS:  Your Honor, what I would say, I

22   guess, is this.  It seems to me that from a general

23   due process standpoint, the fact that Your Honor in

24   this habeas proceeding is providing this opportunity

25   for Mr. Padilla, through counsel, to challenge his

1   detention both legally and factually, provides all
2   the process that is due. And certainly the Hamdi
3   decision, I think, makes that clear, that whether or
4   not Mr. Padilla, through his counsel, would prefer
5   to go first with some legal issues and present them
6   to the Court and have those resolved through a
7   summary judgment type process, or would like more of
8   a factual development first through a due process
9   hearing, it seems to me to be the type of decision
10  that litigants make every day. And those types of
11  decisions don't necessarily implicate due process,
12  because he's got the opportunity and he's made the
13  decision to proceed with the legal arguments first,
14  and so he can't really complain about any delay that
15  follows from that.
16       From the Government's standpoint, Your Honor --
17       THE COURT:  They have, in all the petitions
18  they've filed with me, while they were arguing up in
19  New York they filed petitions, every petition starts
20  off, Mr. Padilla has been held unconstitutionally
21  for two years without due process. Every petition
22  starts that way.
23       MR. SALMONS:  I understand that, Your Honor. I
24  think what I would say from the Government's
25  perspective is we're happy to proceed either way.

1    It does seem to us that it's not uncommon in habeas
2    and other cases where one of the parties has an
3    argument where the petitioner has an argument that
4    says under any circumstance, under any set of facts,
5    the detention is unlawful, to go ahead and proceed
6    through some type of a summary judgment mechanism to
7    resolve that issue.  We have no objection to that,
8    that is certainly, it seems to me, a rational way in
9    which this case could proceed.  And it's hard to see
10   how that part of the proceeding could come to any
11   violation of due process, since that's what the
12   petitioner's asked for.
13       And so I really do see it in terms of whether we
14   go forward first on the legal issues or summary
15   judgment, or we go forward first through some sort
16   of a modified or limited due process hearing, as
17   Your Honor has raised, is sort of a litigation
18   judgment that parties make all the time.  We don't
19   have an objection to proceeding either way.  And we
20   can see some benefits to getting the legal issue out
21   of the way as soon as possible.
22       THE COURT:  Well, of course, this is not like
23   most habeas petitions.  I know there are some, but
24   most habeas petitions come fully litigated with the
25   trial record or some sort of record behind it.

36

1    MR. SALMONS:  That's right, Your Honor.

2    THE COURT:  That is, at least in the 2254 arena,

3  has a presumption of correctness.

4    MR. SALMONS:  That's right, Your Honor.

5    The other thing I would just add quickly is that

6  it seems to us that the line in the Hamdi plurality

7  that makes reference to lower courts proceeding in a

8  prudent -- I believe the quote is both prudent and

9  incremental --

10    THE COURT:  Right.

11    MR. SALMONS:  -- fashion, is broad enough to

12  allow either the sort of summary judgment type

13  approach first, and then getting to the factual

14  development, or the way Your Honor was mentioning.

15    It would seem to me that at the end of the day

16  these are the types of issues that, you know, Mr.

17  Padilla, in consultation with his counsel, get to

18  make.  And it's not a due process issue that he

19  decides to go with the legal argument first,

20  followed up by his factual challenge, or the other

21  way around.

22    THE COURT:  Well, you know, I understand what

23  you're saying.  From a practical standpoint it is an

24  inefficient use of judicial resources to bifurcate

25  issues like this, and to send them up when you know

60

 1    they're going to go all the way to the United States

 2    Supreme Court, no matter what the results are.    And

 3    so what you're doing is you're saying we want to

 4    litigate the legal issues all the way to the United

 5    States Supreme Court, and then, if we have to, come

 6    back and litigate all the factual issues all the way

 7    up to the United States Supreme Court, including the

 8    processes and the whole thing.

 9        MR. SALMONS:  Your Honor --

10        THE COURT:  The result is going to be that

11    Mr. -- and as all of us should understand, the

12    result is going to be that if they lose -- if the

13    strategic decision to go forward on the legal issue

14    proves to be a losing decision, then Mr. Hamdi is

15    going to be in jail for anywhere from four to six

16    more years.    And I think we ought to lay that on the

17    table so that everybody knows that that's what the

18    decision making is all about, so we won't come back

19    later crying in our beer that Mr. Hamdi, poor Mr.

20    Hamdi has been kept in -- I mean Mr. Padilla -- has

21    been kept in jail all this time because counsel has

22    made a strategic decision to proceed this way.    And

23    that's all I want to get clear on the table.

24        MR. SALMONS:  I think Your Honor is accurate in

25    the way you describe the choices that they may be

1    making.

2        I guess the one thing I would add, Your Honor,

3    is that at least at this early stage, the only

4    decision that's been made is how -- is the request

5    for this Court to proceed in a certain order.

6        If the Court, for example, were to determine

7    that the President does have the authority to detain

8    Mr. Padilla, the question of whether to certify that

9    question for a round of appellate review now, or to

10   proceed with factual development at that time, I

11   would -- I think it would still be on the table, and

12   we can address that then.

13       But I think Your Honor accurately described the

14   sort of litigation judgment that petitioner's

15   counsel is making.

16       THE COURT:  Well, I see that Mr. Patel and Mr.

17   Freiman are shaking their heads yes.  Do you, by

18   shaking your heads yes, do you perceive under any

19   circumstances that if I were to rule that the

20   President's authority was -- the President had the

21   authority to do what he's done, that you would then

22   want to go straight forward into an evidentiary

23   hearing?  Is that even within the realm of

24   imagination?

25       MR. FREIMAN:  Your Honor, I don't think, in all

```
1   candor, that that would be our choice at this time.
2       THE COURT:  I don't think so either.
3       MR. FREIMAN:  We would seek interlocutory
4   review.  But Your Honor's determination of whether
5   that was appropriate, and the arguments for and
6   against that review, could be held until that time.
7       THE COURT:  I understand, but -- all I'm saying
8   is that I don't think that there's any --
9       MR. PATEL:  Your Honor, if I could make --
10      THE COURT:  You know, we're making the decision
11  now.  If we're going to go down this road, I'm sure
12  y'all are going to want it to go all the way up, and
13  then the argument six months from now, after we've
14  gone through the legal issues, is going to be much
15  more intense to go forward than it is now, with any
16  evidentiary matters.
17      I just want the table to be clear and make sure
18  everybody understands before I issue any scheduling
19  orders.
20      MR. PATEL:  Your Honor, it could also be that --
21  and I haven't had a chance to talk to the Government
22  about this, or even to my co-counsel.  So I just
23  propose this as a thought balloon.  That we could --
24  I would like to have discussions with the Government
25  and with my co-counsel, that a second track, which
```

1    would essentially be to start raising some of

2    these -- some of the due process issues that Your

3    Honor's concerned.

4         Part of my concern and part of my reason that I

5    don't want the litigation to stop, that I would like

6    the authority issue to go forward, is especially as

7    to the counsel, which is almost a first step, that's

8    an issue in flux.  And we may not need to litigate

9    that, because we may be able to come to an agreement

10   about that.

11        THE COURT:  The issue with regard to counsel?

12        MR. PATEL:  Yes.

13        THE COURT:  What issue is there?

14        MR. PATEL:  Excuse me, Your Honor?

15        THE COURT:  What issue is there?  I thought we

16   were -- I thought that it was resolved, and the only

17   question that you asked was whether there was

18   attorney-client privilege, and I heard nobody say

19   that they did not think attorney-client privilege

20   lay in this case.

21        MR. PATEL:  Except, Your Honor, as to the

22   privilege team.  And --

23        THE COURT:  Well, that's not an issue at this

24   point, that's -- it's not even in place.  Is it, Mr.

25   Salmons, is there -- if he takes notes, what's going

1    to happen?

2        MR. PATEL:  Your Honor, I think I may be able to

3    answer that question better.

4        THE COURT:  I'd rather hear it from the

5    Government.

6        MR. PATEL:  Okay.

7        MR. SALMONS:  Your Honor, I'm sorry, in that

8    exchange I couldn't quite make out exactly what the

9    question was.

10        THE COURT:  If Mr. Patel meets with Mr. Padilla

11    and takes notes, what is the Government's position

12    with his attorney-client privilege right, with

13    regard to the information contained in those notes?

14        MR. SALMONS:  Your Honor, let me try and answer

15    it this way.  And I'm not entirely sure what the

16    current status is with regard to whether those notes

17    would be subjected to a privilege team review, so

18    that they could be properly classified.  But it

19    seems to me that the issue is not one of attorney-

20    client privilege, but is one of identifying and

21    properly handling and storing national security-

22    related information.  That happens in criminal

23    cases, that happens in civil cases, and that's not

24    an issue about attorney-client privilege, it's --

25    and it's a very -- the intelligence team that would

1    review the material is a privilege team that would,

2    you know, be walled off from any litigation.  And

3    any information that would be contained in those

4    notes would not be involved, from the Government's

5    standpoint, in any of the proceedings involving Mr.

6    Padilla.

7        As you just stated, the attorney-client

8    privilege is being acknowledged -- not acknowledged,

9    but at least protected, any argument about the

10   attorney-client privilege, because we're keeping --

11   you know, it's not going to get into the hands of

12   the folks involved in these cases.

13       And whether or not that is a requirement that's

14   still going to be in place, is a question that we

15   were discussing with Mr. Patel yesterday, and we're

16   going to undertake to try and resolve, without the

17   Court's involvement.  But it doesn't seem to me to

18   really be a question of attorney-client privilege.

19   Nothing in the agreement says that there's no

20   attorney-client privilege, or that Mr. Patel or the

21   other counsel could be forced to disclose anything

22   that Mr. Padilla tells them.  It only speaks in

23   terms of monitoring and in terms of identifying and

24   properly handling national security information.

25       MR. FREIMAN:  Your Honor, if I may, with all due

1    respect, I disagree with the factual

2    characterization of the conditions of access.  There

3    is a clause near the end of those conditions that

4    explicitly reserves for the Government the

5    opportunity to contest the availability of the

6    attorney-client privilege.  I believe Your Honor has

7    that as one of the exhibits filed under seal to our

8    reply.  However --

9        THE COURT:  As a matter of fact, those exhibits

10   were sent back because they were not filed under --

11   in accordance with the local rules.  You just can't

12   dump something on us and say it's under seal.  You

13   have to file a motion for leave to file something

14   under seal and say why.  I'm not going to open up an

15   envelope, not knowing -- having any idea what's in

16   that, because the next thing you know, I'm

17   disqualified from hearing the case because

18   somebody's dumped something on my desk in an

19   envelope without following the procedure.  So I

20   haven't seen those documents.

21       MR. FREIMAN:  Our apologies, Your Honor.

22       THE COURT:  No, that's all right, but I think

23   the rule -- one of the orders that was issued

24   originally in this case pointed out the local rule

25   with regard to sealing documents.

1    MR. FREIMAN:    In that case I redouble our

2    apologies.

3    Your Honor, I wanted to add to that, should Mr.

4    Salmons' statement suggest that the Government now

5    recognizes attorney-client privilege, then I mean

6    obviously the Government has changed its position

7    since it drafted that document.    And if the

8    Government, in fact, acknowledges attorney-client

9    privilege, then we're not going to be put between a

10    rock and a hard place where, if Mr. Padilla were to

11    say something to Mr. Patel, for example, the

12    Government could go ahead and subpoena Mr. Patel,

13    and ask him to testify as to the content of those

14    communications, and be unable to claim attorney-

15    client privilege.

16    So if that is, in fact, Mr. Salmons' statements,

17    we accept that.

18    THE COURT:    Well, first of all, I want to get --

19    I want to lay this on the table.    The Government can

20    always subpoena an attorney and ask him to testify.

21    The attorney can always claim attorney-client

22    privilege.    And then it's up to the Court to decide

23    whether he's entitled to it.    Because the attorney

24    doesn't get a blanket decision.    And that is always

25    the risk that every attorney runs in representing

1   any client involved with -- any client.  And, if

2   it's a criminal client, it's doubly so.  Because

3   there are exceptions to the attorney-client

4   privilege.  While it is one of the highest and most

5   regarded privileges in common law, it is not without

6   exception.

7        And so if you are holding out for a pure

8   attorney-client no challenge right, then you're

9   barking up the wrong tree, you're going in the wrong

10  direction.

11       Now, what is the Government's position with

12  regard to this last paragraph in the agreement, Mr.

13  Salmons?

14       MR. SALMONS:  Your Honor, I believe the

15  paragraph he's referring to simply says that -- in

16  fact, I'll just read -- I'll read the paragraph I

17  think he's referring to.  It says neither the

18  reference herein to counsel nor any other part of

19  these procedures reflect any determination about or

20  acknowledgement of an attorney-client relationship

21  between counsel and the detainee.

22       You know, that's just a statement that, you

23  know, the Government isn't saying one way or the

24  other whether there's any attorney-client

25  relationship.  But I think if you look at the

```
 1    procedures that are in place, any concern about
 2    attorney-client privilege seems to me misplaced,
 3    because any claimed privilege, it seems to me, has
 4    been accommodated and would have been protected
 5    through this process.
 6         Now, there again you're running up into issues
 7    about national security information and those proper
 8    handlings of such information.  And courts have to
 9    work those things out all the time.  And there are,
10    you know, generally things in place, including the
11    need to have some review of written material to make
12    sure it's properly handled and classified that come
13    into play.  I, again, don't see that as an issue of
14    attorney-client privilege.  And so I -- it seems to
15    me that the concern about privilege is misplaced.
16         THE COURT:  Any response?
17         MR. PATEL:  Your Honor, I think my concern is in
18    my discussions with both the Solicitor General's
19    office and with the Department of Defense, is the
20    Government's current view of exactly the status of
21    the attorney-client privilege and our ability to
22    communicate with Mr. Padilla, is not clear.
23         THE COURT:  Well, what is unclear to you?
24    Because it seems pretty clear to me.
25         MR. PATEL:  Judge, I have an agreement that I
```

```
 1    had to sign, that indicates that the Government is
 2    not conceding that we have an attorney-client
 3    relationship. If that's changed --
 4         THE COURT:  That's pretty clear.  I mean, that's
 5    clear; it's not unclear.
 6         MR. PATEL:  But that appears to have changed,
 7    Your Honor.
 8         THE COURT:  Okay.
 9         MR. PATEL:  And if that's -- and all I've asked
10    for is if the Government wants to modify this
11    agreement in a way that's beneficial to me, just --
12    I just want to have it in the same form.  If someone
13    could just send me a letter, we now acknowledge that
14    you have an attorney-client relationship with your
15    client --
16         THE COURT:  Let me ask you this.  Are they not
17    acknowledging that you are -- does the Government --
18    Let me ask Mr. Salmons.  Does the Government not
19    recognize Mr. Patel as Mr. Padilla's attorney?
20         MR. SALMONS:  Your Honor, to my knowledge, it's
21    not an issue we've contested.
22         THE COURT:  Well, it seems to be in that last
23    paragraph you read me.
24         MR. SALMONS:  Your Honor, I just think it says
25    it doesn't take a position on whether there's an
```

1    attorney-client relationship with regard to the

2    access issues.

3         THE COURT:  That's a different --

4         MR. SALMONS:  There's language --

5         THE COURT:  -- Mr. Salmons --

6         MR. SALMONS:  If I may just read one other

7    paragraph to Your Honor.

8         THE COURT:  Let me say this, Mr. Patel, there's

9    a difference between acknowledging an attorney-

10   client relationship and not taking a position.

11   Maybe not in Washington, but there is down here.

12        MR. SALMONS:  I'm sorry, Your Honor, that was a

13   question to me or to Mr. Patel?  I couldn't hear.

14        THE COURT:  To you, Mr. Salmons.  There is a

15   difference in not taking a position, and

16   acknowledging that there's an attorney-client

17   relationship.

18        MR. SALMONS:  That's -- I understand that, Your

19   Honor.  All I was trying to do was to explain what

20   the paragraph in the access procedures that was

21   referred to earlier stated.

22        The procedures also state that where -- when

23   appropriate, the Department of Defense will monitor

24   communications between the detainee and counsel to

25   protect U.S. national security interests, without

1    compromising attorney-client privileged

2    communications.

3         And so, again, our position is that the

4    procedures that have been worked out, and especially

5    now that there's no monitoring going on, are not

6    inconsistent with any attorney-client privilege.

7    And we're not contesting, to my knowledge, that --

8    anything about Mr. Patel's representation.  We're

9    not challenging his ability to represent Mr.

10   Padilla.

11        THE COURT:  Well, let me ask you this.  Can you,

12   on the record, state today that the Government

13   recognizes Mr. Patel as the attorney for Mr.

14   Padilla?

15        MR. SALMONS:  Yes.

16        THE COURT:  Okay.  That resolves that issue,

17   doesn't it, Mr. Patel and Mr. Freiman?  Okay.

18        Now then, what other problems do you have in --

19   that you think stands in the way of your discussing

20   evidentiary issues with your client?

21        MR. PATEL:  The issue of the privilege team,

22   Your Honor.

23        THE COURT:  Well, that is -- will the Government

24   agree and the petitioner's counsel agree that if

25   there is a question of national security with regard

1    to any of the notes -- I guess that's all we're

2    talking about -- or documents given by Mr. Padilla

3    to his counsel, that they will be sequestered and

4    not reviewed by counsel for the Government, and will

5    not be subjected to even national security review,

6    without a court hearing first?  That's not to say

7    that they -- that's to say they're just going to be

8    put in an envelope and sealed up and you're going to

9    come to me and say can we have them reviewed for

10   national security purposes, and we're going to find

11   out what the details are on that, and then say yeah

12   or nay or change it or whatever.

13        MR. SHEALY:  Your Honor.

14        THE COURT:  Yes, sir.

15        MR. SHEALY:  May I -- I think I can speak for

16   the Government -- and I'll let Mr. Patel address

17   this; I don't think he disagrees -- candidly, we've

18   been thrown a bit of a loop here this morning.  We

19   did not know we were going to get into all these

20   issues.  We thought we had a schedule worked out, we

21   may be wrong, we'll admit that, the Court may not

22   like that.  We thought we had something worked out

23   and we all agreed we could work with.  And we all

24   understood, while we were working through this

25   schedule we proposed, Mr. Patel understood how he

1    was dealing with his client. He's indicating yes, I

2    think. He understood how he was to deal with his

3    client. We understood that. We understood the

4    nature of the relationship, however you want to

5    characterize it, between Mr. Patel and his client.

6        THE COURT: Not --

7        MR. SHEALY: And we respect --

8        THE COURT: He's the one that had the question,

9    and the Government's the one that said that it

10   didn't acknowledge it.

11       MR. SHEALY: A lot of things have been raised --

12       THE COURT: Right.

13       MR. SHEALY: -- in the petitions and the

14   filings. The reason we came here today was to

15   narrow that --

16       THE COURT: Right.

17       MR. SHEALY: -- to try to tell the Court --

18       THE COURT: That's what I'm trying to do.

19       MR. SHEALY: -- how we'd like to proceed. We

20   had, at least between us, I think we knew how these

21   were going to work --

22       THE COURT: Well, you know --

23       MR. SHEALY: -- in this time period.

24       THE COURT: You know, Mr. Shealy, I asked y'all

25   back when the petition was first filed, to get with

1    Mr. Patel and his associates to work out something

2    and submit it to me. Nothing was forthcoming.

3    That's why I scheduled this hearing.

4        Now then, every time I make a suggestion I'm

5    told something like the Government does not

6    recognize us as attorney-clients; or, we don't have

7    attorney-client privilege; or, we can't talk to our

8    client. And I'm just trying to flesh out these

9    issues and see if they are real issues that are

10    impediments to going forward with this case in

11    whatever way the Court wants to proceed with the

12    case. And --

13        MR. SHEALY: If the Court wants to proceed

14    differently, I understand. And I guess --

15        THE COURT: That's all I'm trying to do.

16        MR. SHEALY: I guess we did not -- I think Mr.

17    Patel will agree -- we didn't think we were going to

18    get into all this today. We thought the Court was

19    going to accept our proposal.

20        THE COURT: Well, you should have submitted the

21    proposal before we scheduled the hearing, Mr.

22    Shealy, and then I could have -- because I've been

23    thrown a loop too, you know, I came here thinking

24    that there was no proposal.

25        MR. SHEALY: Yes, sir.

```
 1        THE COURT:  And thinking that we were going to

 2   decide how we were going to proceed with this case,

 3   not knowing whether he wanted to go forward with an

 4   evidentiary hearing and have discovery, not knowing

 5   whether he wanted to go forward with legal issues,

 6   or what you wanted.  So y'all are not the only one

 7   that was thrown a loop.

 8        And also, I've been thrown a loop because I'm

 9   being told that the Government does not, at least

10   that Mr. Patel thinks the Government did not

11   recognize him as attorney for Mr. Padilla, which is

12   not what the Court understood.  The Court has him as

13   attorney of record.

14        MR. SHEALY:  I think that's a misunderstanding

15   in the Court.

16        THE COURT:  Then we cleared it up, and that's

17   all I'm trying to do is clear up these

18   misunderstandings.

19        MR. SHEALY:  And I didn't realize the Court

20   didn't have the filing under seal.  I thought you

21   had that before you.

22        THE COURT:  It was brought up to me yesterday,

23   and it was not filed in accordance the local rules.

24        MR. SHEALY:  I understand.

25        THE COURT:  And I'm not going to go unsealing
```

1    documents and looking at things that -- particularly

2    in this case --

3        MR. SHEALY:  I understand that.

4        THE COURT:  -- that I don't know what's inside,

5    or have a representation of it.  Or --

6        MR. SHEALY:  The proposal that we can agree to,

7    and I think if the Court would -- when the Court is

8    able to read the entire agreement, I think more

9    things will be clear.  But I don't think the

10   Government, quite frankly, and the attorneys --

11   well, whatever difficulty we had, I think we

12   understood how we were working with respect to Mr.

13   Padilla.

14       THE COURT:  And with regard to legal issues.

15       MR. SHEALY:  Yes, sir.  And that the reason we

16   proposed, and Mr. Patel proposed what we did today,

17   was for him to make summary judgment on a very

18   narrow legal issue which they'd like to make summary

19   judgment on, and deal with that first.  And then

20   when the Court rules on that, then we have a number

21   of options, including what we've already discussed,

22   they may or may not take interlocutory appeal.

23   That's between the Court and, quite frankly, Mr.

24   Patel.  We have no problem with that.

25       And then at that point we would then begin, or

1    maybe not begin, depending how the Court rules, with

2    these issues we have, we talked about here today.

3    And perhaps by that time we would have a great deal

4    of this worked out.

5         But what I think Mr. Patel wanted to do, and the

6    defense, what Mr. Padilla wanted to do and what we

7    wanted to do is to allow him to pursue this narrow

8    legal issue first, work its way through, let us

9    focus on briefing that and get it done, and then

10   focus on all this more complicated stuff.

11        THE COURT:  I understand that.

12        MR. SHEALY:  If the Court does not wish to do

13   that, then we --

14        THE COURT:  But all I -- I want to make sure

15   that it's on the record that I've done what I can do

16   to see that Mr. Padilla's due process rights are

17   protected, that there aren't going to be any

18   complaints at whatever level, that Mr. Patel, that

19   his clients were not able to talk to his client -- I

20   mean his lawyer was not able to talk to his client.

21        MR. SHEALY:  Yes, sir.

22        THE COURT:  That there aren't any complaints at

23   whatever level that the Government does not -- that

24   Mr. Patel is not the attorney, or didn't get the

25   respect that he was entitled to as his attorney,

1    that there is -- it's clear on the record that if we

2    pursue this avenue that there's not going to be

3    whining that poor Mr. Padilla has been languishing

4    in jail for all this period of time because there's

5    been a strategic decision to let him sit there while

6    we piecemeal this case.  I want all of that clear.

7        MR. SHEALY:  I think they have agreed to this

8    interim period, to that.  And I --

9        THE COURT:  I understand, but you interrupted

10   when we were talking about the attorney-client

11   issue, and I was asking if there was anything else,

12   and he was saying well, now there's the national

13   security issue.  And even on -- I mean, when you sit

14   down and talk to a client, you make notes, Mr.

15   Shealy.  I think that's a tremendous handicap for an

16   attorney not to be able to make notes when he's

17   talking to his client.

18       MR. SHEALY:  I just think that what -- and I'll

19   end by I think the way we came in here this morning,

20   with all due respect to the Court, Mr. Patel agreed

21   to this proposal.  And what -- I think what the

22   defendant wishes to do and what we agree with, he

23   thinks he has sufficient information do that, the

24   way things are operating now.  And I'll let

25   him address that.  That's what I understood.

 1        MR. PATEL:  Your Honor, I think it is in my

 2   client's best interests to expeditiously, and the

 3   schedule we've set does review this critical issue,

 4   legal issue, expeditiously.  And I think it is to my

 5   client's advantage for us, and when I say us, I mean

 6   the petitioner, the Government and the Court, to

 7   deal with that issue thoroughly.  And at that point,

 8   Your Honor, when Your Honor's rendered a decision

 9   of -- then we can -- and that decision will -- is in

10   the very near foreseeable future, then we can

11   address dealing with some of these other very

12   complex issues, which it is our hope that we will

13   never have to ask Your Honor to resolve.

14        THE COURT:  Well --

15        MR. PATEL:  And we think that's the most

16   efficient use of everybody's energies as we stand

17   here today and as we --

18        THE COURT:  So these issues that you're raising

19   now are not going to come into play in your

20   litigation of this other issue, the legal issue.

21        MR. PATEL:  The issues that we talked about

22   to -- the issues of --

23        THE COURT:  Attorney-client privilege, determine

24   all those sorts of things, your access to your

25   client --

1       MR. PATEL:  Discovery.

2       THE COURT:  -- interrogation of your client, all

3   of that -- that's all of that.  So that the only

4   thing that is in issue now and the only thing that

5   will be going up will be the first issue in your

6   petition.

7       MR. PATEL:  We are not waiving the other things,

8   Your Honor, but we are agreeing to table them so

9   that we can expeditiously resolve that legal issue.

10      THE COURT:  I understand that.  And all I'm

11  saying is that by tabling them, you accept all of

12  the detriment that comes with tabling them, and the

13  detriment that comes with tabling them will not be

14  an issue henceforth.

15      MR. PATEL:  Your Honor, we are not going to

16  complain that somebody gave us something that we

17  asked for.  We are adults and we understand --

18      THE COURT:  No, I --

19      MR. PATEL:  -- the consequences of our decision.

20      THE COURT:  I don't know, there's been a lot of

21  complaining so far about the way -- that he

22  hasn't -- the second issue in your petition is he

23  hasn't gotten his due process proceedings.  And so

24  you are complaining that you haven't gotten

25  something, and now you're asking that it not be

```
1   given to you now and that we wait.  And --
2        MR. PATEL:  We are agreeing to table that.
3        THE COURT:  And there is a detriment to tabling
4   it; you understand that.
5        MR. PATEL:  I do, Your Honor.
6        THE COURT:  Okay.  And that's not -- the
7   detriment that flows from your tabling it, is not
8   going to be an issue in the future.
9        MR. PATEL:  As I understand it, Your Honor, the
10  detriment is that we will not be able to say that
11  from September 14th until whenever Your Honor makes
12  that decision --
13       THE COURT:  Or if you take it up to the Supreme
14  Court and it comes back two years later.  Because
15  frankly, you have been given what you asked for in
16  the past, and frankly, you have been complaining
17  about the detriment that flowed from getting what
18  you wanted.
19       MR. PATEL:  Your Honor, we have -- I'm --
20  actually, Your Honor, I'm not sure I understand --
21       THE COURT:  Here, you asked to be able to
22  litigate this case in New York, and you litigated it
23  and you lost.  And now the first thing you say in
24  the petition down here is he's been languishing in
25  custody for two years and you wanted me to expedite
```

1    hearings and you wanted me to have oral arguments

2    within ten days of the date that you filed your

3    reply.  And I don't know why you did that, when

4    that's really not realistic, except to emphasize the

5    fact that there's been a detriment, that is, Mr.

6    Padilla has been kept in custody for two years while

7    you litigated the way you thought was best.

8        And I don't -- I don't fault you for litigating

9    it the way you did, but all I'm saying is if you do

10   it that way, don't come back in here, don't come

11   back here two years from now saying we have to have

12   an evidentiary hearing in an hurry, because now he's

13   been in jail for four years.  That's all I'm saying.

14       MR. PATEL:  No, I understand that, and I'm -- I

15   appreciate Your Honor phrasing it that way, because

16   my -- my expectation, and again, I haven't had an

17   opportunity to discuss this with the Government or

18   even with my co-counsel.  But if Your Honor was to

19   rule against us, and say that the President does

20   have the authority, which -- a decision which I

21   would expect that Your Honor would render in the not

22   terribly distant future, and certainly in the scheme

23   and the scale of this case, rather soon.

24       At that point, Your Honor, I would think that we

25   would begin essentially two tracks, those -- there

1    would be the discussion of the interlocutory appeal.

2        THE COURT:  See, that's my question.  If you're

3    just waiting on my decision to start a dual track, I

4    question the -- I question that decision.  Because

5    we can start a dual track now, and that's what I'm

6    offering you.

7        MR. FREIMAN:  Your Honor, as I mentioned before,

8    in all candor, we fully expect to seek interlocutory

9    review, should Your Honor rule against us on this

10   threshold issue.

11       THE COURT:  I know that.  He just said though

12   that after I ruled, that then he would consider a

13   dual track.

14       MR. FREIMAN:  Well, Your Honor --

15       THE COURT:  Or did I hear you wrong, Mr. Patel?

16       MR. PATEL:  Your Honor, maybe I spoke before I

17   had a chance to consult both with my co-counsel and

18   with the Government.  That's a possibility, but I'm

19   not certain that that would be the appropriate thing

20   for us to do.

21       THE COURT:  Well, I think that's a possibility

22   we need to cross right now.  Because if you're

23   waiting on my decision to decide whether to do a

24   dual track, I'm not going to do it twice, if that's

25   the way you want to argue it.  Let's either start on

```
1    a dual track or let's not start on a dual track, but
2    don't have me go through one exercise and then come
3    back and say, well, now let's do what you wanted to
4    do back in September.
5         MR. FREIMAN:  Your Honor, absent some sort of
6    extreme intervening event, some kind of enormous
7    factual revelation that none of us sitting here or
8    on the telephone know about right now, or a decision
9    by the Government, for instance, to indict Mr.
10   Padilla somewhere, absent an event like that, I
11   think our preference would strongly be to seek
12   interlocutory review of an adverse order on the
13   threshold issue.  Of course we would first, as we
14   would need to, object to the report and
15   recommendation before Judge Floyd, and --
16        THE COURT:  No, no, no, you have all that -- you
17   have all those rights, I'm not saying that you would
18   accept my -- and of course Judge Floyd will have a
19   chance to look at it and so forth.  But I just
20   wanted to make it clear that once we start down one
21   track, that's where we're going, we're not going
22   back.
23        MR. FREIMAN:  Yes, Your Honor, and I think --
24        THE COURT:  Right now is the juncture.
25        MR. FREIMAN:  You correctly read our strong
```

1    preference for moving along the single track until

2    that track is resolved, at whatever level is the

3    final resolution, in accordance with the wishes of

4    this Court, Judge Floyd, et cetera.

5        THE COURT:  What's the Government feel about

6    that?

7        MR. SALMONS:  Your Honor, we have no objection

8    to proceeding in that way.  We -- we're fine with

9    that approach, if that's petitioner's choice.

10       THE COURT:  I'm sorry, what was that last

11   statement?

12       MR. SALMONS:  We are fine with that approach, if

13   that's the way petitioners would like to proceed.

14       THE COURT: Okay.  Yes, sir.  Who is that, Mr.

15   O'Connell?

16       MR. O'CONNELL:  Michael O'Connell, Your Honor.

17   I better not say anything until I talk to my

18   co-counsel.  I just have an idea, but I think I

19   better wait and talk with them, because I don't know

20   how I can do that right now without -- I guess I

21   can't do it right now.

22       THE COURT:  Okay.  All right.

23       MR. O'CONNELL:  Judge, let me suggest this.  If

24   we could agree that we're going to go with the

25   schedule we have given you as far as the briefing's

1    concerned, and the other issues that you have

2    raised, which I think are valid, if we could have

3    some time to speak with one of them and the

4    Government and to see whether we can resolve them,

5    whether we want to resolve them now or not, and then

6    come back to you and tell you we are not going to

7    resolve them and we don't want you to resolve them

8    now, or we do want you to resolve them now.

9        I'm not talking about a lengthy period of time,

10   I'm talking about a couple of weeks.

11       THE COURT:  Let me say this.  I'm not going to

12   issue a scheduling order from the bench, I'm not

13   going to do it this afternoon.  I'm going to think

14   about what we've said here today.  And frankly, make

15   sure that Judge Floyd is comfortable with my

16   recommendation or my decision on the scheduling.

17       And so if you want to consult with your

18   co-counsel and advise the Government and me of some

19   other approach that you think is prudent, then I'll

20   be glad to hear it.  But it will be sometime next

21   week before any scheduling order is issued.

22       MR. O'CONNELL:  I just think it would be a good

23   idea if we had an opportunity to speak with the

24   Government outside, off the record, and we could

25   resolve some of these issues.

1      MR. FREIMAN:  Your Honor, would it be of any

2  value to you, were the parties to submit a joint

3  suggested scheduling order on paper?

4      THE COURT:  I think you've outlined it here, and

5  I have what you told me, which was October 18th,

6  November 22nd, December 13th, and then at that time

7  decide whether there's oral argument or another

8  status conference, is what I understand.  Do you

9  propose anything different from that?

10     MR. FREIMAN:  No, Your Honor.

11     THE COURT:  Okay.  Well, let me just -- I think

12 I know where y'all are coming from, and I want to

13 make sure that everybody understands that this Court

14 is ready, willing and able to give Mr. Padilla his

15 due process hearing and notice and everything that

16 he's entitled to.  And that if there's an election

17 not to do that, or that that's the election, not to

18 -- to have that at this time, is one that rests at

19 the feet of his counsel.  And then we'll see where

20 we go from here.  Okay?

21     Anything else from the Government, Mr. Salmons,

22 or Mr. --

23     MR. SRINIVASAN:  Srinivasan.

24     THE COURT:  Yes, sir.

25     MR. SALMONS:  Nothing here, Your Honor.

1        MR. SRINIVASAN:  No, Your Honor, thank you for

2    your time.

3        THE COURT:  Thank you.  Mr. Shealy?

4        MR. SHEALY:  No, sir.

5        THE COURT:  Mr. Patel, anything else?

6        MR. PATEL:  Not at this time, Your Honor, thank

7    you.

8        THE COURT:  Mr. Freiman, anything else?

9        MR. FREIMAN:  No, sir, thank you.

10       THE COURT:  Okay.  Thank you very much.  I

11   appreciate it.

12

13       (Court adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 REPORTER'S CERTIFICATION
 2
 3          I, Debra L. Potocki, RDR, CRR, court approved
 4    transcriber, certify that the foregoing is a correct
 5    transcript from the official electronic sound
 6    recording of the proceedings in the above-entitled
 7    matter, to the best of my ability.
 8
 9
10
11    _____
12          Debra L. Potocki, CRR
13
14          Dated:   September 15, 2004
15
16
17
18
19
20
21
22
23
24
25
```

91