**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

JOSE PADILLA, et al.,                    )
                                         )
    Plaintiffs,                          )            Case No. 2:07-410-HFF-RSC
                                         )
    v.                                   )
                                         )
DONALD H. RUMSFELD, et al.,              )
                                         )
    Defendants.                          )
                                         )

**INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' THIRD AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.     PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF AGAINST THE DEFENDANTS
       IN THEIR INDIVIDUAL CAPACITY MUST BE DISMISSED. . . . . . . . . . . . . . . . . . . 7

II.    THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANT GATES IN
       HIS PERSONAL CAPACITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.   PLAINTIFFS' CONSTITUTIONAL CLAIMS MUST BE DISMISSED. . . . . . . . . . . . 13

       A.     Special Factors Counseling Hesitation Foreclose The Creation Of A *Bivens*
              Remedy For Any Of The Constitutional Claims Alleged By Plaintiffs. . . . . . . . 13

       B.     The Defendants Are Entitled To Qualified Immunity For Plaintiffs' *Bivens*
              Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

              1.     The framework for the qualified immunity defense. . . . . . . . . . . . . . . . 25

              2.     Plaintiffs have failed to establish that all of the Defendants personally
                     participated in the violation of Plaintiffs' constitutional rights. . . . . . . . 27

                     a.     Padilla's designation and detention as an enemy combatant. . . . 28

                     b.     Padilla's interrogation and treatment during his detention. . . . . . 32

              3.     Plaintiffs have not alleged a violation of any constitutional rights. . . . . 38

                     a.     The Fourth Circuit's rejection of Padilla's petition
                            for a writ of habeas corpus precludes most of Plaintiffs'
                            constitutional claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

                     b.     Padilla has not stated a violation of
                            the right of access to courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ii

        c.     Padilla has not stated a violation of any rights under the Eighth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        d.     Padilla has not stated a violation of the Fifth Amendment right against self-incrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    4.     To the extent that Plaintiffs have alleged the violation of any constitutional rights related to Padilla's designation, detention, and interrogation as an enemy combatant, those rights were not clearly established at the time of the events alleged in the Third Amended Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

IV.     PADILLA HAS NOT STATED A CLAIM UNDER THE RELIGIOUS FREEDOM RESTORATION ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    A.     RFRA Does Not Create A Cause Of Action Against The Defendants In Their Individual Capacity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    B.     Even If A Cause Of Action Is Allowed, The Defendants Are Entitled To Qualified Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

## TABLE OF AUTHORITIES

Cases                                                                      Page

*American Life League, Inc. v. Reno*,
    47 F.3d 642 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

*Ameritech v. McCann*,
    297 F.3d 582 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

*Anderson v. Creighton*,
    483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26, 48

*Andrews v. U.S.*,
    441 F.3d 220 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

*Bailey v. Kennedy*,
    349 F.3d 731 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28, 30, 35, 36

*Benson v. Allphin*,
    786 F.2d 268 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50, 57

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

*Borucki v. Ryan*,
    827 F.2d 836 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50, 57

*Bryson v. Gonzales*,
    – F.3d – , No. 07-6071, 2008 WL 2877474 (10th Cir. July 28, 2008) . . . . . . .   31, 33, 37

*Bush v. Lucas*,
    462 U.S. 367 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 23

*Butz v. Economou*,
    438 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

*Campbell v. Galloway*,
    483 F.3d 258 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
    334 F.3d 390 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 11, 12

*Carlson v. Green*,
    446 U.S. 14 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*United States v. Sioux*,
    362 F.3d 1241 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

*Chappell v. Wallace*,
    462 U.S. 296 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 17, 23

*Chavez v. Martinez*,
    538 U.S. 760 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

*Christopher v. Harbury*,
    536 U.S. 403 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

*Cockrell v. Hillerich & Bradsby Co.*,
    363 S.C. 485, 611 S.E.2d 505 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Community Mental Health Servs. of Belmont v. Mental Health and Recovery Bd. Serving*
    *Belmont, Harrison & Monroe Counties*,
    150 Fed. Appx. 389 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Correctional Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 35

*County of Riverside v. McLaughlin*,
    500 U.S. 44 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

*Crawford-El v. Britton*,
    523 U.S. 574 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Crowder v. Lash*,
    687 F.2d 996 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

*Davis v. Passman*,
    442 U.S. 228 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*Department of Navy v. Egan*,
 484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 17

*DiMeglio v. Haines*,
 45 F.3d 790 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50, 57

*Doe v. Am. Nat'l Red Cross*,
 112 F.3d 1048 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*ESAB Group, Inc. v. Centricut, Inc.*,
 126 F.3d 617 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Elmaghraby v. Ashcroft*,
 No. 04-CV-1809, 2005 WL 2375202 (E.D. N.Y. Sept. 27, 2005),
 *aff'd in part*, *rev'd in part*, *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007),
 *cert. granted*, 76 U.S.L.W. 3417 (U.S. June 16, 2008) (No. 07-1015) . . . . . . . . . . . .  55

*Employment Division, Department of Human Resources v. Smith*,
 494 U.S. 872 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

*FDIC v. Meyer*,
 510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 35

*Fed. Ins. Co. v. Lake Shore Inc.*,
 886 F.2d 654 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Feit v. Ward*,
 886 F.2d 848 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 9, 10

*Fisher v. United States*,
 425 U.S. 391 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

*Frank v. Relin*,
 1 F.3d 1317 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Gonzalez v. Reno*,
 325 F.3d 1228 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Goodall by Goodall v. Stafford County School Bd.*,
 60 F.3d 168 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

*Hafer v. Melo*,
    502 U.S. 21 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

*Halperin v. Kissinger*,
    807 F.2d 180 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 25, 26, 30

*Hartmann v. Stone*,
    68 F.3d 973 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

*Hatfill v. Gonzales*,
    519 F. Supp. 2d 13 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Heck v. Humphrey*,
    512 U.S. 477 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Hill v. Pugh*,
    75 Fed. Appx. 715 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Hoffman v. Tuten, et al.*,
    446 F. Supp. 2d 455 (D.S.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

*Housecalls Home Health Care, Inc., et al. v. United States Dept. of Health and Human*
    *Svcs., et al.*,
    515 F. Supp. 2d 616 (M.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 34

*Howe v. Bank for Intern. Settlements*,
    194 F. Supp. 2d 6 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Ingraham v. Wright*,
    430 U.S. 651 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

*In re Iraq and Afghanistan Detainees Litigation*,
    479 F. Supp. 2d 85 (D.D.C. 2007),
    *appeal docketed sub. nom, Ali v. Rumsfeld* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

vii

*Jama v. INS*,
    343 F. Supp. 2d 338 (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

*Japan Whaling Ass'n v. American Cetacean Society*,
    478 U.S. 221 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Jeffers v. Gomez*,
    267 F.3d 896 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21, 22, 23

*Kentucky v. Graham*,
    473 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

*Kirby v. City of Elizabeth, North Carolina*,
    388 F.3d 440 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006) . . . . . . . . . . . . . . .   7, 9

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

*Lane v. Pea*,
    518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   52

*Larsen v. United States Navy*,
    346 F. Supp. 2d 122 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

*Lepp v. Gonzales*,
    *Lepp v. Gonzales*, No. C-05-0566 VRW,
    2005 WL 1867723 (N.D. Cal. Aug. 2, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

*Libby v. Marshall*,
    833 F.2d 402 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

*Malley v. Briggs*,
    475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*McVey v. Stacy*,
    157 F.3d 271 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47, 49

*Medina v. City and County of Denver*,
    960 F.2d 1493 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50, 57

*Micklus v. Carlson*,
    632 F.2d 227 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Mitrano v. Hawes*,
    377 F.3d 402 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Nebraska Beef, Ltd. v. Greening*,
    398 F.3d 1080 (8th Cir. 2005), *cert. denied*, 547 U.S. 1110 (2006) . . . . . . . . . . . . . . 14

*New Wellington Financial Corp. v. Flagship Resort Development Corp.*,
    416 F.3d 290 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Newhouse v. Probert*,
    608 F. Supp. 978 (W.D. Mich. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Nichols v. G.D. Searle & Co.*,
    991 F.2d 1195 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Norfolk and Western Ry. Co. v. Director, Office of Worker's Compensation Programs*,
    5 F.3d 777 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*North Dakota v. United States*,
    495 U.S. 423 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Nuclear Transport & Storage, Inc. v. United States*,
    890 F.2d 1348 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Nwanze v. Philip Morris Inc.*,
    100 F. Supp. 2d 215 (S.D.N.Y. 2000),
    *aff'd on other grounds*, 6 Fed. Appx. 98 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 12

*Omar v. Casterline*,
    414 F. Supp. 2d 582 (W.D. La. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Padilla ex rel. Newman v. Bush*,
    233 F. Supp. 2d 564 (S.D.N.Y. 2002),
    *remanded*, *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003),
    *reversed sub nom.*, *Rumsfeld v. Padilla*, 542 U.S. 426 (2004) . . . . . . . . . . . . . . . 42, 45

*Padilla v. Hanft*,
    No. 04-2221-HFF-RSC (D. S.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Padilla v. Hanft ("Padilla I")*,
    389 F. Supp. 2d 678 (D.S.C. 2005), *rev'd*, 423 F.3d 386 (4th Cir. 2005), *cert. denied*, 547
    U.S. 1062 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Padilla v. Hanft ("Padilla II")*,
    423 F.3d 386 (4th Cir. 2005), *cert. denied*, 547 U.S. 1062 (2006) . . . . . . . . . . . . passim

*Rumsfeld v. Padilla*,
    542 U.S. 430 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Papasan v. Allain*,
    478 U.S. 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Pinder v. Johnson*,
    54 F.3d 1169 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Ex parte Quirin*,
    317 U.S. 1 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Ramsay v. INS*,
    14 F.3d 206 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Riley v. Dorton*,
    115 F.3d 1159 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Robbins v. Oklahoma*,
    519 F.3d 1242 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 32, 33, 36

*Sanchez-Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21, 22

*Stafford v. Briggs*,
    444 U.S. 527(1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

*Saucier v. Katz*,
    533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Schneider v. Kissinger*,
    310 F. Supp. 2d 251 (D.D.C. 2004), *aff'd on other grounds*,
    412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006) . . . . . . . . . . . . . . . 18

*Schultz v. Braga,*
    455 F.3d 470 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Schweiker v. Chilicky,*
    487 U.S. 412 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24

*Scott v. Flowers,*
    910 F.2d 201 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Sherbert v. Verner,*
    374 U.S. 398 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

*Spagnola v. Mathis,*
    859 F.2d 223 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sterling v. Tenet,*
    416 F.3d 338 (4th Cir. 2005), *cert. denied*, 546 U.S. 1093 (2006) . . . . . . . . . . . . . . . 19

*Torchinsky v. Siwinski,*
    942 F.2d 257 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Trulock v. Freeh,*
    275 F.3d 391 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Turner v. Safley,*
    482 U.S. 78 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Charleston County,*
    318 F. Supp. 2d 302 (D.S.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Curtiss-Wright Export Corp.,*
    299 U.S. 304 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Hartman,*
    66 M.J. 710 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Ryan-Webster,*
    353 F.3d 353 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Simmons,*
    247 F.3d 118 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

xi

*United States v. Stanley*,
    483 U.S. 669 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Veney v. Wyche*,
    293 F.3d 726 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Wag-Aero, Inc. v. United States*,
    837 F. Supp. 1479 (E.D. Wis. 1993), *aff'd*, 35 F.3d 569 (7th Cir. 1994) . . . . . . . . . . . 12

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*,
    537 U.S. 371 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Wilkie v. Robbins*,
    127 S. Ct. 2588 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 24, 25

*Wilson v. Libby*,
    – F.3d –, No. 07-5257, 2008 WL 3287701 (D.C. Cir. Aug. 12, 2008) . . . . . . . . . . . . 19

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Withrow v. Williams*,
    507 U.S. 680 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Wolfe v. Strankman*,
    392 F.3d 358 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Woods v. Evatt*,
    876 F. Supp. 756 (D.S.C. 1995), *aff'd*, 68 F.3d 463 (4th Cir. 1995) . . . . . . . . . . . . . . 55

*Young v. City of Mount Ranier*,
    238 F.3d 567 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Youngstown Sheet & Tube Co.*,
    343 U.S. 579 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>U.S. Constitution</u>

U.S. Const. Art. I, § 8  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. Art. II, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. Art. III, § 2, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statutes

10 U.S.C. § 801, stat. note §§ 1091-92 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

10 U.S.C. §§ 892, 893, 928 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. §§ 2340-2340A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

28 U.S.C. §1391(e) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Authorization for Use of Military Force Joint Resolution,
      Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001) . . . . . . . . . . . . . . . . . . . . . . 3

Detainee Treatment Act,
      Pub. L. No. 109-163, 119 Stat. 3136, 3474-75 (2006) . . . . . . . . . . . . . . . . . . . . . . 23

Military Commissions Act of 2006,
      Pub. L. No. 109-366, 120 Stat. 2600 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Reagan Act, Pub. L. No. 108-375, 118 Stat. 1811, (2004)
      (codified at 10 U.S.C. § 801, stat. note §§ 1091-92) . . . . . . . . . . . . . . . . . . . . . . . . 23

Religious Freedom Restoration Act,
      42 U.S.C. §§ 2000bb, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

S.C. Code Ann. § 36-2-803 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rules

Fed. R. Civ. P. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 37

Other

Black's Law Dictionary (8th ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) . . . . . . . . . . . 28

## INTRODUCTION

This lawsuit is somewhat of an anomaly for several reasons.  While the Plaintiffs – Jose Padilla and Estela Lebron, Padilla's mother – have sued thirteen current and former federal officers, soldiers, and officials in their individual capacity, *see* Third Amended Complaint (the "Complaint" or "Compl.") ¶ 9, the Plaintiffs seek only nominal damages –  in the amount of one dollar from twelve of the defendants, *see id.* ¶ 139.d.[1]  The thrust of Plaintiffs' suit is their request for equitable relief, which they seek from Secretary of Defense Robert Gates in his individual and official capacity and from the remaining Defendants in their individual capacity. *See id.* ¶¶ 9, 139.a-d.  Padilla, however, is no longer in military custody but rather is in the custody of the Federal Bureau of Prisons, where he is serving a sentence of 17 years for his recent conviction on three counts of terrorism-related federal crimes. The mere possibility that Padilla may again be detained as an enemy combatant sometime in the distant future is insufficient to give Plaintiffs standing for the equitable relief they seek either to "declare" the illegality of past conduct or enjoin any future conduct.  Equitable relief, moreover, is not available against federal defendants in their individual capacity.[2]

Even if Plaintiffs have standing to pursue their claim for $12 in monetary damages, all of Plaintiffs' damages claims fail as a matter of law.  Plaintiffs' constitutional claims should be dismissed because there are special factors counseling hesitation that preclude the Court from creating a damages remedy for an enemy combatant against the federal officers, soldiers and

---

[1]  Plaintiffs seek only equitable relief from Defendant Robert M. Gates.  *See* Compl. ¶ 9.

[2]  This brief addresses the claims asserted against the defendants in their individual capacity.  The United States is separately moving to dismiss the official capacity claims in this matter.

1

officials responsible for his designation as an enemy combatant, and his detention and interrogation as such.  In the alternative, even if recognizing an implied constitutional tort remedy without any statutory foundation were permissible under these extraordinary and sensitive circumstances, the Defendants are entitled to qualified immunity as a matter of law for the constitutional claims that challenge Padilla's designation and detention as an enemy combatant, including his being held in isolation and incommunicado (Claims a-c and f-j, *see id.* ¶¶ 137.a-.c, .f-.j).  The Defendants are also entitled to qualified immunity to the extent that Plaintiffs assert claims related to Padilla's alleged interrogation and conditions of confinement during his detention as an enemy combatant (Claims c.-e., *see id.* ¶¶ 137.c-.e).  Plaintiffs also fail to allege, as they must, that each of the Defendants personally participated in these supposed constitutional violations.

Plaintiffs' non-constitutional claims fail as well.  Padilla's claim under the Religious Freedom Restoration Act ("RFRA") should be dismissed because RFRA does not provide for a cause of action against the Defendants in their individual capacity.  Moreover, to the extent that Padilla has stated a claim under RFRA, the Defendants are entitled to qualified immunity.

Finally, Plaintiffs fail to establish that the Court has personal jurisdiction over Defendant Gates.

## **BACKGROUND**

In the Authorization for Use of Military Force Joint Resolution ("AUMF") of September 18, 2001, Congress specifically authorized the President to

> use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the

2

United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001).  On June 9, 2002, explicitly relying upon the

AUMF, the President directed the Secretary of Defense to detain Jose Padilla in military custody

as an enemy combatant.  The basis for Padilla's detention, as stated by the President, was that:

(1)    Jose Padilla, who is under the control of the Department of Justice and who is a
       U.S. citizen, is, and at the time he entered the United States in May 2002 was, an
       enemy combatant;

(2)    Mr. Padilla is closely associated with al Qaeda, an international terrorist
       organization with which the United States is at war;

(3)    Mr. Padilla engaged in conduct that constituted hostile and war-like acts,
       including conduct in preparation for acts of international terrorism that had the
       aim to cause injury to or adverse effects on the United States;

(4)    Mr. Padilla possesses intelligence, including intelligence about personnel and
       activities of al Qaeda, that, if communicated to the U.S., would aid U.S. efforts
       to prevent attacks by al Qaeda on the United States or its armed forces, other
       governmental personnel, or citizens;

(5)    Mr. Padilla represents a continuing, present and grave danger to the national
       security of the United States, and detention of Mr. Padilla is necessary to prevent
       him from aiding al Qaeda in its efforts to attack the United States or its armed
       forces, other governmental personnel, or citizens;

(6)    it is in the interest of the United States that the Secretary of Defense detain Mr.
       Padilla as an enemy combatant; and

(7)    it is [ ] consistent with U.S. law and the laws of war for the Secretary of Defense
       to detain Mr. Padilla as [an] enemy combatant.

See Letter from President George W. Bush to the Secretary of Defense (June 9, 2002) ("June 9,

2002 Bush Letter"), reprinted in Padilla v. Hanft ("Padilla II"), 423 F.3d 386, 389 (4th Cir.

2005), cert. denied, 547 U.S. 1062 (2006).

On July 2, 2004, Padilla filed a petition for a writ of habeas corpus in the United States

District Court for the District of South Carolina in which he raised many of the same

3

constitutional arguments that are being asserted in this matter. *See Padilla v. Hanft* ("*Padilla I*"), 389 F. Supp. 2d 678, 682 (D.S.C. 2005), *rev'd*, *Padilla II*, 423 F.3d 386 (4th Cir. 2005), *cert. denied*, 547 U.S. 1062 (2006). The Fourth Circuit rejected Padilla's petition and held that his military detention as an enemy combatant was "unquestionably authorized by the AUMF as a fundamental incident to the President's prosecution of the war against al Qaeda in Afghanistan." *Padilla II*, 423 F.3d at 392.

On January 5, 2006, Padilla was transferred from military custody to a federal detention center in Miami, Florida, to face federal criminal charges related to his terrorist activities. Compl. ¶ 12. On August 16, 2007, Padilla was convicted of three federal criminal offenses: conspiracy to kill, kidnap, maim, or injure persons in a foreign country, *see* 18 U.S.C. § 956; providing material support to terrorists, *see* 18 U.S.C. § 2339A; and conspiracy to provide material support to terrorists, *see* 18 U.S.C. § 371. *See generally* Criminal Docket for Case #: 0:04-cr-60001-MGC, *United States of America v. Adham Amin Hassoun, Kifah Wael Jayyousi, and Jose Padilla*, at Number 1193 - Verdict. On January 22, 2008, Padilla was sentenced to a term of imprisonment of 17 years and 4 months. *See id.* at Number 1333 - Judgment. Padilla has appealed his conviction. *See id.* at Number 1342 - Notice of Appeal.

Plaintiffs bring this suit to challenge the constitutionality of Padilla's designation and subsequent military detention as an enemy combatant. Padilla alleges that his designation, detention, interrogation, and treatment as an enemy combatant violated numerous constitutional rights, specifically:

Claim a.     The right of access to legal counsel under the First, Fifth, and Sixth Amendments;

Claim b.     The right of access to courts under the First and Fifth Amendments;

4

Claim c.    The right not to be subjected to conditions of confinement and treatment that violate the rights to procedural and substantive due process under the Fifth Amendment, and the right to be free of cruel and unusual punishment under the Eighth Amendment;

Claim d.    The right to be free from coercive and involuntary custodial interrogation pursuant to procedural and substantive due process under the Fifth Amendment, the Fifth Amendment privilege against self-incrimination, and the right to be free of cruel and unusual punishment under the Eighth Amendment;

Claims e.-g.    The right to free exercise of religion under the First Amendment (e); and the rights to information (f), and to association with family and others (g) under the First Amendment;

Claim h.    The right not to be subject to military detention under the Fourth and Fifth Amendments;

Claim I.    The right to be free from unreasonable seizures under the Fourth Amendment; and

Claim j.    The right not to be subjected to the "collateral effects" of designation as an "enemy combatant" without due process of law under the Fifth Amendment.

*See* Compl. ¶¶ 137.a-.j.[3]  Padilla claims further that his detention and treatment as an enemy combatant violated the Article III and the Habeas Suspension and Treason Clauses of the U.S. Constitution.  *Id.* ¶¶ 137.b & .h.

Plaintiff Lebron alleges that she was "denied . . . virtually all contact with her son" for the duration of his detention as an enemy combatant.  *See id.* ¶ 138.  She alleges that Padilla's detention violated her rights to association and communication under the First and Fifth Amendments.  *See id.*

The defendants in this matter are: Donald H. Rumsfeld, former Secretary of Defense;

_____

[3]  Padilla also asserts a claim under the Administrative Procedures Act.  *See* Compl. ¶ 137.k.  This claim is addressed in the United States' Motion to Dismiss.

John Ashcroft, former Attorney General; Robert M. Gates, Secretary of Defense; Paul Wolfowitz, former Deputy Secretary of Defense; Vice Admiral Lowell E. Jacoby, former Director, Defense Intelligence Agency; Michael H. Mobbs, Special Advisor to the Undersecretary of Defense for Policy; William Haynes, former General Counsel, Department of Defense; Naval Captain Catherine T. Hanft; retired Naval Commander Melanie A. Marr; Naval Commander Stephanie L. Wright; Chief Petty Officer Mack Keen;[4] Sandy Seymour, Technical Director, Consolidated Brig; and Dr. Craig Noble (collectively, the "Defendants"). All of the Defendants except Defendant Gates are sued in their individual capacity only. *See id.* ¶ 9. Defendant Gates is sued in his individual and official capacity for declaratory and injunctive relief only. *See id.* Claims a-h, *see id.* ¶¶ 137.a-.h (related generally to Padilla's military detention, interrogation, and conditions of confinement), are asserted against Defendants Rumsfeld, Wolfowitz, Jacoby, Mobbs, Haynes, Hanft, Marr, Keen, Wright and Seymour. Claims h and j, *see id.* ¶¶ 137.h, .j (related to Padilla's seizure and designation as an enemy combatant), are asserted against Defendants Rumsfeld, Wolfowitz, Jacoby, Mobbs, Haynes, Hanft, Marr, Keen, Wright, and Seymour. Claims a, b, d, f, and h-j, *see id.* ¶¶ 137.a, .b, .d, .f, .h-.j (related to Padilla's seizure, designation as an enemy combatant, and military detention and interrogation), are asserted against Defendant Ashcroft. Claims h and j, *see id.* ¶¶ 137.h, .j (related to Padilla's seizure and designation as an enemy combatant), are asserted against

---

[4] The Complaint in this matter was filed on February 9, 2007. *See* Docket for Case No. 2:07-cv-00410-HFF-RSC at Number 1. However, Defendant Keen was not served until August 28, 2007, well beyond the 120-day limit prescribed by Fed. R. Civ. P. 4(m). *See* Docket for Case No. 2:07-cv-00410-HFF-RSC at Number 43. Therefore, all claims against Defendant Keen should be dismissed pursuant to Rule 4(m) as well as for all of the other reasons discussed herein.

Defendant Gates.  Claims c-d, f-g, *see id.* ¶¶ 137.c-.d, .f-.g (related to Padilla's conditions of confinement and interrogation), are asserted against Defendant Noble.  Plaintiff Lebron's right of association claim, *see id.* ¶ 138, is asserted against Defendants Ashcroft, Rumsfeld, Wolfowitz, Jacoby, Mobbs, Haynes, Hanft, Marr, Keen, Wright, Seymour, and Noble.

## ARGUMENT

**I.    PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF AGAINST THE DEFENDANTS IN THEIR INDIVIDUAL CAPACITY MUST BE DISMISSED.**

Plaintiffs seek declaratory and injunctive relief from all Defendants in their individual capacity and from Defendant Gates in his official capacity (which is addressed in the separate motion filed by the United States).  *See* Compl. ¶¶ 9, 139.a-c.  Plaintiffs seek a declaration that the Defendants' alleged acts violated the Constitution, *see id.* ¶¶ 139.a-.b, and injunctive relief against Padilla's redetention as an enemy combatant, *see id.* ¶ 139.c.  Plaintiffs' request for equitable relief from the Defendants in their individual capacity fails because the Defendants, in their individual capacity, are not parties from whom such relief can be sought or obtained.

Every court of appeals, including the Fourth Circuit, to address the issue of whether a plaintiff alleging the violation of federal rights can sue a government official in an individual capacity for equitable relief has concluded that there is no basis for such a suit.  *See Kirby v. City of Elizabeth, North Carolina*, 388 F.3d 440, 452 n.10 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006) (concluding that injunctive relief can be awarded only against a government employee in his or her official capacity).[5]  These cases recognize that the government is the real

_____

[5]  *See*, *e.g.*, *Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004) ("[T]he declaratory and injunctive relief Wolfe seeks is only available in an official capacity suit."); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993) ("[S]uch equitable relief [reinstatement] could be obtained against Relin only in his official, not his individual, capacity. . ."); *Scott v. Flowers*,

party in interest in a suit for non-monetary relief and that a government employee's personal interest in the litigation does not extend beyond whether or not the employee is required to pay damages out of his or her own pocket. While an injunction or declaratory judgment may affect how the employee performs his or her official duties in the future, a public servant has no legally cognizable *personal* interest in performing official duties in one fashion versus another. On the other hand, the government's interest in a suit seeking equitable relief based on an employee's performance of official duties is apparent because "relief is sought that would require [the employees] to exercise their official powers in certain ways." *Libby v. Marshall*, 833 F.2d 402, 405 (1st Cir. 1987). Thus courts consistently look past language in pleadings naming employees in their individual capacity where the government's own interests are at stake.[6]

---

910 F.2d 201, 213 (5th Cir. 1990) ("[T]he injunctive relief sought and won by Scott can be obtained from the defendants only in their official capacity as commissioners."); *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989) ("[T]he equitable relief Feit requests – a declaration that the policy is unconstitutional and an injunction barring the defendants from implementing the policy in the future – can be obtained only from the defendants in their official capacities, not as private individuals."); *see also Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 26 (D.D.C. 2007) (dismissing plaintiff's claim for injunctive relief against current and former government officials in their individual capacity); *In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85, 118-19 (D.D.C. 2007) ("Because the challenged policies were carried out by the defendants in their capacities as military officials, however, the plaintiffs must seek declaratory relief against them in their official capacities, which they have failed to do here."), *appeal docketed sub. nom*, *Ali v. Rumsfeld*, No. 07-5178 (D.C. Cir. May 31, 2007); *cf. Community Mental Health Servs. of Belmont v. Mental Health and Recovery Bd. Serving Belmont, Harrison & Monroe Counties*, 150 Fed. Appx. 389, 401 (6th Cir. 2005) ("Just as a plaintiff cannot sue a defendant in his official capacity for money damages, a plaintiff should not be able to sue a defendant in his individual capacity for an injunction in situations in which the injunction relates only to the official's job, *i.e.,* his official capacity.").

[6] *See, e.g., Howe v. Bank for Intern. Settlements*, 194 F. Supp. 2d 6, 19 (D. Mass. 2002) ("Regardless of the manner by which a plaintiff designates the action, a suit should be regarded as an official-capacity suit, subject to the defense of sovereign immunity, when a 'judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting,

In light of the real party-in-interest distinction between individual and official capacity suits, an individual capacity claim for equitable relief is not legally viable because it names "improper defendants." *Feit*, 886 F.2d at 858. Only by acting as a government official (not as an individual), can a defendant employee comply with a court decree by altering government policy or practice. A defendant employee who stands before the court in his or her capacity as an individual has no such ability. *See Kirby*, 388 F.3d at 452 n.10 ("The other injunctive relief Kirby seeks could only be awarded against the officers in their official capacities. . .."); *Ameritech v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002) (noting that goals of "vindicating federal rights and holding state officials responsible to federal law – cannot be achieved by a lawsuit against a state official in his or her individual capacity" because such suits "do not seek to conform the State's conduct to federal law; rather, such suits seek recovery from the defendant personally"). Therefore the equitable relief Plaintiffs seek is not redressable in an action against the defendants in their individual capacity and "can be obtained only from the Defendants in their official capacities, not as private individuals." *Feit*, 886 F.2d at 858 (citation omitted).[7] Here, Plaintiffs clearly and deliberately sued the Defendants in their individual capacity. As such, Plaintiffs' "attempt to obtain declaratory and injunctive relief from the Defendants in their personal

---

or to compel it to act'") (*quoting Dugan v. Rank*, 372 U.S. 609, 620 (1963)); *Newhouse v. Probert*, 608 F. Supp. 978, 981 (W.D. Mich. 1985) ("Plaintiff, however, cannot avoid the doctrine of sovereign immunity by naming individual employees as defendants if the United States remains the real party in interest. The court must go beyond the nominal defendants to determine whether the suit is in effect one against the sovereign . . .").

[7] Although Plaintiffs cannot get equitable relief against federal defendants in their individual capacity whether or not in their official capacity they hold the same job as they did when Padilla was detained, many of the named Defendants either no longer hold the same job or are retired from federal service altogether, making the claim for equitable relief even more attenuated and incapable of redress.

capacities fails to state a claim upon which relief may be granted," and their claims are "properly

dismissed." *Id.*[8]

## II.     THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANT GATES IN HIS PERSONAL CAPACITY.

When, as here, a challenge to personal jurisdiction is made at the pre-trial stage, the

Plaintiffs must make a prima facie showing of a sufficient jurisdictional basis to survive the

jurisdictional challenge.  *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d

390, 396 (4th Cir. 2003).  The Court may exercise personal jurisdiction over a non-resident

defendant in this case if (1) the applicable state long-arm statute confers jurisdiction and (2) the

assertion of that jurisdiction is consistent with constitutional due process.  *Nichols v. G.D. Searle*

*& Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993).  In South Carolina, personal jurisdiction is governed

by the state's long-arm statute, S.C. Code Ann. § 36-2-803 (2005).  Because the South Carolina

Supreme Court has interpreted the long-arm statute to extend to the outer limits of constitutional

due process, *see Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508

(2005), federal courts normally conduct a single inquiry under the due process clause, *see*, *e.g.*,

*Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 657 n.2 (4th Cir. 1989).  When the appropriate

standards are applied to Plaintiffs' Third Amended Complaint, it is clear that the Plaintiffs have

not met their burden of establishing a prima facie basis for personal jurisdiction over non-resident

Defendant Gates.

There are two types of personal jurisdiction: specific and general.  A court has specific

---

[8]  In addition, for the reasons articulated in the United States' motion to dismiss the official capacity claims against Defendant Gates, Plaintiffs lack standing to sue for equitable relief, including a "declaration" regarding the alleged illegality of past conduct.  *See*, *e.g.*, U.S. Mot.  Rather than repeat those arguments here, the Defendants incorporate them by reference.

jurisdiction over a cause of action that directly arises out of or relates to the defendant's forum state activities. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, nn. 8 & 9 (1984). When the cause of action does not arise from the defendant's contacts with the forum state, general jurisdiction may be exercised upon a showing that the defendant's contacts are of a "continuous and systematic" nature. *See id.* at 416. In this case, the Plaintiffs have not alleged let alone established that Defendant Gates has continuous and systematic contacts with the State of South Carolina such that general personal jurisdiction would be proper. Therefore, the Plaintiffs must demonstrate specific personal jurisdiction. *Carefirst*, 334 F.3d at 397.

The Fourth Circuit has "synthesized the requirements of the Due Process Clause for asserting specific [personal] jurisdiction into a three-part test." *New Wellington Financial Corp. v. Flagship Resort Development Corp.*, 416 F.3d 290, 294-95 (4th Cir. 2005). To justify an exercise of personal jurisdiction, "a defendant's actions must have been 'directed at the forum state in more than a random, fortuitous, or attenuated way.'" *Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004) (*quoting ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997)). First, the defendant must have "purposefully availed [him]self of the privilege of conducting activities in the [forum] State." *Id.* Second, the plaintiffs' claims must "arise out of those activities directed at the [forum] State." *New Wellington*, 416 F.3d at 295. Third, the exercise of jurisdiction must be "constitutionally reasonable." *Id.* Personal jurisdiction is proper only if all three requirements are met. *Carefirst*, 334 F.3d at 397.

Plaintiffs do not allege any facts establishing that Defendant Gates traveled to South Carolina, took any actions in South Carolina, or directed any actions at Padilla while he was in custody in South Carolina. Nor could Plaintiffs allege any actions by Defendant Gates towards

Padilla while he was in custody in South Carolina because Defendant Gates did not become Secretary of State until December 18, 2006,[9] almost one year *after* Padilla had been transferred from military custody to a federal detention center to face federal criminal charges. Plaintiffs have alleged no facts that would demonstrate that Defendant Gates had the "minimum contacts" with South Carolina that due process requires and that would warrant forcing him to defend himself against an individual capacity liability claim in this forum. To the extent that Defendant Gates is subject to suit in his individual capacity, it must be in his home state or the forum where he took any alleged actions related to Padilla.[10]

## III.    PLAINTIFFS' CONSTITUTIONAL CLAIMS MUST BE DISMISSED.

Plaintiffs' constitutional claims should be dismissed as to all of the Defendants for two alternative reasons. First, there are special factors counseling hesitation that preclude the Court from creating a damages remedy for an enemy combatant against the federal officers, soldiers,

---

[9]  *See* Biography of Dr. Robert M. Gates, Secretary of Defense, *at* http://www.defenselink.mil/bios/biographydetail.aspx?biographyid=115. The date that Secretary Gates began his service is subject to judicial notice. *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) (noting that a court may take judicial notice of matters of public record when considering a motion to dismiss under Fed. R. Civ. P. 12(b)).

[10]  *See, e.g., Hill v. Pugh*, 75 Fed. Appx. 715, 719 (10th Cir. 2003) ("It is not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state."); *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1051 (9th Cir. 1997) (finding no personal jurisdiction over a Director in the Food and Drug Administration solely because of his role in the regulatory process that led to the dissemination of blood products in Arizona); *Nwanze v. Philip Morris Inc.*, 100 F. Supp. 2d 215, 220 (S.D.N.Y. 2000) ("Mere supervision over the Bureau of Prisons, the reach of which extends into every state, is insufficient to establish a basis for the exercise of personal jurisdiction."), *aff'd on other grounds*, 6 Fed. Appx. 98 (2d Cir. 2001); *Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479, 1485 (E.D. Wis. 1993) ("When federal agency heads are not alleged to have been directly and actively involved in activities in the forum state, many courts have refused to exercise personal jurisdiction over them."), *aff'd*, 35 F.3d 569 (7th Cir. 1994).

and other officials responsible for his designation, detention, and interrogation.  Alternatively, even if it were appropriate for a court to create a damages remedy absent statutory authorization in this extraordinary and sensitive context, the Defendants are entitled to qualified immunity as a matter of law on all of Plaintiffs' claims.

A.     **Special Factors Counseling Hesitation Foreclose The Creation Of A _Bivens_ Remedy For Any Of The Constitutional Claims Alleged By Plaintiffs.**

Plaintiffs seek damages from the Defendants for alleged constitutional infirmities in Padilla's designation, detention, and interrogation as an enemy combatant during an ongoing armed conflict specifically authorized by the Congress.  The "special factors" doctrine developed by the Supreme Court in *Bivens* and its progeny precludes an individual damages remedy for this unprecedented claim.

A judicially-created damages remedy for constitutional violations "is not an automatic entitlement."  *Wilkie v. Robbins*, 127 S. Ct. 2588, 2597-98 (2007).  In *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court held that the victim of an alleged Fourth Amendment violation could bring suit to recover damages in the absence of a statutory cause of action only where there were "no special factors counseling hesitation in the absence of affirmative action by Congress."  403 U.S. at 396.  Subsequently, the Court has countenanced an expansion of *Bivens* on just two occasions, and in both instances specifically determined that there were no such "special factors."  *See Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980).  The Supreme Court has "in most instances . . . found a *Bivens* remedy unjustified," *Wilkie*, 127 S. Ct. at 2597-98, and accordingly, in the nearly three decades since *Carlson*, the Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants," *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61,

13

68 (2001).[11]  As a result, "recognizing such a claim is clearly disfavored."  *See In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85, 93-94 (D.D.C. 2007) (refusing to recognize a *Bivens* remedy for military detainees in Iraq and Afghanistan against U.S. military and civilian personnel); *accord Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005) (recognizing the "presumption against judicial recognition of direct actions for violations of the Constitution by federal officers or employees") (*quoting McIntosh v. Turner*, 861 F.2d 524, 526 (8th Cir. 1988)), *cert. denied*, 547 U.S. 1110 (2006).  Moreover, the Court has determined that a wide range of factors may make it inappropriate for federal courts to create a *Bivens* remedy in a particular context, even where the plaintiff has no alternative statutory remedy available.  *See Wilkie*, 127 S. Ct. at 2598 ("even in the absence of an alternative [existing process for protecting a constitutionally recognized interest], a *Bivens* remedy is a subject of judgment"); *id.* at 2604-05 (holding that the "serious difficulty of devising a workable cause of action" was a special factor that precluded the creation of a *Bivens* claim).

Plaintiffs seek an unprecedented extension of *Bivens* into a new, previously unrecognized, and highly sensitive context – one that would allow a damages action seeking recovery from the personal assets of current and former members of the President's Cabinet, soldiers, and other

---

[11]  *See, e.g.*, *Malesko*, 534 U.S. at 70-72 (refusing to recognize a *Bivens* remedy against private companies performing governmental functions under contract with the United States because doing so would not serve the public policy purposes of the remedy); *FDIC v. Meyer*, 510 U.S. 471, 486 (1994) (refusing to allow a *Bivens* claim against a federal agency because of its potential impact on federal fiscal policy); *Schweiker v. Chilicky*, 487 U.S. 412, 425-29 (1988) (rejecting a *Bivens* remedy for the denial of Social Security benefits because a statutory procedure already existed to challenge adverse eligibility determinations); *Bush v. Lucas*, 462 U.S. 367 (1983) (refusing to recognize a *Bivens* remedy for the alleged violation of First Amendment rights arising out of federal personnel decisions for fear that the claim might interfere with a statutory scheme regulating the federal workplace).

federal officials for the wartime actions of the United States military in identifying, capturing, detaining, and interrogating enemy combatants.  This Court should decline Plaintiffs' invitation because the *Bivens* remedy they seek impinges upon the Executive Branch's authority to conduct war, formulate foreign policy, and protect national security from terrorist attack.  Such a claim is unprecedented, would violate bedrock separation-of-powers principles and would constitute a sharp departure from the Supreme Court's well-settled reluctance to extend *Bivens* liability to new contexts.

**1.**  The Constitution explicitly delegates authority over decisions related to the conduct of war to the Legislative and Executive branches.  *See* U.S. Const. Art. I, § 8 (Legislative Branch); Art. II, § 2 (Executive Branch).  For this reason, the Supreme Court has repeatedly recognized that courts should refrain from interfering in the core functions of the political branches, especially during wartime.  *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) (plurality opinion) ("We accord the greatest respect and consideration to the judgments of military authorities in matters relating to the actual prosecution of a war, and recognize that the scope of that discretion necessarily is wide."); *id.* at 531 ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them."); *North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."); *see also Department of Navy v. Egan*, 484 U.S. 518, 530 (1988) (noting the reluctance of the courts "to intrude upon the authority of the Executive in military and national security affairs).  In keeping with this deference, the Supreme Court has refused, on the basis of the special factors doctrine, to

create a *Bivens* action against military officials *or civilians* for claims arising incident to military service.  *United States v. Stanley*, 483 U.S. 669, 681-83 (1987).[12]

The decision to designate, detain, and interrogate Padilla as an enemy combatant was a military decision made pursuant to the AUMF's explicit grant of authority to the President from Congress.  *See* June 9, 2002 Bush Letter.  Padilla's designation and detention were deemed "necessary to prevent [Padilla] from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens."  *Id.*  The power to identify, detain, and question individuals like Padilla who have aligned themselves with declared enemies of the United States and have taken up arms against this country is essential to the exercise of constitutionally and congressionally delegated war powers.  Therefore, deference to the President's decision in that regard is especially warranted.  *See Youngstown Sheet & Tube Co.*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.").

The potential disruption to the coordinate branches of government caused by recognizing

---

[12]  In *Stanley*, the Court considered the creation of a *Bivens* remedy that would allow a former serviceman to sue military officers and civilians to recover damages he sustained as a result of his involuntary participation in an Army medical experiment.  *Stanley*, 483 U.S. at 671-73.  The Court found that "congressionally uninvited intrusion into military affairs by the judiciary" is a special factor precluding creation of a *Bivens* remedy.  *Id.* at 683.  *Stanley* was an extension of *Chappell v. Wallace*, 462 U.S. 296 (1983), in which the Court also found separation-of-powers to be a special factor counseling hesitation that prevented the creation of a *Bivens* remedy that would allow enlisted military personnel to sue their superior officers.  The Court reasoned in *Chappell* that since "Congress, the constitutionally authorized source of authority over the military system of justice, ha[d] not provided a damage remedy for claims by military personnel that constitutional rights have been violated by superior officers . . .[a]ny action to provide a judicial response by way of such a remedy would be plainly inconsistent with Congress' authority in this field."  462 U.S. at 304.

a cause of action for damages by an enemy combatant against his captors in a time of war is far greater than that found sufficient to preclude a *Bivens* action in either *Stanley* or *Chappell*.  This is true regardless of who along the chain of decision-making the enemy combatant chooses to sue. The Supreme Court has recognized that "the greatest respect and consideration" is to be accorded to "the judgments of military authorities in matters relating to the actual prosecution of a war," and that the scope of the discretion exercised by these authorities "necessarily is wide."  *Hamdi*, 542 U.S. at 535 (plurality opinion).  It follows, therefore, that courts should take great care when asked to create a cause of action that would affect the ability of these officials to exercise the judgment and discretion which courts have accorded them with respect to the prosecution of war. *Id*; *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982) (recognizing that the purpose of qualified immunity is to shield government officials from "undue interference with their duties and from potentially disabling threats of liability").

**2.**  Not only would recognizing a *Bivens* remedy here impermissibly intrude on Presidential and Congressional primacy in matters of war, it would also impinge on the national security prerogative of the coordinate branches.  Even in times of peace, federal courts have broadly deferred to the Executive Branch on national security matters.  *See, e.g.*, *Egan*, 484 U.S. at 530 ("courts traditionally have been reluctant to intrude upon the authority of the Executive in . . . national security affairs."); *Halperin v. Kissinger*, 807 F.2d 180, 187 (D.C. Cir. 1986) (noting that the "harm produced" by the assertion of damages actions against federal officials "is particularly severe in the national security field, since 'no governmental interest is more compelling'") (*quoting Haig v. Agee*, 453 U.S. 280, 307 (1981)); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 270 n.27 (D.D.C. 2004) (dismissing claims for equitable relief because they

concerned "foreign and national security policy directives of the President"), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006).  There are obvious and significant national security concerns inherent in subjecting current and former members of the President's Cabinet, soldiers, and other federal officials to personal liability for their decisions regarding the designation, detention and interrogation of an enemy combatant whom the President has expressly concluded represents a "continuing, present and grave danger to the national security of the United States," *see* June 9, 2002 Bush Letter.  The prospect of prolonged litigation and personal liability might unduly influence decisions concerning the designation, detention and interrogation of enemy combatants like Padilla, or the release of such enemies from military custody, which could adversely impact the fundamental security of the Nation, enhancing the risks to our military in the field and our citizens at home.

Adjudication of the claims pressed by Plaintiffs in this case would necessarily require an examination of the manner in which the government identifies, captures, designates, detains, and interrogates enemy combatants.  *See In re Iraq*, 479 F. Supp. 2d at 105 ("The discovery process alone risks aiding our enemies by affording them a mechanism to obtain what information they could about military affairs and disrupt command missions by wresting officials from the battlefield to answer compelled deposition and other discovery inquiries about the military's interrogation and detention policies, practices, and procedures.").[13]  A *Bivens* cause of action should not be created where the litigation of extremely sensitive matters itself raises serious

---

[13]  *Cf. Sterling v. Tenet*, 416 F.3d 338, 348 (4th Cir. 2005) (noting that even established methods for the protection of sensitive information, "whatever they might be, still entail considerable risk" of revealing the information they are invoked to protect), *cert. denied*, 546 U.S. 1093 (2006).

18

national security concerns and is thus a policy judgment that should be left to Congress. *See Wilson v. Libby*, – F.3d –, No. 07-5257, 2008 WL 3287701, at *9-10 (D.C. Cir. Aug. 12, 2008) (refusing to create a *Bivens* remedy where litigation of the plaintiffs' allegations "would inevitably require judicial intrusion into matters of national security and sensitive intelligence information"). **3.** Recognizing the *Bivens* remedy sought by Plaintiffs would also impermissibly intrude upon the primacy of the Executive Branch in matters of foreign policy, including whether, where and when the United States chooses to capture enemy combatants. Certainly, foreign governments have an interest in the manner in which associates of Al Qaeda or any other foreign terrorist organization are identified, detained, and interrogated by the United States. For different legal consequences to attach when the United States arrests and detains an enemy combatant on domestic rather than foreign soil would necessarily impact the Executive's decision-making in that regard, could lead to increased foreign operations, and, in turn, impact foreign relations. That is especially true in regard to persons involved in international terrorism occurring abroad and aimed at undermining foreign governments which thereby have a keen and legitimate interest in the proceedings. As the D.C. Circuit explained in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985), "the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials . . . The foreign affairs implications of suits such as this cannot be ignored . . .". *See also id.* at 205-09 (refusing to recognize a *Bivens* remedy for alleged constitutional violations resulting from a plan by former President Reagan and members of the National Security Council to overthrow the government of Nicaragua); *cf. Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 230 (1986) ("[C]ourts are fundamentally underequipped to formulate national policies or develop standards for matters not

19

legal in nature.") (*quoting United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (1981) (footnote omitted)).  Even outside of the national security context, federal courts have traditionally deferred to the Executive Branch on foreign policy matters.[14]  Indeed, courts have approached foreign affairs with caution even when Congress has passed legislation contemplating some form of judicial involvement.  *See*, *e.g.*, *Sosa*, 542 U.S. at 727-28.  The rationale for this deference is particularly acute where a suit involves a request for the Judiciary to create a private cause of action without statutory authorization that would implicate foreign policy concerns.

**4.**  Beyond the concerns outlined above, recognizing a private right of action for damages against government officers would adversely impact the military in several other important ways.  First, the threat of a damages remedy would unduly interfere with military planning and discipline.  Second, such a cause of action would give our enemies a means of interfering with ongoing military operations.  *Bivens* actions brought by designated enemy combatants such as Padilla could hamper military operations by "bring[ing] aid and comfort to the enemy . . . diminish[ing] the prestige of our commanders," as well as those upon whom the commanders rely for advice, by "allow[ing] the very enemies [they are fighting] ... to call [them] to account in [their] own civil courts," thereby diverting the time and attention of those officials from the

---

[14]  *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n. 21 (2004) (recognizing "policy of case-specific deference to the political branches" in foreign affairs and "strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990) (highlighting "significant and deleterious consequences" that the creation of a damages action would have on "foreign policy operations"); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (recognizing that "congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved").

"military offensive" to the "legal defensive." *Johnson v. Eisentrager*, 339 U.S. 763, 778-79

(1950). Indeed, "[i]t would be difficult to devise more effective fettering" of executive branch

officials, *see id.*, than to allow an enemy combatant to trade a battlefield in Afghanistan for a

battlefield in the U.S. legal system where the primary weapon of choice is a personal liability

damages action directed at the federal officials deemed responsible for his designation, detention,

and interrogation. *See Stanley*, 483 U.S. at 683 ("Even putting aside the risk of erroneous judicial

conclusions (which would becloud military decisionmaking), the mere process of arriving at

correct conclusions would disrupt the military regime."); *see also Sanchez-Espinoza*, 770 F.2d at

209 ("[T]he danger of foreign citizens using the courts in situations such as this to obstruct the

foreign policy of our government is sufficiently acute that [courts] must leave to Congress the

judgment whether a damage remedy should exist."). The District Court for the District of

Columbia succinctly and accurately identified this concern in *In re Iraq*, a case in which a group

of alien detainees in Iraq and Afghanistan brought suit on *Bivens* theories against military and

civilian personnel who were responsible for their alleged detention and treatment while confined.

Finding that "considerations of institutional competence" precluded creation of the *Bivens* remedy

sought by the detainees, that court stated

> There is no getting around the fact that authorizing monetary damages remedies
> against military officials engaged in an active war would invite enemies to use our
> own federal courts to obstruct the Armed Forces' ability to act decisively and
> without hesitation in defense of our liberty and national interests, a prospect the
> Supreme Court found intolerable in *Eisentrager*.

*In re Iraq*, 479 F. Supp. 2d at 105-06 (*quoting Sanchez-Espinoza*, 770 F.2d at 208-09).[15]

---

[15] Although the courts in *Sanchez-Espinoza* and *In re Iraq* dealt in particular with the
danger of foreigners using the courts to obstruct foreign policy, the nationality of a potential
(continued...)

21

Moreover, implying a damages remedy here would create a paradoxical result: U.S. soldiers fighting al Qaeda abroad are barred from bringing *Bivens* actions against military and civilian officials for injuries arising out of their military service, *see Stanley*, 483 U.S. at 682-83, while al Qaeda associates such as Padilla who find their way to U.S. soil would be able to sue those military and civilian officials for their alleged detention, interrogation, and conditions of confinement during this war.  Again, a principal reason no damages remedy should be created is because of the impact an implied judicial remedy would have on military decision-making – an impact far greater if a suit is allowed by al Qaeda associates than if such a remedy were given to U.S. military personnel.  It would be anomalous, to say the least, to provide an implied constitutional tort remedy to an identified enemy of the United States, who was found to represent a "continuing, present and grave danger to the national security of the United States" and whose detention was found to be "necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens," *see* June 9, 2002 Bush Letter, when that remedy has been expressly denied to the military officers who are engaged in the fight against al Qaeda.  *See Eisentrager*, 339 U.S. at 783 (rejecting an interpretation of the Fifth Amendment that would put "enemy aliens in unlawful hostile action against [the United

---

[15](...continued)
plaintiff does not control the special factors analysis in these circumstances.  United States citizens, no less than foreigners, might use litigation against federal officers in their individual capacity rather than the political process to oppose foreign policy initiatives to which those citizens object.  And a United States citizen who joins forces with al Qaeda may pose an even greater threat to this country than a non-citizen.  *See Hamdi*, 542 U.S. at 519 (plurality opinion) ("There is no bar to this Nation's holding one of its own citizens as an enemy combatant . . . A citizen, no less than an alien, can be part of or supporting forces hostile to the United States or coalition partners and engaged in an armed conflict against the United States.") (citations and internal quotations omitted).  There is no question, in light of Padilla's conviction for three federal criminal offenses involving terrorism, that Padilla falls into that category.

States] . . . in a more protected position than our own soldiers" and stating that "[i]t would be a paradox indeed if what the Amendment denied to Americans it guaranteed to enemies."); *In re Iraq*, 479 F. Supp. 2d at 106 n.22 ("The Court agrees with the defendants that creating a *Bivens* remedy for these plaintiffs would result in an absurdity whereby remedies for constitutional violations that are denied our service men and women by the decisions in *Stanley* and *Chappell* would be available to the very enemies against whom those men and women risk their lives to defend our country's sovereignty."). This Court should decline Plaintiffs' request to confer a cause of action "on all the world except Americans engaged in defending it." *Eisentrager*, 339 U.S. at 784.

    **5.** Given the potential impact of creating a damages action for enemy combatants to use against federal officials alleged to be responsible for their designation, detention, and treatment as enemy combatants, Congress, not the Judiciary, is the appropriate branch to create any damages action in this context. *Stanley*, 483 U.S. at 683; *Bush*, 462 U.S. at 380; *cf. Sosa*, 542 U.S. at 727-28. Congress, however, has not created any such damages remedy. In fact, with respect to the issue of the interrogation and treatment of military detainees, "Congress has [ ] issued legislation addressing detainee treatment without creating a private cause of action for detainees injured by military officials." *In re Iraq*, 479 F. Supp. 2d at 107 n.23 (*citing* Detainee Treatment Act, Pub. L. No. 109-163, 119 Stat. 3136, 3474-75 (2006) (codified at 42 U.S.C. § 2000dd), and Reagan Act, Pub. L. No. 108-375, 118 Stat. 1811, 2068-71 (2004) (codified at 10 U.S.C. § 801, stat. note §§ 1091-92)).[16] As the court explained in *In re Iraq*, the absence of any provision for damages

_____

    [16] In addition, both the Military Commissions Act of 2006, *see* Pub. L. No. 109-366, 120 Stat. 2600 (2006), and the Uniform Code of Military Justice, *see* 10 U.S.C. §§ 892, 893, 928;

(continued...)

actions in this legislation is "some indication that Congress' inaction in this regard has not been

inadvertent."  479 F. Supp. 2d at 107 n.23.  The fact that Congress has chosen not to include such

a remedy in the legislation at issue makes it particularly inappropriate for courts to create one.

*See Chilicky*, 487 U.S. at 423; *Spagnola v. Mathis*, 859 F.2d 223, 229 (D.C. Cir. 1988) ("After

*Chilicky*, it is quite clear that if Congress has 'not inadvertently' omitted damages against officials

in the statute at issue, the courts must abstain from supplementing Congress' otherwise

comprehensive statutory relief scheme with *Bivens* remedies . . .); *cf. Stanley*, 483 U.S. at 683

("[I]t is irrelevant to a special factors analysis whether the laws currently on the books afford

Stanley . . . an adequate federal remedy for his injuries") (internal quotation marks omitted).[17]

*        *        *        *        *

In sum, Plaintiffs propose a judicially-created remedy that would strike at the core

functions of the political branches, impacting military discipline, aiding our enemies, and making

the United States more vulnerable to terrorist attack.  There can be little doubt that accepting

Plaintiffs' invitation to create a judicial damages remedy for enemy combatants to use against

U.S. officials in their individual capacity for alleged constitutional infirmities in their detention

---

[16](...continued)
*United States v. Hartman*, 66 M.J. 710 (2008) (affirming conviction by court-martial for maltreatment of detainees), address the treatment of detainees; but neither provides for a private right of action for damages.

[17]  Moreover, among the wide range of factors that may be considered by the Court in determining whether a *Bivens* remedy is inappropriate here, *see Wilkie*, 127 S. Ct. at 2598, is the fact that Padilla *had* a congressionally-created habeas corpus remedy to challenge the fact of his military detention, *see* 28 U.S.C. § 2241.  Padilla exercised that remedy and had judicial review in the form of a habeas petition of most if not all of the constitutional challenges he raises in this matter.  *See infra* § II.B.2.a-.b.  It would be especially inappropriate, given the concerns raised herein, to recognize some sort of implied further review in the form of a damages claim against an individual federal employee.

and treatment would be "a general *Bivens* cure . . . worse than the disease." *Wilkie*, 127 S. Ct. at

2604. Accordingly, this Court should dismiss all of Plaintiffs' constitutional claims as a matter of

law.

> **B.      The Defendants Are Entitled To Qualified Immunity For Plaintiffs' *Bivens*
>          Claims.**

Even if the Court does not find that special factors preclude the creation of the *Bivens*

remedy that Plaintiffs seek, Plaintiffs' constitutional claims should nonetheless be dismissed

because the Defendants are entitled to qualified immunity.

> **1.      The framework for the qualified immunity defense.**

Qualified immunity shields government officials who perform discretionary governmental

functions from civil liability so long as their conduct does not violate any "clearly established

statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "provides ample protection to all but

the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S.

335, 341 (1986)). Qualified immunity is not merely a defense to liability. It is intended to afford

sweeping protection to federal officials from the entirety of the litigation process. As the Fourth

Circuit has explained,

> The grant of qualified immunity to government officials ensures that these officials
> can perform their duties free from the specter of endless and debilitating lawsuits.
> Without such an immunity, the operations of government would be immobilized.
> [P]ermitting damages suits against government officials can entail substantial
> social costs, including the risk that fear of personal monetary liability and
> harassing litigation will unduly inhibit officials in the discharge of their duties.

*Torchinsky v. Siwinski*, 942 F.2d 257, 260-61 (4th Cir. 1991) (alteration in original) (citations

omitted). Accordingly, the Supreme Court has repeatedly emphasized that an official's

entitlement to qualified immunity must be resolved at the earliest possible stage of the litigation and that "discovery should not be allowed" until it is determined that the plaintiff has properly stated a claim for the violation of a clearly established right. *Harlow*, 457 U.S. at 818-19; *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998); *Anderson v. Creighton*, 483 U.S. 635, 647 n.6 (1987).

After a defendant asserts entitlement to qualified immunity, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. The Fourth Circuit has recognized that the determination of whether a defendant's actions are shielded by the defense of qualified immunity requires a two-step inquiry that should be made "in proper sequence." *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006) (*citing Saucier v. Katz*, 533 U.S. 194, 200 (2001)). First, the court must evaluate whether, viewing the facts in the light most favorable to the plaintiff, a constitutional right has been violated. *Id.* If so, the court proceeds to determine whether that right was clearly established at the time of the violation. *Id.* (*citing Saucier*, 533 U.S. at 200).

In addition, in order for Plaintiffs to establish a *Bivens* claim against each of the Defendants, Plaintiffs must specify the acts taken by each which violated Plaintiffs' constitutional rights because liability in a *Bivens* case is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). There is no respondeat superior liability. *Id.*

As explained *infra*, Plaintiffs fail to allege facts that establish that all Defendants personally participated in the alleged constitutional violations. Moreover, eight of Padilla's constitutional claims – Claims a-c and f-j (related to Padilla's seizure, designation as an enemy

26

combatant, military detention, and conditions of confinement, *see* Compl. ¶¶ 137.a-c, .f-.j) – fail as a matter of law with respect to all of the Defendants because these claims are explicitly precluded by the Fourth Circuit's prior rejection of Padilla's petition for a writ of habeas corpus. Claims c-e (related to Padilla's conditions of confinement and interrogation, *see id.* ¶¶ 137.c-.e) are also precluded to the extent they rely on Padilla being held in isolation and incommunicado because these claims are also encompassed within the Fourth Circuit's decision. Claim d (related to Padilla's interrogation, *see id.* ¶ 137.d) also fails to allege a violation of Padilla's rights under the Self-Incrimination Clause of the Fifth Amendment because that clause does not apply in the enemy combatant context and the information allegedly obtained was not used in any criminal proceeding against Padilla. Claim b (*see id.* ¶ 137.b) fails to allege a violation of Padilla's right of access to courts under the First and Fifth Amendment because he has no cognizable claim other than the habeas corpus action that he presented and lost; and Claims c and d (*see id.* ¶ 137.c-.d) fail to allege a violation of any rights under the Eighth Amendment because it only applies to punishment imposed on convicted prisoners in the criminal context. To the extent that any of the constitutional claims are not precluded by Padilla's failed petition for habeas corpus, the claims fail nonetheless because his constitutional claims were not "clearly established" at the time Padilla was designated and detained as an enemy combatant.

> **2.**     **Plaintiffs have failed to establish that all of the Defendants personally participated in the violation of Plaintiffs' constitutional rights.**

In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court clarified the level of specificity necessary for a complaint to survive a motion to dismiss. The Court stated that:

> a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief"

> requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 1964-65 (internal citations and quotations omitted); *see* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). Accordingly, the Court found, it is not sufficient for a plaintiff to show merely that his or her claims are "conceivable," the plaintiff must show that the complaint sets forth facts establishing that the claims are actually "plausible." *Twombly*, 127 S. Ct. at 1974; *see Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (noting that the *Twombly* standard may have greater "bite" in the context of qualified immunity cases). Plaintiffs' *Bivens* claims can be broadly separated into two categories: 1) claims challenging Padilla's designation and subsequent detention in military custody as an enemy combatant – Claims a.-b., and f.-j.; and 2) claims challenging Padilla's interrogation and the conditions of confinement during his detention – Claims c.-g. Under the *Twombly* standard, Plaintiffs have failed to meet the threshold requirement of sufficiently alleging the personal participation of each Defendant in either category of claim.

### a.    Padilla's designation and detention as an enemy combatant.

Plaintiffs do not allege that Defendants Hanft, Marr, Wright, Keen, Seymour, or Noble had any involvement in the decisions to designate Padilla an enemy combatant or detain him as such. Moreover, it is inconceivable that Defendant Gates could have had any personal involvement in the enemy combatant designation or detention because he did not become Secretary of Defense until December 18, 2006, *see infra* note 9, over four years *after* Padilla was

28

designated an enemy combatant by the President, and almost a year *after* Padilla was transferred from military custody to a federal detention center in Miami, Florida.

With respect to Defendants Ashcroft, Rumsfeld, Jacoby, Wolfowitz, Mobbs, and Haynes, Plaintiffs do not allege that any of these defendants designated Padilla as an enemy combatant. In fact, Plaintiffs admit that it was the President of the United States who made this designation and ordered that Padilla be detained in military custody. Compl. ¶ 42. Plaintiffs allege that Defendant Ashcroft, and "Senior Defense Policy Defendants," whom Plaintiffs identify as Rumsfeld, Jacoby, Wolfowitz, Mobbs, and Haynes and ten unidentified individuals, made a "recommendation" that Padilla be detained as an enemy combatant. *See id.* However, the facts stated in the materials cited as support for Plaintiffs' factual allegations do not support holding any of these defendants personally liable for decisions that were ultimately the President's to make.

According to Exhibit 1 of the Complaint – the text of a speech in which then White House Counsel Alberto Gonzales outlined the steps involved in the designation of a U.S. citizen as an enemy combatant, *see* Compl. Exh. 1[18] – only the Secretary of Defense and the Attorney General, through recommendations they submit to the President, have some arguable involvement in the process of designating and detaining an enemy combatant. But even Defendants Rumsfeld and Ashcroft cannot reasonably be held personally liable for Padilla's designation and detention as an enemy combatant because any recommendation they may have submitted on those issues was

---

[18] The Court's consideration of Exhibit 1 of Plaintiffs' Complaint does not convert this motion to dismiss into a motion for summary judgment. A court may even consider documents outside of the complaint that are "integral to and explicitly relied on in the complaint." *See Phillips v. LCI Int'l, Inc*., 190 F.3d 609, 618 (4th Cir. 1999). Plaintiffs attached Exhibit 1 to – and specifically reference Exhibit 1 in – their Complaint.

subject to the judgment and discretion of the President, who alone ultimately decided to designate

and detain Padilla as an enemy combatant.

To the extent that Plaintiffs attempt to hold Defendants Ashcroft, Rumsfeld, Jacoby,

Wolfowitz, Mobbs, and Haynes personally liable for their alleged role in developing the process

through which the enemy combatant designation is made, this claim is unavailing.  Plaintiffs offer

only the conclusory allegation that these defendants had knowledge of and participated in the

"develop[ment] [of] an extra-judicial, ex parte assessment of enemy combatant status followed by

indefinite military detention."  *See* Compl. ¶¶ 36-37.  Plaintiffs, however, allege no *facts*

concerning this alleged knowledge and participation.  Their allegations are insufficient even for

notice pleading purposes, let alone for overcoming the defense of qualified immunity.  *See*

*Twombly*, 127 S. Ct. at 1964-65; Fed. R. Civ. P. 8(a)(2) (requiring "a short plain statement of

*facts showing that the pleader is entitled to relief*") (emphasis added); *Harlow*, 457 U.S. at 808,

820 n.35 (cautioning that in the qualified immunity context, federal courts must be "alert to the

possibilities of artful pleading" and stressing the need for "firm application of the Federal Rules

of Civil Procedure") (*quoting Butz v. Economou*, 438 U.S. 478, 507 (1978)); *cf. Veney v. Wyche,*

293 F.3d 726, 730 (4th Cir. 2002) (explaining that courts need not accept as true allegations that

are "merely conclusory, unwarranted deductions of fact, or unreasonable inferences" or

"allegations that contradict matters properly subject to judicial notice or by exhibit").  It is well

established that Plaintiffs cannot circumvent properly pleading personal involvement in a

constitutional tort complaint by resorting to vague and conclusory allegations.  *E.g., Bryson v.*

*Gonzales*, — F.3d —, No. 07-6071, 2008 WL 2877474, at *4-8 (10th Cir. July 28, 2008)

(reversing denial of motion to dismiss on the basis of qualified immunity because plaintiff failed

to sufficiently allege defendant's personal participation and criticizing plaintiff's use of conclusory allegations); *Housecalls Home Health Care, Inc., et al. v. United States Dept. of Health and Human Svcs., et al.,* 515 F. Supp. 2d 616, 623-24 (M.D.N.C. 2007) (dismissing conclusory allegations against federal defendant in *Bivens* action and stating "individual defendants must have directly and personally participated in the tort").

The requirement that Plaintiffs plead personal involvement with factual detail is particularly important in cases in which cabinet officers and other senior government officials are sued. The requirement of pleading personal participation as to those individuals is especially important because it is counter-intuitive and in fact unreasonable to infer that such officials have involvement in, or even knowledge of, the discrete actions of every subordinate. *See Nuclear Transport & Storage, Inc. v. United States*, 890 F.2d 1348, 1355 (6th Cir. 1989) (explaining that "[i]f a mere assertion that a former cabinet officer and two other officials 'acted to implement, approve, carry out, and otherwise facilitate' alleged unlawful policies were sufficient to state a claim, any suit against a federal agency could be turned into a *Bivens* action by adding a claim for damages against the agency head and could needlessly subject him to the burdens of discovery and trial."); *cf. Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003) (rejecting claims against high-level federal officials for lack of sufficient allegations of personal involvement); *Trulock v. Freeh,* 275 F.3d 391, 400, 402 (4th Cir. 2001) (affirming dismissal of *Bivens* claim against former Director of Federal Bureau of Investigation where allegations did not establish his personal participation). Plaintiffs fail to sufficiently allege the personal involvement of each or indeed any Defendant in the violation of any rights associated with Padilla's designation and detention as an enemy combatant. Therefore, Claims a-b, and f-j, *see* Compl. ¶¶ 137.a-.b & .f-.j, should be

31

dismissed as to Defendants Ashcroft, Rumsfeld, Jacoby, Wolfowitz, Mobbs, Haynes, Hanft, Marr, Wright, Keen, Seymour, and Noble; and Claims h and j, *see id.* ¶¶ 137.h, .j, should be dismissed as to Defendant Gates.

      b.    <u>Padilla's interrogation and treatment during his detention.</u>

Plaintiffs fail to sufficiently allege the personal involvement of Defendants Ashcroft Rumsfeld, Wolfowitz, Jacoby, Mobbs, Haynes, Hanft, Marr, Wright, Keen, Seymour, and Noble in the violation of any rights associated with Padilla's interrogation or the conditions of confinement during his detention as an enemy combatant, specifically Claims c.-g., *see* Compl. ¶¶ 137.c-.g. Plaintiffs assert that "[u]pon information and belief, Mr. Padilla was subject to . . . abuses" as a result of express authorization by "Senior Defense Policy Defendants," *see* Compl. ¶ 105, a group that Plaintiffs have defined as being comprised of Defendants Rumsfeld, Wolfowitz, Jacoby, Mobbs, Haynes and ten unidentified individuals. Compl. ¶¶ 14-19. Throughout their Complaint, Plaintiffs repeatedly refer to this group collectively as "Senior Defense Policy Defendants" without differentiating among individual defendants or identifying what role each defendant played in the constitutional violations they allege. "[T]he burden rests on the plaintiffs to provide fair notice of the grounds for the claims made against each defendant."[19] *Robbins*, 519 F.3d at 1250 (collecting cases) (dismissing *Bivens* claims in part for failure to satisfy the standard of fair notice required by Rule 8 and explaining that "[g]iven the complaint's use of either the

---

    [19] Plaintiffs' conclusory allegations are especially troubling because Plaintiffs have grouped together government officials from separate agencies, at different levels of service, with differing responsibilities. *See* Compl. ¶¶ 14-19. Faced with a similar plaintiff-assembled grouping of defendants employed by different entities, the Tenth Circuit in *Robbins* observed, "[p]resumably, the alleged tortious acts committed by [the Director of DHS, the operator of a daycare, and individual social workers] are entirely different in character and therefore are mistakenly grouped in a single allegation." *Robbins*, 519 F.3d at 1250.

collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed"); *accord Bryson*, 2008 WL 2877474 at *7 (noting that conclusory allegations naming a collective of "'Defendants,' generically" are not helpful "in figuring out what *facts* [plaintiff] means to allege about [a particular defendant's] conduct") (emphasis in original).  As to Padilla's interrogation and conditions of confinement claims, Plaintiffs' allegations are devoid of any meaningful factual content regarding what allegedly was authorized, when, or by whom.  Plaintiffs' reliance on boilerplate references to a collection of defendants from different agencies with differing duties and responsibilities cannot satisfy their burden to establish the personal participation of each Defendant in the alleged unconstitutional conduct.

Moreover, the few allegations in the Complaint that do identify the actions of a specific Senior Defense Policy Defendant do not relate to Padilla.  Rather, virtually all of the actions specifically attributed to a particular Senior Defense Policy Defendant – by Plaintiffs' own admissions or as set out in the documents attached to the Complaint – relate to policies that apply to the treatment of detainees held outside of the United States.[20]  Padilla, however, is a United

---

[20] *E.g.*, Compl. ¶ 59 (alleging that Rumsfeld personally approved interrogation techniques for *Guantanamo* detainees); ¶ 61 (alleging Wolfowitz approved interrogation techniques in use at *Guantanamo*); ¶ 62 (alleging that Haynes suggested certain techniques at *Guantanamo*); *see also id.* Exhibit 4 (reporting on detainees *outside* of the U.S); Compl. ¶ 49 (describing Exhibit 4); Exhs. 5 and 6 (analyzing the question of whether and how international treaties, as incorporated by federal laws, and customary international law apply to the conditions of detention and procedures for trial of members of al Qaeda and the Taliban militia who came under U.S. control *in Afghanistan*); Exh. 7 (discussing whether the rule of *Miranda v. Arizona* applies to interrogations of suspected enemy combatants captured *in Afghanistan*); Exh. 8 (analyzing 18 U.S.C. §§ 2340-2340A, which makes it a criminal offense for any person *outside*

(continued...)

States citizen who was arrested and detained on U.S. soil. *See* Compl. ¶¶ 1, 35, 45. Plaintiffs

nonetheless ask this court to accept their theory that particular actions or decisions Defendants

Rumsfeld, Wolfowitz, Jacoby, Mobbs, or Haynes allegedly made with respect to detainees at

Guantanamo must have been authorized to apply to Jose Padilla. *E.g.*, Compl. ¶¶ 105, 107, 125.

Neither the factual allegations in the Complaint nor any of the attached exhibits, however, links

the actions of these Defendants to Padilla's alleged interrogation or conditions of confinement.[21]

*See*, *e.g.*, Compl. ¶ 105 (containing conclusory assertion supported by public statements

pertaining to Iraq); ¶ 107 (containing conclusory statement supported by exhibits relating to

detainees al-Marri and Hamdi addressing detainee privileges); ¶ 125 (containing conclusory

statement with no factual support whatsoever). Plaintiffs' mere assertion that "Senior Defense

Policy Defendants" knew that "the authorization of aggressive interrogation techniques for use at

Guantanamo was being interpreted to permit the use of such techniques against suspected

terrorists elsewhere" – lacking even any explicit reference to Padilla – is wholly speculative and

---

[20](...continued)
of the United States to commit or attempt to commit torture); Exh. 9 (examining the legal
standards governing military interrogations of *alien* unlawful combatants held *outside* the United
States); ¶ 50 (describing Exhibits 5-9); Exh. 11 (requesting authorization for techniques at
*Guantanamo*); Exh. 13 (recommending approval for techniques at *Guantanamo*); Exh. 14
(analyzing interrogation techniques at *Guantanamo*); Compl. ¶¶ 64-67, 68-90 (describing
Exhibits 11, 13, and 14); Compl. ¶ 78 (describing Exhibit 16 as recommending techniques for
use on detainees *outside of the United States* and Exhibit 17 as authorizing techniques for use at
*Guantanamo*).

[21] Plaintiffs also allege that Defendant Ashcroft was responsible for the legal opinions
"purporting to provide legal sanction for aggressive military detention and interrogation
programs." Compl. ¶ 55. As described in note 20, *supra*, the Department of Justice legal
opinions attached to the complaint apply to detainees captured or held outside of the United
States. *See* Compl. Exhs. 5-9.

does not allege facts that satisfy the plausibility standard required by *Twombly*.  *See* 127 S. Ct. at 1965-67.

The few other allegations against Defendants Rumsfeld, Wolfowitz, Jacoby, Mobbs, or Haynes that purport to pertain specifically to Padilla are either equally conclusory, *e.g.,* Compl. ¶¶ 56, 89, 111, 124, or seek to hold an official liable for the actions of the agency that he heads, *e.g*., Compl. ¶¶ 108, 110.  Neither are adequate to hold these Defendants personally liable.  A defendant's position as director or supervisor for a particular agency is not sufficient to state a claim under *Bivens*.  *See, e.g., Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (noting that in a *Bivens* suit, liability may not be based on *respondeat superior*) (internal citation omitted); *cf. FDIC v. Meyer*, 510 U.S. 471, 486 (1994) (refusing to subject federal agencies to liability under *Bivens*).  Instead, liability in a *Bivens* case is "personal, based upon each defendant's own constitutional violations."  *Trulock*, 275 F.3d at 402.  Alleging that Defendant Jacoby's agency devised and approved interrogation plans for detainees, compl. ¶ 108 or the agency Defendant Wolfowitz headed was consulted on matters pertaining to Padilla's visitors and reading matters, compl. ¶ 110, fails to describe what actions Defendants Jacoby or Wolfowitz took and is accordingly insufficient to hold either Defendant liable.  Furthermore, Plaintiffs' conclusory assertions of the Defendants' undefined involvement in Padilla's interrogations or conditions of confinement are inadequate to state a claim without any supporting factual foundation.  *See Malesko*, 534 U.S. at 70-71 (explaining that *Bivens* liability is limited to those who are "directly responsible" for such violations); *Robbins*, 519 F.3d at 1250 (noting that in §1983 cases, it is particularly important that "the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her,

35

as distinguished from collective allegations against the state.") (emphasis in original) (*citing Twombly*, 127 S. Ct. at 1970-71 n.10).  In the end, Plaintiffs simply have not tied the alleged actions of any particular "Senior Defense Policy Defendant" to the facts they alleged occurred in this case.

Plaintiffs repeat the same mistake as to the collection of Defendants they label as "Military Supervisory Defendants."  Plaintiffs only generally assert that those Defendants, whom Plaintiffs identify as Defendants Hanft, Marr, Keen, Wright and Seymour and eight unidentified individuals, *see* compl. ¶¶ 22-27, *plus* Defendant Noble and thirty other unidentified individuals "failed to take steps to halt" the alleged constitutional violations, thereby causing the harms alleged in the Complaint.[22]  Compl. ¶ 124.  Plaintiffs do not allege that any one of these forty-four

---

[22]  The only allegations in the Complaint which specifically identify any particular action by any one of these Defendants are: 1) that Defendants Wright and Seymour conducted regular unannounced inspections of the wing in which Padilla was housed (Compl. ¶ 80); 2) that "Military Supervisory Defendants" allegedly sent detailed reports up the chain of command about Brig detention and interrogation activity (Compl. ¶ 112), and 3) that Defendant Seymour indicated to Padilla's counsel that he was concerned about Padilla's isolation (Compl. ¶ 119).  It is unclear how any of these actions rise to the level of a constitutional violation.  Plaintiffs' allegations against these Defendants essentially boil down to the basic assertion that they conducted rounds and provided reports to their supervisors about the detainees in the Brig – routine tasks performed daily by supervisory employees in *any* detention facility.  Such general allegations are insufficient to put these defendants on notice of what they are alleged to have ordered, reported, observed or been informed about that supposedly amount to a constitutional tort.  *E.g., Crowder v. Lash*, 687 F.2d 996, 1005-06 (7th Cir. 1982) (dismissing conditions of confinement claim against Commissioner of Corrections where there was no evidence that he personally participated, directed, or expressly consented to any of the challenged actions, despite the fact that he was familiar with conditions of specific unit where plaintiff was held, based on communications with subordinates, as well as discussions with and letters from plaintiff, because this would leave, contrary to settled principles for individual capacity actions, "any well informed Commissioner . . . personally liable for damages flowing from any constitutional violation occurring at any jail within that Commissioner's jurisdiction"); *cf. Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) (explaining that "throw[ing] in words such as 'deliberate indifference'" and "the presence of a few conclusory legal terms does not insulate a

(continued...)

Defendants personally committed, ordered anyone to commit, or was even present during the alleged violations.  Nor do they affirmatively provide a link between any particular alleged constitutional violation and any one of these forty-four Defendants.[23]  Courts routinely dismiss on qualified immunity grounds cases in which no affirmative link between the alleged violations and the Defendants' conduct is provided.  *See*, *e.g.*, *Bryson*, – F.3d –, 2008 WL 2877474 at *6-7 (dismissing *Bivens* claims because plaintiffs failed to provide an "affirmative link" between defendant's conduct and the alleged constitutional violation); *Jeffers v. Gomez*, 267 F.3d 896, 915-16 (9th Cir. 2001) (dismissing prisoners' constitutional claims against prison director for failure to show any causal connection between supervisor's conduct and the alleged violation).  Furthermore, to the extent that Plaintiffs seek to hold Defendants Hanft, Marr, Wright, Keen, or Seymour liable for the actions of their subordinates' (or any of the unnamed defendants') allegedly unconstitutional conduct, such an attempt must fail.  As described above, liability in a

---

[22](...continued)
complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support a finding of deliberate indifference.").

[23]  Plaintiffs allege that "Operational Defendants," which by Plaintiffs' definition refers to forty-four named and unidentified defendants and also includes Defendants Hanft, Marr, Seymour, Keen, Noble and Wright, told Padilla that his attorneys were not trustworthy and threatened him with unpleasant consequences if he revealed his conditions of confinement to counsel.  Compl. ¶ 86.  Plaintiffs do not identify the time, place or manner in which any of these alleged statements were made or, more importantly, which - *if any* - of the current defendants (Hanft, Marr, Seymour, Keen, Noble or Wright) made the statements.  Even if these alleged statements were to be found to have constitutional significance, and it is not clear that they do, none of these defendants can be held personally liable for statements in the absence of any factual allegations establishing that the defendant actually made or was "personally complicit" in another making the statement.  *See Trulock*, 275 F.3d at 402 (determining that supervisors are entitled to immunity when there is no allegation that supervisors "were personally complicit" in another's alleged misrepresentations).

*Bivens* case is "personal, based upon each defendant's own constitutional violations" and there is no *respondeat superior* liability. *Trulock,* 275 F.3d at 402.

Finally, while Plaintiffs assert that Defendant Noble's alleged evaluations of Padilla's mental health were "wholly inadequate," *see* Compl. ¶ 103, Plaintiffs offer nothing – apart from a formulaic recitation of "deliberate indifference," *see id.* ¶ 7 – from which it could be inferred that this alleged conduct constituted at most anything more than ordinary negligence, which is not actionable under the Constitution. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (stating that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process"); *Young*, 238 F.3d at 577 (explaining that "[n]egligence . . . is insufficient to support a claim of a Fourteenth Amendment violation"); *Hoffman v. Tuten, et al.*, 446 F. Supp. 2d 455, 471 (D.S.C. 2006) (observing that "[n]egligence, in general, is not actionable . . . under the *Bivens* doctrine."). For these reasons, Claims c.-g., *see* Compl. ¶¶ 137.c.-g, should be dismissed as to all Defendants.

### 3.    Plaintiffs have not alleged a violation of any constitutional rights.

To the extent that Plaintiffs have sufficiently alleged the personal involvement of any of the Defendants in a violation of any of Plaintiffs' constitutional rights, Plaintiffs' claims still fail as a matter of law.

   a. <u>The Fourth Circuit's rejection of Padilla's petition for a writ of habeas corpus precludes most of Plaintiffs' constitutional claims</u>.

Padilla alleges that his designation as an enemy combatant and his subsequent detention as such violated various constitutional rights. However, the Fourth Circuit's rejection of Padilla's petition for a writ of habeas corpus precludes any constitutional claims that were encompassed within the Fourth Circuit's decision. This includes claims based upon the President's designation

and detention of Padilla as an enemy combatant (Claims a-c and f-j; *see* Compl. ¶¶ 137.a-.c, .f-.j),

and claims relating to Padilla's interrogation which rely upon the alleged coercive effect of his

being detained and held incommunicado (Claims c-e; *see id.* ¶¶ 137.c-.e.).

On July 2, 2004, Padilla filed a petition for a writ of habeas corpus in the United States

District Court for the District of South Carolina.  *See Padilla I*, 389 F. Supp. 2d 678, 682  (D. S.C.

2005), *rev'd*, *Padilla II*, 423 F.3d 386 (4th Cir. 2005), *cert. denied*, 547 U.S. 1062 (2006).  Padilla

claimed that his military detention as an enemy combatant without criminal charge violated the

Fourth, Fifth and Sixth Amendments.  *Padilla I*, 389 F. Supp. 2d at 679 n.1.  Specifically, Padilla

alleged that

- he was "incarcerated and unlawfully held" at the Consolidated Naval Brig in South Carolina;

- he had not been given "fair notice of the Government's case against him" and had been given "no opportunity to be heard by a neutral decision maker to contest the factual grounds for his imprisonment";

- he was entitled to an evidentiary hearing on the factual allegations underlying his designation as an "enemy combatant;"

- he "unquestionably ha[d] the right to access to counsel;" and

- his "ongoing interrogation" "throughout two years of incommunicado detention" "violate[d] his rights under the Fifth, Sixth and Eighth Amendments to the U.S. Constitution, including the rights against self-incrimination, the right to counsel, the right not to be subject to cruel or unusual punishment, and substantive and procedural due process."

*See* Petition for Writ of Habeas Corpus *filed in Padilla v. Hanft*, No. 04-2221-HFF-RSC (D. S.C.)

("Petition for Writ of Habeas Corpus") ¶¶ 1, 3, 15, 27-29, 32.  Padilla also sought an order

requiring the government to cease all interrogation of him while his petition was pending.  *Id.* at

Prayer For Relief No. 4.  The district court granted Padilla's petition, finding that the President

did not have the authority to detain Padilla as an enemy combatant. *Padilla I*, 389 F. Supp. 2d at 688-692.  This decision, however, was reversed by the Fourth Circuit in *Padilla II*.

In *Padilla II*, the Fourth Circuit held that the President possessed authority, pursuant to the AUMF, to designate Padilla as an enemy combatant and to detain him in military custody as such. 423 F.3d at 389.  After finding that Padilla qualified as an enemy combatant under the definitions adopted by the Supreme Court in *Hamdi* and *Ex parte Quirin*, 317 U.S. 1 (1942), the Fourth Circuit declared that "[Padilla's] military detention as an enemy combatant by the President is unquestionably authorized by the AUMF as a fundamental incident to the President's prosecution of the war against al Qaeda in Afghanistan." *Padilla II*, 423 F.3d at 392.  The Fourth Circuit recognized that the AUMF

> provided the President all powers necessary and appropriate to protect American citizens from terrorist acts by those who attacked the United States on September 11, 2001.  As would be expected, and as the Supreme Court has held, those powers include the power to detain identified and committed enemies such as Padilla, who associated with al Qaeda and the Taliban regime, who took up arms against this Nation in its war against these enemies, *and* who entered the United States for the avowed purpose of further prosecuting that war by attacking American citizens and targets on our own soil – a power without which, Congress understood, the President could well be unable to protect American citizens from the very kind of savage attack that occurred four years ago almost to the day.

*Id.* at 397 (emphasis in original).  Although the Fourth Circuit acknowledged that Padilla could not be detained indefinitely, the Court found that his detention had not exceeded the duration authorized by the AUMF because the United States remains engaged in the conflict with al Qaeda in Afghanistan.  423 F.3d at 392 n.3 (*citing Hamdi*, 542 U.S. at 520-521).

The doctrine of collateral estoppel prevents Padilla from relitigating issues of fact or law decided in prior federal litigation in which Padilla had a full and fair opportunity to litigate the issues.  *Ramsay v. INS*, 14 F.3d 206, 210 (4th Cir. 1994).  The doctrine applies where: 1) the issue

40

is identical to one previously litigated; 2) the issue was actually decided in the prior proceeding; 3) determination of the issue was a critical and necessary part of the decision in the prior proceeding; 4) the prior judgment is final and valid; and 5) the party against whom estoppel is asserted had a full and fair opportunity to litigate the issue in the previous forum. *Id.* Under the collateral estoppel doctrine, any claim raised by Padilla in this case that is encompassed by issues of fact or law that were actually litigated and necessarily decided against him in a prior federal proceeding is precluded.[24]

There is no question that the majority, if not the entirety, of the claims that are the subject of this litigation were part and parcel of the Fourth Circuit's rejection of Padilla's habeas petition. In recognizing that the President had the authority to designate Padilla as an enemy combatant and to detain him in military custody as such, the Fourth Circuit in *Padilla II* decided all of the issues of law encompassed by Padilla's petition for habeas corpus. *See Padilla I*, 389 F. Supp. 2d at 679 n.1. These issues of law fall into three categories: 1) Padilla's designation as an enemy combatant, *see Padilla II*, 423 F.3d at 389, 392; 2) Padilla's detention as an enemy combatant, *see id.*; and 3) Padilla's being held incommunicado during his detention, *see id.* at 394-95. The Fourth Circuit's determination that each of these actions were lawful under the Constitution encompasses the following claims raised in this suit: Claims a (denial of access to counsel), b (right of access to courts), c (incommunicado detention and interrogation as an enemy

---

[24] The Supreme Court has specifically recognized in the criminal context that a prisoner cannot bringing a constitutional tort action that effectively challenges the legality of his criminal conviction without first overturning the conviction on direct appeal or through habeas corpus proceedings. *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). The same logic applies in this case to preclude Padilla's constitutional tort challenge to his designation and detention as an enemy combatant, which were upheld in his prior habeas corpus challenge.

41

combatant), h (military detention), i (unreasonable seizure), and j (due process).  To the extent that these Claims are based upon the President's designation and incommunicado detention of Padilla as an enemy combatant, these claims are precluded by *Padilla II*.  *Compare Padilla I*, 389 F. Supp. 2d at 692 n.1 *and* Petition for Writ of Habeas Corpus ¶¶ 1, 3, 15, 27-29, 32 *with* Compl. ¶¶ 137.a-.c, .h-j.

 *Padilla II* also bars those constitutional claims that Padilla did not explicitly raise in his habeas petition but which are controlled, legally, by the Fourth Circuit's determination that Padilla was properly held in isolation and incommunicado.  Padilla specifically alleged in his habeas petition that he was being held "incommunicado."  *See* Petition for Habeas Corpus ¶¶ 14, 19, 32.[25]  However, in denying habeas relief, the Fourth Circuit recognized that inherent in the authority to detain a designated enemy combatant such as Padilla for the duration of active hostilities is the ability – and the necessity – of detaining the enemy combatant in isolation with limited if any opportunity to communicate with the outside world.  In this regard, the Fourth Circuit found that the detention of designated enemy combatants serves three equally important purposes: 1) preventing the detainee from returning to the field of battle; 2) facilitating the process of gathering intelligence from the detainee; and 3) "restrict[ing] the detainee's communication with confederates so as to ensure that the detainee does not pose a continuing threat to national security even as he is confined."  *Padilla II*, 423 F.3d at 394-95.  It is these considerations, the Fourth Circuit found, that make "military detention not only an appropriate,

_____

 [25] *See also Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564, 574 (S.D.N.Y. 2002) ("It is not disputed that Padilla is held incommunicado, and specifically that he has not been permitted to consult with Newman or any other counsel"), *remanded*, *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003), *reversed sub nom.*, *Rumsfeld v. Padilla*, 542 U.S. 426 (2004).

but also the necessary, course of action to be taken in the interest of national security." *Id.* Thus *Padilla II* is also dispositive of Claims c (conditions of confinement and treatment), d (interrogation), e (free exercise of religion), f (right to information) and g (right of association), *see* Compl. ¶¶ 137.c-.g, that rely upon the coercive effect of his being detained and held incommunicado – *i.e.*, in near or total isolation from his family, *see*, *e.g.*, *id.* ¶¶ 82, 90-92, 116-19, and from outside sources of information such as radio, television, reading and religious materials, *see*, *e.g.*, *id.* ¶ 96 – whether or not they were explicitly identified in his habeas petition.[26]

In any event, whether or not all of Plaintiffs' claims meet the technical requirements for collateral estoppel, these claims should nonetheless be dismissed on the basis of stare decisis.  In *Padilla II*, a panel of the Fourth Circuit determined that the President had the authority to designate Padilla as an enemy combatant and that pursuant to that designation Padilla could be detained and held incommunicado by the military.  To the extent that Plaintiffs' claims implicate these settled points of law, those claims are properly dismissed under the doctrine of stare decisis. *See Norfolk and Western Ry. Co. v. Director, Office of Worker's Compensation Programs*, 5 F.3d 777, 779 (4th Cir. 1993); *United States v. Charleston County*, 318 F. Supp. 2d 302, 308 (D.S.C. 2002).

        b.    <u>Padilla has not stated a violation of the right of access to courts</u>.

Whether or not the Fourth Circuit's decision is preclusive, an additional reason why Padilla has not stated a violation of the right of access to the courts in Claim b is that Padilla has

---

[26] *Padilla II* is similarly dispositive of Plaintiff Lebron's First Amendment right of association claim, which is premised upon the allegation that Lebron was denied "virtually all contact with her son" during his detention as an enemy combatant. *See* Compl. ¶ 138. Moreover, it cannot be said, in light of *Padilla II*, that Lebron had a clearly established right to have contact with Padilla during his detention as an enemy combatant. *See infra* § III.B.4.

not identified a claim of any sort that he was unable to bring in the past because of any actions by

the Defendants.  The Supreme Court has recognized that constitutional claims for denial of the

right of access to courts generally fall into two categories:

> In the first are claims that systemic official action frustrates a plaintiff or plaintiff
> class in preparing and filing suits at the present time . . . The second category
> covers claims not in aid of a class of suits yet to be litigated, but of specific cases
> that cannot now be tried (or tried with all material evidence), no matter what
> official action may be in the future.

*Christopher v. Harbury*, 536 U.S. 403, 412-14 (2002).  The Court has recognized that the right of

access to courts is ancillary to the underlying claim, without which a plaintiff cannot have

suffered injury by being shut out of court.  *Id.* at 414-15.  Thus, to state a denial of access to

courts claim, a plaintiff must allege both: (1) a "nonfrivolous, arguable" underlying claim, and (2)

official acts frustrating litigation of the claim.  *Id.* at 415.

Nowhere in Padilla's Amended Complaint does he identify a claim of any sort that he was

unable to bring in the past because of the actions of any of the Defendants.  The only past claim

referred to in the Complaint is a petition for a writ of habeas corpus, *see* Compl. ¶ 84, which

Padilla brought in two jurisdictions and ultimately lost, *see Padilla II*, 423 F.3d at 389.[27]  Padilla

does not identify any claim that the Defendants' actions prevented him from pursuing.[28]

<div style="margin-left:2em">

c.    Padilla has not stated a violation of any rights under the Eighth
       Amendment.

</div>

Even if the Fourth Circuit's decision is not preclusive of Padilla's Eighth Amendment

claims in Claims c and d, an additional reason why Padilla has not stated a violation of his Eighth

Amendment rights is that it is well established that the Eighth Amendment does not apply unless

there has been a criminal conviction.  *See Ingraham v. Wright*, 430 U.S. 651, 667-68, 671 n.40

---

[27]  To the extent that Padilla suggests he was denied the opportunity to contest the basis for his enemy combatant designation, *see* Compl. ¶ 44, he is incorrect.  The reasons Padilla did not obtain a factual hearing on the basis for his designation and detention as an enemy combatant are twofold: 1) he filed his initial habeas petition in the wrong jurisdiction; and 2) once he filed in the proper jurisdiction, he made a strategic decision to litigate the factual basis for his designation and detention after litigating the question of whether the President had the authority to designate and detain him as an enemy combatant.  In the first habeas proceeding, which was brought in the Southern District of New York, the district court recognized the President's authority to detain Padilla as an enemy combatant and was prepared to determine the factual sufficiency of that designation.  *See Padilla ex rel. Newman*, 233 F. Supp. 2d at 587-99, 610.  The district court's decision, however, was reversed by the Supreme Court on the basis that the habeas petition was filed in the wrong jurisdiction.  Rumsfeld v. Padilla, 542 U.S. 430 (2004).  In his second habeas proceeding in the District of South Carolina, Padilla agreed to have the district court first decide, on the basis of a stipulated set of facts, the issue of whether the President had the authority to detain him as an enemy combatant before then addressing the factual basis for his designation and detention as an enemy combatant.  *See* Sept. 27, 2004 Scheduling Order in No. 2:04-2221-HFF-RSC (D.S.C.).  After the Fourth Circuit denied Padilla's petition for habeas, the district court was to decide the validity of the enemy combatant designation.  When Padilla was subsequently indicted on federal criminal charges and removed from the jurisdiction, however, the issue became moot.  *See* Nov. 29, 2005 Order in No. 2:04-2221-HFF-RSC (D.S.C.).

[28]  Similarly, Padilla cannot premise his right of access claim on the Habeas Suspension Clause, *see* Compl. ¶¶ 137.b, .h, because Padilla has not been denied the opportunity to pursue a writ of habeas corpus.  Moreover, that argument was raised in Padilla's petition for habeas corpus, *see* Petition for Habeas Corpus at ¶ 21, and rejected by the Fourth Circuit, *see Padilla II*, 423 F.3d at 389.

(1977) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."). Padilla makes no allegation that any of the mistreatment he was allegedly subjected to occurred in connection with any criminal proceedings against him. In fact, Padilla specifically alleges that he was held in military custody "without charge," *see* Compl. ¶ 1, and his eventual criminal conviction post-dated all the allegations of mistreatment in this Complaint.

d.      Padilla has not stated a violation of the Fifth Amendment right against self-incrimination.

Whether or not the Fourth Circuit's decision is preclusive, Padilla's allegation that the Defendants violated his right to be free from "coercive and involuntary custodial interrogation," asserted in Claim d. under the Self-Incrimination Clause of the Fifth Amendment, fails because Padilla does not allege that he made any incriminating statements. There can be no violation of the right against self-incrimination unless an incriminating statement has been made. *Riley v. Dorton*, 115 F.3d 1159, 1165 (4th Cir. 1997) (en banc); *Fisher v. United States*, 425 U.S. 391, 408 (1976) (stating that the Fifth Amendment privilege "applies only when the accused is compelled to make a Testimonial Communication that is incriminating"). Moreover, the Fifth Amendment right against self-incrimination is a *trial* right. *Withrow v. Williams*, 507 U.S. 680, 691 (1993). "Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial." *Riley*, 115 F.3d at 1165 (*citing Verdugo-*

46

*Urquidez*, 494 U.S. at 264)).[29]  Nowhere does Padilla allege that an incriminating statement he

made while held as an enemy combatant was used against him in a trial.[30]

> **4.    To the extent that Plaintiffs have alleged the violation of any constitutional rights related to Padilla's designation, detention, and interrogation as an enemy combatant, those rights were not clearly established at the time of the events alleged in the Third Amended Complaint.**

A constitutional right is clearly established "if the contours of the right are sufficiently

clear so that a reasonable officer would have understood, under the circumstances at hand, that his

behavior violated the right." *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007) (*quoting*

*Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir. 2003) (internal quotation marks and alteration

omitted)).  The Fourth Circuit does not require officials to "sort out conflicting decisions or to

resolve subtle or open issues.  Officials are not liable for bad guesses in gray areas; they are liable

for transgressing bright lines." *McVey v. Stacy,* 157 F.3d 271, 277 (4th Cir. 1998) (internal

quotation marks and citation omitted).  Accordingly, the constitutional rights that Plaintiffs assert

in this case must have been clearly established in a "particularized and relevant sense," at the time

of the Defendants' alleged actions. *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995) (*citing*

---

[29]  *See also Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (plurality opinion) (finding no violation of the Fifth Amendment's Self-incrimination Clause where the plaintiff's statements were never admitted as testimony against him in a criminal case; stating that "The text of the Self-Incrimination Clause simply cannot support the [] view that the mere use of compulsory questioning, without more, violates the Constitution."); *id.* at 777-79 (Souter, J., concurring).

[30]  Qualified immunity might not preclude a free-standing constitutional claim such as a well-pled allegation by Padilla that a particular individual denied him medical care in a manner that arose to a violation of the Fifth Amendment.  However, because Plaintiffs have neither specifically outlined the parameters of such a claim, nor alleged facts to support the personal participation of any of the Defendants in such a claim, *see supra* § III.B.2, it would not survive as to any of the Defendants.

*Anderson*, 483 U.S. at 640). "[I]n light of the pre-existing law the unlawfulness" of the Defendants' conduct must have been "apparent." *Id.* (*citing Anderson*, 483 U.S. at 640). When Plaintiffs' constitutional claims are considered under this demanding standard, it is evident that Padilla's designation, detention, and interrogation as an enemy combatant did not violate any clearly established constitutional rights.

As an initial matter, Plaintiffs cannot identify clearly established law in a "particularized" sense where, as here, they have repeatedly failed to identify discrete acts by discrete individuals to compare that law to. Plaintiffs' repeated reference to two categories of defendants, which all told constitute fifty-nine individuals (the five named and ten unidentified "Senior Policy Defendants" and the six named and thirty-eight unidentified "Operational Defendants"), for whom Plaintiffs fail to articulate particular acts makes it impossible for any individual to be on notice of their allegedly unconstitutional conduct. For this reason alone, Plaintiffs cannot carry their burden of identifying clearly established law.

Moreover, no federal court has afforded an enemy combatant the constitutional protections Plaintiffs seek in this case. To the contrary, in a recent and closely analogous case, the Supreme Court held that the AUMF authorized the military detention of an American citizen, Yaser Hamdi, who was captured in Afghanistan, designated as an enemy combatant, and subsequently detained in military custody on U.S. soil. *See Hamdi*, 542 U.S. at 518-522 (plurality opinion). The Court specifically recognized that "[t]here is no bar to this Nation's holding one of its own citizens as an enemy combatant." *Id.* at 519. To the extent that Plaintiffs would argue that their claims fall outside the reach of *Hamdi* because Padilla was captured on U.S. soil while Hamdi was captured on foreign soil, this argument has already been expressly rejected by the

48

Fourth Circuit.  In *Padilla II*, the Fourth Circuit concluded that the reasoning in *Hamdi* did not support a distinction between Padilla's detention and Hamdi's detention based upon where they captured.  The court observed that while the plurality in *Hamdi* limited its opinion, it did not do so

> in a way that leaves room for argument that the President's power to detain one who has associated with the enemy and taken up arms against the United States in a foreign combat zone varies depending upon the geographic location where that enemy combatant happens to be captured.

*Padilla II*, 423 F.3d at 394.

The *Padilla II* decision also encompassed Plaintiffs' claims that Padilla's designation, detention, and interrogation as an enemy combatant violated his Fourth, Fifth, and Sixth Amendment rights.  423 F.3d at 389; *see also Padilla I*, 389 F. Supp. 2d at 679 n.1.  In light of the Fourth Circuit's decision, it cannot be said that any of these rights was clearly established at the time Padilla was in military custody.  Nor can it be said that Plaintiffs had clearly established First Amendment rights of association, or that Padilla had clearly established First Amendment rights of access to information, since the Fourth Circuit recognized that inherent in the authority to detain Padilla as an enemy combatant is the authority to detain him in isolation and incommunicado.  *Id.* at 395.

In light of *Hamdi* and *Padilla II*, it cannot be said that there were any constitutional "bright lines" applicable to Padilla's case which the Defendants could be held liable for transgressing.  *See McVey,* 157 F.3d at 277.  *Hamdi* and *Padilla II* support the Defendants' position that even if Plaintiffs have sufficiently alleged their personal participation in Padilla's designation, detention, and/or treatment as an enemy combatant, which Plaintiffs have not, there was no violation of Padilla's clearly established constitutional rights.

49

Moreover, courts have recognized that only infrequently will the law be "clearly established" for purposes of qualified immunity where the relevant inquiry "requires a particularized balancing that is subtle, difficult to apply, and not yet well-defined." *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995) (internal quotations and citations omitted).[31]  The determination of whether the rights Padilla asserts in this case were clearly established at the time of the Defendants' alleged actions requires a careful balancing that considers Padilla's rights as an American citizen and the Executive Branch's authority to conduct war, protect national security, and formulate foreign policy.[32]  Such a balance is inherently "subtle" and "difficult to apply." *Id.* And the most recent and closely analogous cases in which courts have attempted to

---

[31] *See, e.g.*, *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992) ("In determining whether the law was clearly established, we bear in mind that allegations of constitutional violations that require courts to balance competing interests may make it more difficult to find the law clearly established when assessing claims of qualified immunity." ) (citations and quotations omitted); *Borucki v. Ryan*, 827 F.2d 836, 848 (1st Cir. 1987) ("[W]hen the law requires a balancing of competing interests, . . . it may be unfair to charge an official with knowledge of the law in the absence of a previously decided case with clearly analogous facts." ) (footnote omitted); *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir. 1986) (stating that a constitutional rule that "involv[es] the balancing of competing interests" is "so fact dependent that the 'law' can rarely be considered 'clearly established'").

[32] *See, e.g.*, *Hamdi*, 542 U.S. at 529-32 (plurality opinion) (recognizing that "striking the proper constitutional balance" between the individual liberty interest of a designated enemy combatant and the "weighty and sensitive governmental interests in ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States" is of "great importance to the Nation during this period of ongoing combat"); *cf. County of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991) (recognizing, in the context of domestic law enforcement, that the determination of the length of time permitted under the Fourth Amendment that persons arrested without a warrant could remain in police custody without a judicial determination of probable cause required a "'practical compromise' between the rights of individuals and the realities of law enforcement") (*quoting Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975)).

define this balance – *Hamdi* and *Padilla II* – both make clear that the rights Padilla claims in this case were not clearly established at the time of the Defendants' alleged actions.

## IV.     PADILLA HAS NOT STATED A CLAIM UNDER THE RELIGIOUS FREEDOM RESTORATION ACT.

Padilla alleges that he was denied his right to the free exercise of his religion as protected by the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*.  *See* Compl. ¶ 137.e (Claim e).[33]  RFRA provides that the "government shall not 'substantially burden a person's exercise of religion' unless the government demonstrates that the burden furthers a 'compelling governmental interest' by the 'least restrictive means,'" *American Life League, Inc. v. Reno*, 47 F.3d 642, 654 (4th Cir. 1995) (*quoting* 42 U.S.C. § 2000bb-1).  Padilla's purported RFRA claim fails as a matter of law because RFRA does not create a cause of action against the Defendants. Moreover, even if such a cause of action is allowed under RFRA, the Defendants are entitled to qualified immunity.

### A.     RFRA Does Not Create A Cause Of Action Against The Defendants In Their Individual Capacity.

The threshold inquiry for a RFRA claim is whether the challenged governmental action substantially burdens the exercise of sincerely-held religious beliefs.  *Goodall by Goodall v. Stafford County School Bd.*, 60 F.3d 168, 171 (4th Cir. 1995).  The burden of proving the existence of a substantial interference with the right of free exercise rests on the religious adherent.  *Id.*  Only if such a substantial burden is proven must the government demonstrate that the compelling interest test is satisfied.  *Id.*  RFRA provides that "[a] person whose religious

---

[33]  Padilla's RFRA claim is not asserted against Defendants Ashcroft and Noble.  *See* Compl. ¶ 137.e.

exercise has been burdened . . . may assert that violation as a claim or defense in a judicial

proceeding and obtain appropriate relief *against a government*."  42 U.S.C. § 2000bb-1(c)

(emphasis added).  This language does not provide for a cause of action against a government

employee in his or her individual capacity.

Any interpretation of a statute begins with the text, *United States v. Simmons*, 247 F.3d

118, 122 (4th Cir. 2001), and the text of RFRA indicates that Congress has authorized suits

against government entities, not individual government employees.  The phrase "appropriate

relief against a government" would be an odd way for Congress to indicate that individual

employees must pay money judgments from their personal assets, which is what Padilla seeks

from the defendants here.  In common usage, the term "government" means an entity, not an

individual person employed by the government.  *See* Black's Law Dictionary 715 (8th ed. 2004)

(noting that the term "government" "refers collectively to the political organs of a country").  And

taken as a whole, the phrase "appropriate relief against a government" would not appear to

encompass actions for money damages at all, as sovereign immunity generally prevents money

damages from being an "appropriate" form of relief to seek from a government.  *See Lane v.

Peña*, 518 U.S. 187, 192 (1996).

RFRA's definition of "government," read in proper context, does not change this common

sense construction.  RFRA defines "government" as "a branch, department, agency,

instrumentality, and official (or other person acting under color of law) of the United States, or a

covered entity."  42 U.S.C. § 2000bb-2(1).  In this definition, only the phrase "official (or other

person acting under color of law)" could conceivably implicate a government employee in his or

her individual capacity.  Careful analysis of this phrase, however, indicates that it does not.  A

plaintiff may seek judicial relief from a government employee in two different capacities: "official capacity" and "individual capacity."  The term "official capacity" denotes a suit nominally against an official, but in reality against the government itself, while "individual capacity" denotes a suit against the officer personally.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  RFRA's reference to "official," then, is referring to the prospect of an official-capacity suit – a suit that, consistent with the preceding text, would seek relief against a "government," 42 U.S.C. § 2000bb-1(c).

Nor does the residual phrase "other person acting under color of law" authorize individual capacity suits.  When, as in this case, a list of specific terms ends with a reference to "other" such items, the Supreme Court and the Fourth Circuit commonly turn to two canons of statutory construction: *noscitur a sociis* and *ejusdem generis*.  *See, e.g.*, *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 383-85 (2003) (using canons to limit scope of phrase "other legal process"); *Andrews v. U.S.*, 441 F.3d 220, 224 (4th Cir. 2006) (using canons to interpret phrase "any other law enforcement officer"); *U.S. v. Ryan-Webster*, 353 F.3d 353, 366 (4th Cir. 2003) (using *ejusdem generis* canon to interpret the catch-all phrase "other document prescribed by statute for entry into . . . the United States").  According to the *noscitur a sociis* ("known by its associates") canon, the meaning of an undefined word or phrase "should be determined by the words immediately surrounding it."  *Andrews*, 441 F.3d at 224 (*quoting* Black's Law Dictionary 1087 (8th ed. 2004)).  The closely related *ejusdem generis* ("of the same class") canon provides that "[a] general word or phrase [that] follows a list of specifics . . . will be interpreted to include only items of the same type as those listed."  *Id.* (*quoting* Black's Law Dictionary 556 (8th ed. 2004)).

53

As applied to the phrase "branch, department, agency, instrumentality, and official (or other person acting under color of law)," these canons show that the definition of "government" does not include government employees in their individual capacities. Rather, it simply shows that other persons acting under color of law will be considered the "government" with respect to obtaining appropriate relief. *Noscitur a sociis* indicates that the term "official" must be read in context with the other terms on the list, all of which refer to government entities, not to individual employees of such entities. *Ejusdem generis* indicates that "other persons acting under color of law" must be read in light of the specific terms that precede it. All those specific terms contemplate suits against government entities (either in name or by way of an official capacity suit), not individual employees.

This interpretation of "official (or other persons acting under color of law)" finds support in the Supreme Court's prior constructions of similar phrases. *Cf. United States v. Sioux*, 362 F.3d 1241, 1246 (9th Cir. 2004) ("It is an elementary principle of statutory construction that similar language in similar statutes should be interpreted similarly."). For instance, 28 U.S.C. § 1391(e) (2000) provides for expanded venue and nationwide service of process in actions against an "officer or employee" of the United States "acting in his official capacity or under color of legal authority." In *Stafford v. Briggs*, a *Bivens* action, the Court interpreted the terms "officer and employee of the United States . . . acting in his official capacity or under color of legal authority" to apply only to actions brought against federal employees in their official capacity, not actions against employees in their individual capacity. 444 U.S. 527, 535-36 (1980); *see also Micklus v. Carlson*, 632 F.2d 227, 240-41 (3d Cir. 1980). The Court reached this result over the plaintiff's argument that the phrase "official capacity *or under color of legal authority*" (emphasis

54

added) was intended to embrace individual capacity suits in addition to official capacity suits. The Court noted that the phrase "or under color of legal authority" could reasonably be read as describing the character of the defendant at the time of the suit and, so read, limited § 1391(e)'s coverage to actions against a federal official who was, at the time of the events giving rise to the suit, acting in an official way.  *See Stafford*, 444 U.S. at 536.[34]

**B.**    **Even If A Cause Of Action Is Allowed, The Defendants Are Entitled To Qualified Immunity.**

Even if Padilla has stated a RFRA claim against the Defendants in their individual capacity, the Defendants are entitled to qualified immunity for three distinct reasons.  First, as explained *supra*, at the time of the Defendants' alleged actions, it was not clearly established that RFRA allows for the cause of action Padilla asserts in this case because the Fourth Circuit has not addressed the question of whether a cause of action against individual government employees is available under RFRA.  *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 283-86 (1994) (refusing to apply retroactively amendments to Title VII because the amendments could be viewed as both

---

[34]  The few cases to have addressed this issue to date have found that RFRA does provide a cause of action against individual government employees.  *See, e.g.*, *Jama v. INS*, 343 F. Supp. 2d 338, 371-73 (D.N.J. 2004); *Lepp v. Gonzales*, No. C-05-0566 VRW, 2005 WL 1867723, at *8 (N.D. Cal. Aug. 2, 2005); *cf. Woods v. Evatt*, 876 F. Supp. 756, 771 (D.S.C. 1995) (assuming that RFRA claim could be asserted against state officials in their individual capacity without deciding whether the Act permitted individual capacity claims), *aff'd*, 68 F.3d 463 (4th Cir. 1995); *Elmaghraby v. Ashcroft*, No. 04-CV-1809, 2005 WL 2375202, at * 30 n.27 (E.D. N.Y. Sept. 27, 2005) (stating without explanation that "RFRA accordingly reaches officials acting in their individual capacities"), *aff'd in part*, *rev'd in part*, *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), *cert. granted,* 76 U.S.L.W. 3417 (U.S. June 16, 2008) (No. 07-1015). The Fourth Circuit has not addressed this issue.  For the reasons cited above, the Defendants respectfully urge that those courts that have suggested a cause of action under RFRA exists against individual government employees are in error.  In any event, to the extent that Plaintiffs seek an equitable, non-damages claim under RFRA, such claims are barred against the Defendants in their individual capacity as they are not proper parties for such a claim.  *See supra* § I.

creating a new cause of action and increasing the damages available under a preexisting cause of action).

Second, it was not clearly established in the Fourth Circuit that a RFRA claim can be premised upon an intentionally discriminatory policy or practice, as opposed to a neutral policy or practice of general applicability. Padilla alleges that deliberate actions were taken to interfere with and substantially burden his ability to practice his religion. *See* Compl. ¶¶ 98-100, 104. Padilla further alleges that the actions which denied him the ability to practice his religion were taken pursuant to an approved interrogation plan. *See id.* ¶¶ 104-05. It is not clearly established that these allegations state an actionable RFRA violation because courts have held that RFRA covers only "neutral" laws that are "generally applicable" and which adversely impact religious freedom. *See Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir. 1995) (holding that "if the regulations are not neutral and generally applicable, [the court] need not address the [RFRA]"); *Omar v. Casterline*, 414 F. Supp. 2d 582, 594 (W.D. La. 2006) (finding RFRA did not affect analysis of First Amendment free exercise claim that was not based on any law of neutral applicability); *Larsen v. United States Navy*, 346 F. Supp. 2d 122, 137-38 (D.D.C. 2004) (holding that the plaintiffs' claims were "clearly outside the realm of the RFRA" because the plaintiffs were challenging an "intentionally discriminatory policy" rather than a "neutral law of general applicability"). The Fourth Circuit has not addressed this issue.[35]

Third, numerous circuits, including the Fourth Circuit, have recognized that where the existence of a right or the degree of protection it warrants in a particular context is subject to a

---

[35] Claims for such intentional discrimination would generally be cognizable under the First Amendment. However, as explained *supra*, special factors preclude the recognition of such a *Bivens* claim – which in any event would be barred by qualified immunity – here.

balancing test, the right can rarely be considered "clearly established" in particular circumstances in the absence of closely analogous factual and legal precedent that would have given a reasonable official fair warning as to how that balance should have been struck in the particular case at hand. *See*, *e.g.*, *DiMeglio*, 45 F.3d at 806 (recognizing that law applicable to constitutional inquiry which required "a particularized balancing that is subtle, difficult to apply, and not yet well-defined" would "only infrequently" be "clearly established" for purposes of qualified immunity) (citation omitted); *Benson*, 786 F.2d at 276; *Medina*, 960 F.2d at 1498; *Borucki,* 827 F.2d at 848. RFRA was enacted to ensure that after the Supreme Court's decision in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990), claims that government action impinged on the free exercise of religion would still be analyzed under the fact-intensive balancing test of *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). *See* 42 U.S.C. § 2000bb(b)(1). A determination of Padilla's RFRA claims in this setting would require the Court to balance the Executive Branch's authority to conduct war, protect national security, and formulate foreign policy, with the interests set forth in RFRA – the burden imposed upon a particular exercise of religion, the compelling governmental interest that justifies the burden, and the restrictiveness of the means used to further that interest, *see* 42 U.S.C. § 2000bb-1(b)(1)-(2).[36] The most recent and closely analogous cases in which courts have attempted to define the balance between the constitutional rights of an American citizen designated to be an enemy combatant and the authority of the Executive Branch in the conduct of

---

[36] *Cf. Turner v. Safley*, 482 U.S. 78, 84-85 (1987) (recognizing that the Court's task in reviewing prisoners' constitutional claims is to balance the policy of judicial restraint – owing to the fact that the responsibility for prison administration is committed to the legislative and executive branches  – regarding prisoner complaints and the need to protect constitutional rights) (quotations omitted).

war, national security, and foreign policy, make clear that any constitutional claims related to Padilla's designation, detention, and interrogation as an enemy combatant were not clearly established at the time of the Defendants' actions. *See Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (plurality opinion); *Padilla II*, 423 F.3d 386 (4th Cir. 2005). Accordingly, to the extent that Plaintiffs' RFRA claim, which is derived from the First Amendment, is based upon Padilla's designation, detention, or interrogation as an enemy combatant, it cannot be said that the Defendants would have been on notice that their alleged conduct violated Padilla's rights under RFRA. For all of these reasons, the Defendants are entitled to qualified immunity for Padilla's RFRA claim.

## **CONCLUSION**

For the reasons stated above, all of Plaintiffs' claims should be dismissed.

Dated: August 25, 2008

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

W. WALTER WILKINS
United States Attorney for the
District of South Carolina

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

S/Barbara M. Bowens
BARBARA M. BOWENS (I.D. #4004)
Civil Chief
United States Attorney's Office
District of South Carolina
1441 Main Street Suite 500
Columbia, SC 29201
Telephone: (803) 929-3052
Facsimile: (803) 254-2912
E-mail: barbara.bowens@usdoj.gov

TIMOTHY P. GARREN
Director Torts Branch
Civil Division

MARY HAMPTON MASON
Senior Trial Counsel

GLENN S. GREENE (admitted *pro hac vice* )
SARAH WHITMAN
Trial Attorneys
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 616-4143
Facsimile:   (202) 616-4314
E-mail: glenn.greene@usdoj.gov
*Attorneys for Defendants Donald H. Rumsfeld,
John Ashcroft, Paul Wolfowitz, Lowell E.
Jacoby, Michael H. Mobbs, William Haynes,
Catherine T. Hanft, Melanie A. Marr,
Stephanie L. Wright, Mack Keen, Sandy
Seymour, Dr. Craig Noble, and Robert M.
Gates*