IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

RECEIVED
USDC. CLERK, CHARLESTON. SC

2011 FEB 17  A 9: 04

| | |
|---|---|
| Estela Lebron, et. al.,<br><br>    Plaintiffs,<br><br>        v.<br><br>Donald H. Rumsfeld, et. al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2:07-410-RMG

**ORDER**

This matter comes before the Court on Defendants' motions to dismiss Plaintiffs' claims, asserting, *inter alia*, that no valid cause of action exists in this matter under the principles of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny and that they are entitled to qualified immunity regarding all claims asserted in the Third Amended Complaint. Defendant Gates, sued in his official capacity as Secretary of Defense, further asserts that Plaintiffs have no standing to assert claims for declaratory and injunctive relief arising from an alleged fear of redetention and/or the claimed stigmatizing effects of a continuing designation as an enemy combatant. For reasons set forth below, the Court grants Defendants' Motion to Dismiss (Dkt. Entry 141) and Defendant Gates' Motion to Dismiss (Dkt. Entry 139) and finds that this Order renders the remaining motions moot.

## BACKGROUND

On May 8, 2002, Padilla, an American citizen, arrived at O'Hare International Airport in Chicago from Pakistan via Switzerland and was initially interrogated by Customs and law

-1-

enforcement officials. After several hours of interrogation, he was served with a material witness

warrant and taken into custody. Padilla was transferred to a detention center in New York City,

placed under the control of the Bureau of Prisons and the United States Marshals and appointed

counsel. Padilla, through counsel, moved on May 22, 2002 to vacate the material witness warrant.

On June 9, 2002, President George W. Bush issued a formal directive to Donald Rumsfeld, then

Secretary of Defense, designating Padilla as an "enemy combatant" who was "closely associated with

[A]l Qaeda, an international terrorist organization with which the United States is at war." (Dkt.

Entry 91-3). The President further asserted that Padilla had "engaged in conduct that constituted

hostile and war-like acts" and represented "a continuing, present and grave danger to the national

security of the United States . . . ." (*Id.*). The President further asserted that Padilla possessed

valuable intelligence about the personnel and activities of Al Qaeda and that it was "in the interest

of the United States that the Secretary of Defense detain Mr. Padilla as an enemy combatant." (*Id.*).

The President declared that his action was "consistent with U.S. law and the laws of war for the

Secretary of Defense to detain Mr. Padilla as an enemy combatant." (*Id.*).

Two days later, on June 11, 2002, Padilla's counsel filed a Writ of Habeas Corpus pursuant

to 28 U.S.C. § 2241 seeking his release from detention. According to an affidavit filed by Padilla's

counsel, she was informed by government officials that Padilla was being transferred to the Naval

Brig in Charleston, South Carolina and she would not have the right to visit him or communicate

with him in any way. *Padilla v. Bush*, 233 F. Supp. 2d 564, 572 (S.D.N.Y. 2002). From that date

until March 2004, Padilla was held incommunicado from counsel, family and friends and underwent

extensive interrogation by government officials. *Id.* at 574.

Padilla's case was assigned to the Chief Judge of the Southern District of New York, Michael

B. Mukasey.[1]  In opposition to the petition for writ of habeas corpus, the Government submitted a sworn statement titled "Declaration of Michael H. Mobbs". (Dkt. Entry 91-2).  In his declaration, Mr. Mobbs identified himself as a special advisor to the Under Secretary of Defense for Policy and provided the Court information in support of the President's designation of Padilla as an enemy combatant.  Mobbs stated that the information provided to the Court derived from "multiple intelligence sources," including two confidential sources that were held at locations outside the United States. According to Mr. Mobbs, these confidential sources "have direct connections with the Al Qaeda terrorist network and claim to have knowledge of the events described." (*Id.* at 3).

Mobbs further stated that Padilla had previously been convicted of murder and that he had traveled to Pakistan, Afghanistan and the Middle East after being released from prison. (*Id.*).  Padilla reportedly had become "closely associated" with known members of Al Qaeda and participated in discussions and training regarding the commission of terrorist acts within the United States.  These discussions reportedly included a plan to build and detonate a "radiological dispersal device (also known as a 'dirty bomb')" within the United States, possibly in Washington, D.C. (*Id.* at 4). There were also reportedly discussions regarding the detonation of explosive devices in hotel rooms, gas stations and train stations. (*Id.* at 5).  Mobbs further represented that Padilla had returned to the United States "to conduct reconnaissance and/or other attacks" on behalf of Al Qaeda when he was detained in Chicago. (*Id.*).  The Mobbs declaration concluded by repeating President Bush's finding at the time of Padilla's enemy combatant designation that he posed "a continuing, present and grave danger to the national security of the United States" and his detention was "necessary to prevent him

---

[1] Judge Mukasey was subsequently appointed the 81st Attorney General of the United States, serving from November 2007 until January 2009.

from aiding Al Qaeda in its efforts to attack the United States . . . " (*Id.*).

In a comprehensive 50 page order issued on December 4, 2002, Judge Mukasey initially found that he had jurisdiction over the case despite the fact that Padilla had been moved by the Government to the Naval Brig in Charleston, South Carolina. *Padilla v. Bush*, 233 F. Supp.2d 564 (S.D.N.Y. 2006). The District Court then turned its attention to the critical question of whether the President of the United States had the authority to designate an American citizen arrested on American soil for hostile acts on behalf of a foreign enemy as an "enemy combatant" and, thus, deny that citizen the rights normally afforded criminal defendants under the laws and Constitution of the United States. Judge Mukasey concluded that the President had the inherent authority to detain Padilla as an enemy combatant and further determined that the detention had been implicitly authorized by Congress in adopting the Joint Resolution providing the President the authority to take necessary actions against persons and organizations responsible for the attacks on September 11, 2001 and to prevent future terrorist attacks. 233 F. Supp. 2d at 587-589. The District Court's finding regarding Congressional authorization for the President to detain Padilla was in response to Padilla's argument that the Non-Detention Act, 18 U.S.C. §4001(a), prohibited the detention of any American citizen unless authorized by Congress.

While Judge Mulkasey recognized the President's right to designate Padilla as an enemy combatant and to place him under the control of the Secretary of Defense, he was less comfortable with the detaining of Padilla "incommunicado." *Id.* at 599. The District Court found that Padilla was not entitled to counsel or due process under the Fifth and Sixth Amendments because his detention was not pursuant to any criminal process but concluded that the rights associated with the Great Writ included the right to be represented by counsel. *Id.* at 601-05. He found the right to

-4-

counsel weighed heavily in Padilla's favor and directed the Government to provide him access to his attorney to assist in the petition for a Writ of Habeas Corpus. *Id.* at 604-05.

The Government moved to reconsider that portion of Judge Mukasey's order which allowed Padilla to have access to counsel and submitted a sworn declaration from Vice Admiral Lowell Jocoby in support of its motion. (Dkt. Entry 91-23). Admiral Jacoby asserted that he "firmly believe[s] that providing Padilla access to counsel risks loss of a critical intelligence resource, resulting in grave and direct threat to national security." (*Id.* at 2). The Admiral explained that the Government's interrogation approach to Padilla was "largely dependent upon creating an atmosphere of dependency and trust between the subject and the interrogator." (*Id.* at 5).

Judge Mulkasey characterized the Jacoby Declaration as "speculative" and criticized with equal force some of the opposing arguments, including the claim that his recent decision was "a repudiation of the Magna Carta." *Padilla v. Rumsfeld*, 243 F. Supp. 2d 42, 51, 57 (S.D.N.Y. 2003). He declined to change his decision to provide Padilla counsel and directed the parties to work out a satisfactory arrangement for counsel's consultation with her client. He noted that it had now been a year and half since the September 11 events and Padilla "is not only the first, but also the only case of its kind." *Id.* at 57. He expressed the hope that it would remain an "isolated" case arising out of the September 11 experience. Both parties thereafter filed appeals with the Second Circuit.

The Jacoby Declaration coincided with a fierce intra-government debate over the use of aggressive interrogation techniques to be utilized with persons designated as enemy combatants with potential knowledge of Al Qaeda methods, personnel and plans. One group, which included a number of high ranking members of the Department of Defense, favored the use of coercive interrogation techniques which included sensory and sleep deprivation, extreme temperature

variations, and use of stress positions, such as prolonged standing in one position. The use of these more aggressive methods of interrogation was endorsed by lengthy opinions of Deputy Assistant Attorney General John Yoo and by William J. Haynes II, General Counsel of the Department of Defense, both of whom concluded that such methods were lawful. (Dkt. Entry 91-5, 91-6, 91-7, 91-8, 91-9, 91-15). Other government officials, including a representative of the FBI and the General Counsel of the Navy, offered opinions that these methods violated the Geneva Convention and American law. (Dkt. Entry 91-12, 91-16). As the Padilla case wound itself through the American judicial system, the issue of the lawful scope of interrogation for persons designated as enemy combatants remained largely unsettled within the Government.

By the time the Second Circuit issued its order in *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003), Padilla had been in the custody of the Department of Defense for nearly 18 months. He had been isolated from counsel, family and friends and subject, by all accounts, to intense interrogation. In a decision split 2 to 1, the majority of Judges' Barrington D. Parker and Rosemary S. Pooler, held that the President did not have the inherent authority to detain an American citizen captured and held on American soil as an enemy combatant. The majority further found that the Joint Resolution adopted by Congress shortly after September 11, Public Law No. 107-40, 115 Stat. 224 (2000), did not provide the President the congressional authorizaiton to hold Padilla, which was required by the Non-Detention Act. 18 U.S.C. § 4001(a). *Padilla,* 352 F.3d at 698. The Government was directed to release Padilla within 30 days or to charge him under federal criminal statutes. *Id.* at 699. Second Circuit Judge Richard C. Wesley dissented, asserting that the President had the inherent authority to detain Padilla as an enemy combatant and Congress had given ample authorization to the President to detain Padilla. Judge Wesley characterized Judge Mukasey's opinion as "thoughtful and

-6-

thorough" and indicated he would vote to affirm. *Id.* at 726-31.

The Supreme Court granted *certiorari* to *Padilla* and also agreed to hear the other pending case of an American citizen declared an enemy combatant, Yaser Hamdi. The Fourth Circuit had earlier upheld the President's designation of Hamdi as an enemy combatant, but it had been noted that Hamdi was captured on the battlefield in Afghanistan and had surrendered a rifle. *Hamdi v. Rumsfeld*, 296 F. 3d 278, 281 (4th Cir. 2002).

The Supreme Court issued decisions in *Hamdi* and *Padilla* on June 28, 2004. The Supreme Court upheld the designation of Hamdi as an enemy combatant, noting that "[t]here is no bar to the Nation holding one of its citizens as an enemy combatant." *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004). The Court noted the need to weigh the detainee's liberty interest against the government's interest in not allowing the enemy to return to the battlefield. *Id.* at 531. The Court went on to hold that a citizen detained as an enemy combatant had the right to notice of the factual basis of his detention and a fair opportunity to rebut the evidence before a neutral decision maker. *Id.* at 533-4.

In *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), the Supreme Court found that neither the District Court in New York nor the Second Circuit had jurisdiction over Padilla's habeas petition because he had been transferred to the Naval Brig in Charleston. The 5-4 decision, authored by Chief Justice Rehnquist, upheld the traditional view that any habeas petition must be in the district where the prisoner was physically present. *Id.* at 443. Since there was no jurisdiction, the Court vacated the Second Circuit's decision and directed the petitioner to begin the process again in the District of South Carolina. Justice Stevens, in a dissent joined by three other Justices, asserted that exceptional circumstances existed in *Padilla* which made jurisdiction where the prisoner was originally held proper. *Id.* at 464. Justice Stevens further observed that *Padilla* "raises questions

-7-

of profound importance to the Nation." *Id.* at 455.

Padilla's case was then transferred to the District of South Carolina and assigned to Judge Henry F. Floyd. On February 28, 2005, Judge Floyd held that the President did not have the inherent constitutional authority to indefinitely detain an American citizen captured on American soil and that Congress had not granted the President such authority. *Padilla v. Hanft*, 389 F. Supp. 2d 678, 688-91 (D.S.C. 2005). He granted Padilla's petition for a Writ of Habeas Corpus and ordered the detainee released within 45 days. *Id.* at 691.

The Government appealed the District Court decision to the Fourth Circuit, which on September 9, 2005 reversed Judge Floyd's decision. Judge Luttig, writing for an unanimous panel, found that the President did have the authority from Congress under the 2001 Joint Resolution to detain Padilla as an enemy combatant. The Court described Padilla as an American citizen who "took up arms" against the United States in a foreign combat zone and then "traveled to the United States for the avowed purpose of further prosecuting war on American soil . . . ." *Padilla v. Hanft*, 423 F. 3d 386, 389 (4th Cir. 2005).

Padilla once again sought *certiorari* to the Supreme Court. Within days of the deadline for the Government to submit its brief on the *certiorari* petition, the Government moved before the Fourth Circuit to vacate its recent order and to allow the Government to transfer Padilla to civilian authorities so he could be arraigned on various federal criminal offenses in the Southern District of Florida. The Fourth Circuit characterized the Government's motion as potentially an effort to avoid review by the United States Supreme Court and took the highly unusual position of denying the motions to vacate and to transfer. *Padilla v. Hanft*, 432 F. 3d 582 (4th Cir. 2005). The Fourth Circuit observed that the issues raised by the Government's motion and by Padilla's appeal were "of

sufficient national importance as to warrant consideration by the Supreme Court . . . " *Id.* at 586.

The Supreme Court granted the Government's request for Padilla to be transferred to civilian authorities on January 4, 2006, and he was then transferred to Miami to face federal conspiracy charges pending against him in the Southern District of Florida. On April 3, 2006, the Supreme Court denied Padilla's *certiorari* petition on the basis that the case was now moot since the prisoner had obtained the remedy, prosecution in the United States District Court, which he had sought. Justice Kennedy, writing for the Court, observed that "Padilla's claims raise fundamental issues respecting the separation of powers, including consideration of the role and function of the courts . . .", which he thought unwise to address now since the claims were moot. *Padilla v. Hanft*, 126 S.Ct. 1649, 1650 (2006). Justice Ginsburg dissented from the denial of *ceriorari* and noted the importance of the issues raised by the appeal.

Padilla brought the present civil action on February 9, 2007, alleging that his detention as an enemy combatant and the treatment rendered during his detention violated his federal statutory and constitutional rights. He sought damages against various present and former governmental officials which he alleged were responsible for his detention and treatment. Padilla went to trial on the various federal criminal charges on May 5, 2007 in Miami. He was convicted by a jury on all counts on August 16, 2007. Padilla was thereafter sentenced to 17 years and 4 months in prison. Padilla has appealed his conviction to the Eleventh Circuit, where it is still pending. Padilla is presently serving his sentence in a civilian high security prison in Colorado administered by the United States Bureau of Prisons.

All named defendants have now moved to dismiss Padilla's civil action, asserting, *inter alia*, that there exists no valid private right of action against them and that they are entitled to qualified

immunity since the actions being challenged were not matters of settled federal law at the time of their actions. Defendant Gates, sued in his official capacity as Secretary of Defense, further asserts Plaintiffs have no standing to assert claims for declaratory or injunctive relief based upon an alleged fear of redetention or the claimed stigmatizing effects of a continuing designation as an enemy combatant. After extensive briefing on all issues relating to the multiple motions to dismiss, the Court conducted oral argument on February 14, 2011 and now issues this Order.

## LEGAL STANDARD

Defendants have jointly moved to dismiss all of Plaintiffs' claims pursuant to Rule 12(b)(6); Defendant Gates has additionally moved for dismissal pursuant to Rule 12(b)(1). For purposes of the motions, the district court must "take all factual allegations as true" and draw all reasonable inferences from such facts in a light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).[2] The Court need not accept as true, however, "unwarranted inferences, unreasonable conclusions, or arguments" or "legal conclusions, elements of causes of action or bare assertions devoid of further factual enhancement . . ." *Nemet Chevrolet*, 591 F.3d at 256; *Giarratano v. Johnson*, 521 F. 3d 298, 302 (4th Cir. 2008).

## ANALYSIS

### A. The *Bivens* Claims

Padilla asserts a broad range of constitutional torts against present and former governmental

---

[2]Although Defendant Gates has moved for dismissal pursuant to Rule 12(b)(1) in addition to Rule 12(b)(6), the standards in the context of the present motions are, in effect, the same. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *see also Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

officials, including former Secretary of Defense Donald Rumsfeld; Secretary of Defense Robert

Gates; former Deputy Secretary of Defense Paul Wolfowitz; former Department of Defense General

Counsel William Haynes; former Director of the Defense Intelligence Agency, Vice Admiral Lowell

Jacoby; and the former commanders of the Naval Brig, Catherine Hanft and Melanie Marr. Padilla

contends that his designation as an enemy combatant and approximately three and half year detention

under the custody of the Department of Defense violated his rights to counsel, access to the courts,

freedom of religion, freedom of association and due process, and the manner of his detention and

interrogation by government officials violated his right against cruel and unusual punishment. (Dkt.

Entry 91).

Since Congress has never created a private right of action against federal officials based upon

a deprivation of constitutional rights, such as 42 U.S.C. § 1983, Padilla asserts claims based upon

the landmark United States Supreme Court decision of *Bivens v. Six Unknown Named Agents of*

*Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* involved allegations that certain federal

narcotics officials made a warrantless entry of the plaintiff's home, conducted an unlawful search

and arrested him on narcotics charges–all without probable cause. In recognizing a private civil

cause of action for money damages implied from the face of the Constitution, the Supreme Court

specifically noted that the "present case involved no special factors counseling hesitation in the

absence of affirmative action by Congress." *Id.* at 396. The Court subsequently recognized private

rights of action involving a claim against employees of the Department of Agriculture in a dispute

with a futures commission merchant, *Butz v. Economou*, 438 U.S. 478 (1978), a former

congressional aide allegedly subject to sex discrimination, *Davis v. Passman*, 442 U.S. 228 (1979),

and a wrongful death suit involving federal prison officials, *Carlson v. Green*, 446 U.S. 14 (1980).

In the over 30 years since *Carlson v. Green* was decided, the Supreme Court, with increasingly strong and direct language, has refused to extend the *Bivens* claim to other contexts, generally finding present "special factors counseling hesitation". In *Bush v. Lucas*, 462 U.S. 367 (1983), a case involving the First Amendment rights of a federal employee, the Court noted that in the absence of a congressional directive, "the federal courts must make the kind of remedial determination that is appropriate for a common law tribunal, paying particular heed . . . to any special factors counseling hesitation before authorizing a new kind of federal litigation." *Id.* at 378. Thus, the Court declined to create "a new judicial remedy." *Id.* at 388.

The Court subsequently addressed two claims brought by a present and a former serviceman. In *Chappell v. Wallace*, 462 U.S. 296 (1983), a Navy enlisted man sought relief from racial discrimination by superior officers. The Court found that in the military setting, "special factors" strongly counseled against creating a private right of right because of the "peculiar and special relationship of the soldier to his superiors . . .". *Id.* at 299. The Court observed that the "inescapable demands of military discipline and obedience to orders cannot be taught on the battlefield; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection." *Id.* at 300. Similarly, in *United States v. Stanley*, 483 U.S. 669 (1987), the Court declined to allow a *Bivens* action by a former serviceman who alleged he had been provided LSD as part of an experiment. Recognizing that its decision was essentially a "policy judgment", the Court determined that the potential disruption associated with "harmful and inappropriate judicial intrusion upon military discipline" constituted a special factor that counseled against extending the implied right of action to the former serviceman. *Id.* at 681-82.

The Court has in recent years expressly noted its reluctance to expand *Bivens* to contexts

-12-

outside the early cases. In *Schweiker v. Chilicky*, 487 U.S. 412 (1988), which involved the Court's refusal to provide a *Bivens* action for Social Security claimants, Justice O'Connor noted that "[o]ur more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Id.* at 421. Chief Justice Rehnquist, writing for the Court in *Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001), stated that "[s]ince *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Id.* at 68. In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), Justice Kennedy observed that "[b]ecause implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability to any new context or new category of defendants." *Id.* at 1948.

Lower courts, particularly in cases affecting foreign affairs and national security, have generally followed the Supreme Court's trend and declined to recognize *Bivens* claims beyond the context of the earlier cases. In *Sanchez-Espinoza v. Reagan*, 770 F. 2d 202 (D.C. Cir. 1985), the Court of Appeals for the District of Columbia addressed claims by persons asserting that they had been injured by allegedly illegal government action in support of the Contras in Nicaragua. Then Judge Scalia, writing for his court, concluded that in the areas of military and foreign policy the courts "must stay our hand" because the courts lacked the "institutional competence" to fashion appropriate damage remedies. Where there exist a "host of considerations that must be weighed and appraised" then "we must leave to Congress the judgment whether a damage remedy should exist." *Id.* at 208-09.

A similar approach was taken by the Second Circuit in *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (*en banc*), *cert. denied* 130 S. Ct. 3409 (2010). The Plaintiffs, foreign nationals, asserted that they had been subject to torture in foreign countries following delivery of them to foreign

government agents by United States officials, a practice known as "extraordinary rendition." Defendants moved to dismiss the *Bivens* claims asserting that the national security and foreign policy implications of "extraordinary rendition" constituted "special factors which counsels hesitation" that made recognition of such a claim inappropriate. In rejecting the *Bivens* claim, the Second Circuit observed that the "counsels hesitation" standard is "remarkably low", particularly where recognition of such a claim "would have the natural tendency to affect diplomacy, foreign policy, and the security of the nation . . .". *Id.* at 574. The court observed that such a suit "unavoidably influences government policy, probes government secrets, invades government interests, enmeshes government lawyers and thereby elicits government funds for settlement." *Id.* The court further observed that it "is a substantial understatement to say that one must hesitate before extending *Bivens* into such a context" because the issues are "complex and rapidly changing" and involve "critical legal judgments...as well as policy choices that are by no means easily reached." *Id.* at 574-75, 580. The Second Circuit concluded that if a cause of action was to be created for such claims it should be done by Congress, rather that the courts. *Id.* at 580-81; *see also, Mohamed v. Jeppesen Dataplan, Inc.*, 614 F. 3d 1070, 1084 (9th Cir. 2010) (claims relating to "extraordinary rendition" dismissed on state secrets grounds).

The United States District Court for the District of Columbia dealt with a similar claim by foreign nationals in *In re Iraq and Afghanistan Detainees*, 479 F. Supp. 2d 85 (D.D.C. 2007), who alleged that they had been tortured by United States military personnel. In analyzing whether "special factors counseling hesitation" were present, the court considered the practicalities of such proposed litigation: "There is no getting around the fact that authorizing money damages remedies against military officials engaged in an active war would invite our enemies to use our own federal

-14-

courts to obstruct the Armed Forces ability to act decisively and without hesitation in defense of our liberty and national interests . . .". *Id.* at 105. The court went on to observe that the "discovery process alone risks aiding our enemies by affording a mechanism to obtain what information they could about military affairs and disrupt command missions by wresting officials from the battlefield to answer compelled deposition and other discovery inquiries about the military's interrogation and detention policies, practices and procedures." *Id.* Further, "the spectacle of high ranking military officials being haled into our own courts to defend against our enemies legal challenges" could undermine command leadership and make officers "hesitant to act for fear of being held personally liable for any injuries resulting from their conduct." *Id.* In concluding that Congress must be left the responsibility to create a damage remedy, if any, in this circumstance, the court stated that it "is established beyond peradventure that military affairs, foreign relations, and national security are constitutionally committed to the political branches of our government . . .". *Id.* at 107; *see also*, *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010).

In light of the significant Supreme Court and lower court jurisprudence narrowly constricting *Bivens* claims cited above, it is noteworthy that two recent district court cases that have asserted *Bivens* actions in the national security area have survived motions to dismiss. In a case factually related to the action pending in the District of South Carolina, *Padilla v. Yoo*, 633 F. Supp 2d 1005 (N.D. Cal. 2009), the District Court for the Northern District of California concluded that there were not "special factors" present that would prevent recognizing a *Bivens* action asserted by Padilla against John Yoo, the former Deputy Assistant Attorney General and author of numerous legal memoranda sanctioning the use of coercive interrogation techniques. The Court analyzed the body of Supreme Court case law since the 1980 decision in *Carlson* and concluded that each case

-15-

individually was factually distinguishable from the facts presented by Padilla in his claim before that court. *Id.* at 1023-26. The District Court for the Northern District of California discounted the Fourth Circuit's decision in *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005), noting that while it was "still good law, it is questionable whether, should an appeal before the Supreme Court have not been mooted by Padilla's sudden transfer out of military custody, the decision would have been affirmed." *Id.* at 1038. An appeal of the district court's decision is now pending before the Ninth Circuit.

In *Vance v. Rumsfeld*, 694 F. Supp 2d 957 (N.D. Ill. 2010), the plaintiffs are American citizens who went to work for a private Iraqi security firm and allege that the were detained and subjected to cruel and degrading treatment by agents of the United States. The court rejected the argument that the Supreme Court had adopted a "steadfast rule" against the adoption of new *Bivens* claims and concluded that court precedent did not support "a 'blank check' for high ranking government officials." *Id.* at 973, 975. The *Vance* case is now on appeal to the Seventh Circuit.

In analyzing this substantial body of case law relating to *Bivens* claims, it is useful to soberly and deliberately evaluate the factual circumstances of Padilla's arrival and the then-available intelligence regarding his background and plans on behalf of Al Qaeda. Padilla arrived in Chicago nearly eight months after September 11, 2001 with reports that he was an Al Qaeda operative with a possible mission that included the eventual discharge of a "dirty bomb" in the Nation's capital. (Dkt. Entry 91-2 at 4) He also had reportedly engaged in discussions with Al Qaeda operatives about detonating explosives in hotels, gas stations and train stations. (*Id.* at 5). He was also thought to possess significant knowledge regarding Al Qaeda plans, personnel and operations. (Dkt. Entry 91-23 at 8-9).

Based on the information available at the time, which reportedly included information from

-16-

confidential informants previously affiliated with Al Qaeda, the President of the United States took the highly unusual step of designating Padilla, an American citizen arrested on American soil, an enemy combatant. (Dkt. Entry 91-3). As Judge Mukasey would later note, no other similarly situated American citizen was so designated. *Padilla v. Rumsfeld*, 243 F. Supp. 2d at 57. Based upon that designation, the Department of Defense detained Padilla at the Naval Brig in Charleston and prohibited all contact with counsel, family and friends while intensive interrogation was conducted. According to allegations in Plaintiffs' complaint, which for purposes of this motion we must presume to be true, Padilla's interrogations included at least some of the coercive techniques then being utilized with detainees at Guantanamo.

Because Plaintiffs have asserted a *Bivens* claim, this Court is mandated by United States Supreme Court precedent to consider whether there exist "significant factors that counsel hesitation" in recognizing an implied right of action from the face of the United States Constitution under these circumstances. The designation of Padilla as an enemy combatant and his detention incommunicado were made in light of the most profound and sensitive issues of national security, foreign affairs and military affairs. It is not for this Court, sitting comfortably in a federal courthouse nearly nine years after these events, to assess whether the policy was wise or the intelligence was accurate. The question is whether the Court should recognize a cause of action for money damages that by necessity entangles the Court in issues normally reserved for the Executive Branch, such as those issues related to national security and intelligence. This is particularly true where Congress, fully aware of the body of litigation arising out of the detention of persons following September 11, 2001, has not seen fit to fashion a statutory cause of action to provide for a remedy of money damages under these circumstances.

-17-

In determining whether the Court should create "a new judicial remedy" and authorize "a new kind of federal litigation" under these circumstances, it is important for the Court to evaluate the practical implications of such a decision. *Bush v. Lucas*, 462 U.S. at 378, 388. The Court finds the discussions of the *en banc* Second Circuit decision in *Arar* and the District Court of the District of Columbia in *In re Iraqi and Afghanistan Detainees* most helpful regarding this issue. The *Arar* Court noted that such litigation "unavoidably . . .probes government secrets, invades government interests [and] enmeshes government lawyers . . ." and would require the Court's "assessment of the validity and rationale of [the] policy and its implementation . . . ." 585 F.3d at 574-75. The Court in *In re Iraq and Afghanistan Detainees* observed that the discovery procedures could be used by our enemies to obtain valuable intelligence, and government officials could be distracted from their vital duties to attend depositions or respond to other discovery requests. The United States District Court for the District of Columbia noted that after the disruption of the pre-trial discovery, the government would face the spectacle of high ranking officials being summoned to court to answer the claims of our enemies. 479 F. Supp.2d at 105, 107.

Should Padilla's claims survive the Defendants' motions to dismiss, one could easily imagine a massive discovery assault on the intelligence agencies of the United States Government, to include dozens of subpoenas, numerous requests to produce, 30(b)(6) depositions of document custodians at various intelligence and defense agencies, and lengthy and probing depositions of high ranking government officials with national security clearances and personal knowledge of some of the Nation's most sensitive information. The management and conduct of such pre-trial litigation would require the devotion of massive governmental resources, which by necessity would then distract the affected officials from their normal security and intelligence related duties. In an effort to assess the

quality and veracity of the President's designation and the declarations by various government officials, Padilla's counsel would likely seek information on intelligence methods and interrogations of other Al Qaeda operatives. All of this would likely raise numerous complicated state secret issues. A trial on the merits would be an international spectacle with Padilla, a convicted terrorist, summoning America's present and former leaders to a federal courthouse to answer his charges. This massive litigation would have been authorized not by a Congressionally established statutory cause of action, but by a court implying an action from the face of the American Constitution.[3]

The Court has carefully considered the recent district court decisions in *Vance v. Rumsfeld* and *Padilla v. Yoo,* the latter presenting nearly identical factual and legal issues as the case before this Court. Both the *Vance* and *Yoo* courts reviewed the same Supreme Court and lower court jurisprudence as this Court but reached a different conclusion regarding the appropriateness of recognizing new *Bivens* claims in different contexts. The essential difference is that the *Vance* and *Yoo* Courts view the Supreme Court case law since 1980 as limiting the extension of *Bivens* claims in cases which have identical factual presentations but permitting the extension of *Bivens* actions in other contexts. 694 F. Supp. 2d at 972-73; 633 F. Supp. 2d at 1022-26. This Court views the case law as holding that the creation of any new *Bivens* claim is "disfavored" and "rarely if ever applied in new contexts," particularly in such sensitive areas as national security, military affairs and foreign intelligence. *See Ashcroft v. Iqbal*, 129 S. Ct. at 1948; *United States v. Stanley*, 483 U.S. at 681-82;

---

[3] Plaintiffs' counsel urged the Court at oral argument to delay consideration of the practical realities of allowing a *Bivens* claim to go forward under these facts and circumstances until after the motion to dismiss stage. This approach, however, would result in the Court failing to timely consider "special factors" counseling hesitation, which include here the potential disruption and burdening of national security, intelligence and military operations arising from discovery under the Federal Rules of Civil Procedure.

*Chappell v. Wallace*, 462 U.S. at 300-301; *Arar v. Ashcroft*, 585 F.3d at 571-572; *Sanchez-Espinoza v. Reagan*, 770 F. 2d at 208-09; *In re Iraq and Afghanistan Detainees*, 479 F. Supp.2d at 103-07. The *Vance* and *Yoo* cases are presently before the Seventh and Ninth Circuits respectively and it is likely that this Court's order will be appealed to the Fourth Circuit, perhaps one day creating the situation where these difficult and important issues can be definitively resolved.

The Court finds that "special factors" are present in this case which counsel hesitation in creating a right of action under *Bivens* in the absence of express Congressional authorization. These factors include the potential impact of a *Bivens* claim on the Nation's military affairs, foreign affairs, intelligence, and national security and the likely burden of such litigation on the government's resources in these essential areas. Therefore, the Court grants the Defendants' Motion to Dismiss (Dkt. Entry 141) regarding all claims of Plaintiffs arising from the United States Constitution.[4]

## B. Qualified Immunity

Defendants further argue that even if Padilla could assert a viable cause of action, they would still be protected from liability by the doctrine of qualified immunity. This doctrine is a "pure question of law" and is based on the proposition that government officials "performing discretionary

---

[4] In reaching the conclusion that Padilla does not have a right under these circumstances to assert a claim for money damages against present and former government officials under *Bivens*, it is not as if the American judicial system has failed to afford him significant opportunities to vindicate his legal rights. He initially sought relief from his detention under a writ of habeas corpus, which was heard ultimately by two district courts, two courts of appeal and the United States Supreme Court. Padilla's use of the Great Writ ultimately resulted, as Justice Kennedy noted, in his obtaining the relief he sought--trial under the Constitution in an United States District Court. 547 U.S. 1062 (2006). The importance of the writ of habeas corpus as "a stable bulwark of our liberties" is eloquently described in *Boumediene v. Bush*, 553 U.S. 723, 739-47. Further, Padilla was allowed in his criminal proceeding to raise issues of his detention in support of his motion to dismiss the criminal charges. *United States v. Padilla*, 2007 WL 1079090 (S.D. Fla. 2007). Padilla's appeal from his criminal conviction is presently pending before the Eleventh Circuit.

functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of what a reasonable person would have known" at the time the action was taken. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *DiMeglio v. Haines*, 45 F.3d 790, 794 (4th Cir. 1995). The legal violation must be "apparent" and "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Government officials "cannot be required to predict how the courts will resolve legal issues," or "to sort out conflicting decisions or to resolve subtle or open issues." *Francis v. Giacomelli*, 588 F.3d 186, 196 (4th Cir. 2009); *McIvey v. Stacey*, 157 F.3d 271, 277(4th Cir. 1998). As the Fourth Circuit stated in *Lewis v. Tripp*, 604 F.3d 1221, 1230 (4th Cir. 2010), "[i]f qualified immunity means anything, it must mean that public employees who are just doing their jobs are generally immune from suit." The Supreme Court bluntly stated the force of the qualified immunity defense in *Malley v. Briggs*, 475 U.S. 335, 341 (1986): "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."

The courts have also shown a marked reluctance to deny qualified immunity to officials in circumstances where they were required to balance competing interests of the citizen and the government. ". . . [W]here a sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated", the courts "only infrequently" will determine that such rights were "clearly established" and only then where the violations are "egregious." *McIvey v. Stacey*, 157 F.3d at 277 (4th Cir. 1998); *Medina v. City & County of Denver*, 960 F. 2d 1493, 1498 (10th Cir. 1992). This is because the "particularized balancing" normally required is "subtle, difficult to apply and not yet well defined." *DiMeglio v. Haines*, 45 F.3d at 806 (4th Cir.

1995).

Under prior Supreme Court precedent, a district court reviewing a government official's assertion of qualified immunity privilege was required initially to determine whether the plaintiff had suffered a deprivation of a constitutional right. Upon a determination that a constitutional right was violated, the court was then mandated to address the question of whether such a right was "clearly established" at the time of the governmental official's action. *Saucier v. Katz*, 533 U.S. 194 (2001). The Court revisited the issue in *Pearson v. Callahan*, 129 S.Ct. 808 (2009), and determined that this two step sequence was no longer required. Instead, the Court left to the sound discretion of the lower courts whether to follow the *Saucier* two step protocol or to address initially only the issue of whether the alleged legal violations were "clearly established" at the time of the challenged governmental action. *Id*. at 818-821. Based upon the particular facts and circumstances of this case, in exercising its discretion as set forth in *Pearson*, the Court has determined that it is most appropriate to address initially the issue of whether the alleged violations of the Plaintiffs legal rights were then "clearly established."

The Plaintiffs' claims fall into three general areas, each which require the Court to determine whether, at the time of the challenged governmental action, there were "clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. at 818. These three areas are as follows:

> 1. Whether Padilla's designation as an enemy combatant and consequential detention by the Department of Defense violated his clearly established constitutional rights;
>
> 2. Whether the treatment afforded Padilla while detained by the Department of Defense as an enemy combatant, including the alleged use of certain coercive interrogation

techniques, violated his clearly established constitutional rights; and

      3. Whether the treatment afforded Padilla while detained by the Department of Defense as an enemy combatant violated his clearly established rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb.

Padilla was designated as an enemy combatant and ordered detained by the Department of Defense on a direct written order of the President of the United States issued on June 9, 2002. (Dkt. Entry 91-3). The President's order was issued by the President in his capacity as Commander in Chief, and the named defendants were all subordinate civilian or military officials of the American government. The President represented that his order was "consistent with U.S. law and the laws of war" and was based on findings that Padilla "represents a continuing, present and grave danger to the national security of the United States" and his detention as an enemy combatant was necessary to prevent him from "aiding [A]l Qaeda in its efforts to attack the United States . . ." (*Id.*).

Within two days of his designation and detention, Padilla's able counsel moved before Judge Mukasey for a writ of habeas corpus, which allowed an independent judicial officer to hear and consider the detainee's challenge to the President's June 9, 2002 order. The issues were fully briefed and argued before Judge Mukasey and a comprehensive and thorough order was issued by the District Court on December 4, 2002, finding that the designation and detention were lawful. *Padilla v. Bush*, 233 F. Supp 2d 587-594. The *Padilla* case was then appealed to the Second Circuit, which held the designation and detention as an enemy combatant was unlawful, and then appealed to the United States Supreme Court, which vacated the Second Circuit decision on jurisdictional grounds. *Padilla v. Rumsfeld*, 352 F.3d at 698, 712; *vacated* 542 U.S. 426 (2004). Padilla then began the habeas process again in the District of South Carolina, where Judge Henry Floyd held that Padilla's

designation and detention were unlawful, but that decision was thereafter reversed by the Fourth Circuit. *Padilla v. Hanft*, 389 F. Supp 2d 678 (D.S.C. 2005), *reversed* 423 F.3d at 389. The Supreme Court ultimately denied *certiorari*, leaving the Fourth Circuit's decision in place as the final law of the case. 547 U.S. 1062 (2006).

In light of this quite extraordinary litigation history, the remarkable circumstances regarding the President's direct written order designating Padilla an enemy combatant, and the President's direction to subordinate officials to detain Padilla, it is hard for the Court to imagine a credible argument that the alleged unlawfulness of Padilla's designation as an enemy combatant and detention were "clearly established" at that time. The strikingly varying judicial decisions appear to be the very definition of unsettled law, and the Fourth Circuit's order, which is the law of the case, actually finds the detention and designation lawful. Indeed, an argument could be made that the Fourth Circuit's holding constitutes collateral estoppel on the issue of the lawfulness of Padilla's designation and detention. The Court finds it unnecessary to reach the collateral estoppel issue here, but suffice it to say that if a credible argument for collateral estoppel could be made then it would be difficult to argue that the contrary position of the Fourth Circuit was the then "clearly established" law. Therefore, to the extent that a viable cause of action were found to exist under the Constitution, the Court finds that all defendants are entitled to qualified immunity on all issues relating to Padilla's designation and detention as an enemy combatant.

Next, the Court must address whether the manner in which Padilla was treated while detained as an enemy combatant, which included the alleged use of coercive interrogation techniques, constituted "clearly established" violations of constitutional law. For purposes of these motions to dismiss, the Court must presume the allegations in Plaintiffs' Third Amended Complaint to be true.

-24-

(Dkt. Entry 91). Padilla was, as noted by Judge Mukasey, essentially a class of one, an American citizen detained on American soil and designated an enemy combatant. 243 F. Supp 2d at 57. To say the scope and nature of Padilla's legal rights at that time were unsettled would be an understatement. As amply documented by the Plaintiffs in attachments to their Third Amended Complaint, the Department of Justice's Office of Legal Counsel issued lengthy memoranda, prior to and after Padilla's detention, concluding that various coercive interrogation techniques, including ones allegedly utilized in Padilla's interrogations, were lawful. (Dkt. Entry 91-5, 91-6, 91-7, 91-8, 91-9, 91-10, 91-11). Some of these conclusions were vigorously challenged within the government, including by the General Counsel of the Navy and a representative of the FBI. (Dkt. Entry 91-12, 91-16). A detailed report issued by a Department of Defense working group on detainee interrogations, issued on March 6, 2003, concluded that the interrogation techniques being utilized on enemy combatants were lawful. No court during the period of Padilla's detention as an enemy combatant, extending from June 9, 2002 until January 4, 2006, ever addressed the lawfulness of the interrogation techniques utilized on persons designated as enemy combatants.

It is not necessary for the Court to address the lawfulness of Padilla's treatment while detained as an enemy combatant to resolve the defendants' assertion of a qualified immunity defense, and the Court specifically declines to do so.[5] At the time of the Padilla's detention by the Department of Defense, there were few "bright lines" establishing controlling law on the rights of enemy combatants. *Maciarello v. Sumner,* 973 F.2d at 298. No court had specifically and definitively addressed the rights of enemy combatants, and the Department of Justice had officially

---

[5] A well established rule of constitutional construction provides that a court should not pass on questions of constitutionality unless required by the case to do so. *Pearson v. Callahan,* 129 S.Ct. at 821.

sanctioned the use of the techniques in question. While it is true there was vigorous intra-governmental debate on this issue during Padilla's detention, the qualified immunity case law makes clear that government officials are not charged with predicting the outcome of legal challenges or to resolve open questions of law. *Francis v. Giacomelli*, 588 F.3d at 196; *McIvey v. Stacey*, 157 F.3d at 277. Moreover, a final judicial resolution of the legal rights of enemy combatants would require a "sophisticated balancing of interests" of the detainee's asserted rights and the government's profound interests in national security and avoiding future terrorist attacks. Engaging in such "particularized balancing" of interests precludes a finding of clearly established law, except in the most egregious circumstances. *McIvey v. Stacey* at 277; *DiMeglio v. Haines*, 45 F.3d at 806; *Medina v. City & County of Denver*, 960 F.2d at 1498.

Taking the allegations of the Plaintiffs' Complaint as true for purposes of this motion, the Court finds that it was not clearly established at the time of his designation and detention that Padilla's treatment as an enemy combatant, including his interrogations, was a violation of law. Therefore, to the extent a viable claim under the Constitution were found to exist, the Court finds that the defendants are entitled to qualified immunity regarding all claims of alleged constitutional violations arising out of Padilla's detention as an enemy combatant.

Finally, the Court must address the issue of qualified immunity under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb. The RFRA provides that the "Government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability." § 2000bb(1)(a). An exception is provided, however, where the Government can demonstrate that its actions were "in furtherance of a compelling state interest" and it utilized "the least restrictive means of furthering that compelling governmental interest." § 2000bb(1)(b).

The Congressional findings accompanying the adoption of RFRA described the exception as "a workable test for striking sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(5). Courts have recognized a right of action under the RFRA against government employees in their individual capacities but have also recognized a qualified immunity defense where the alleged violations of the Act were not a matter of settled law. *Jama v. United States*, Case no. CO9-0256-JCC, 2010 WL 771789 at *6-7 (W.D. Wash. Mar. 2, 2010); *Harrison v. Watts*, 609 F. Supp 2d 561, 575 (E.D. Va. 2009); *Keen v. Noble*, Case no. CVF04-5645 AWI WMW P, 2007 WL 2789561 at 7 (E.D. Cal. 2007).

Padilla alleges in his Complaint that as part of the interrogation process, his religious materials, including the Koran, were taken from him and he was denied a watch or other means to adhere to prayer times and religious holidays. (Dkt. Entry 91 at 30-32). He alleges that these actions substantially burdened the exercise of his religious faith. For purposes of this motion, the Court assumes such allegations to be true.

During the period of Padilla's detention and interrogation, the legal status of persons designated as enemy combatants was in a state of legal uncertainty. Padilla's own legal journey through the American court system is a testament to the legal uncertainty of his status and his rights. No American court during this period had ever definitively addressed the potential applicability of the RFRA to persons who were undergoing interrogation as enemy combatants. Under the dynamic circumstances then existing, there were no "bright lines" establishing the settled federal law regarding the applicability of the RFRA to enemy combatants. *Anderson v. Creighton*, 483 U.S. at 640. As Judge Janice Rogers Brown stated in her concurring opinion in *Rasul v. Myers*, "Congress was not focused on how to accommodate the important values of religious toleration in the military

detention setting . . . In 2000, when Congress amended the RFRA, jihad was not a prominent part of our vocabulary and prolonged military detentions or alleged enemy combatants were not part of our consciousness." 563 F. 3d at 535. *But see Padilla v. Yoo*, 633 F. Supp. 2d at 1038-39.

Further, the application of the statutory exception for a compelling governmental interest by necessity requires "striking a sensible balance between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(5). This form of "sophisticated balancing of interests" is the very type of discretionary decision making that prevents a finding of "clearly established" federal law on the issue. *McIvey v. Stacey*, 157 F.3d at 277; *Medina v. City & County of Denver*, 960 F. 2d at 1498. For instance, the issue of whether the withholding of a watch or clock might burden a detainee's observation of prayer times might be weighed against the arguably compelling state interest in obtaining control over a critical subject during his interrogation. Another example might be weighing a detainee's desire to engage in prayer every two hours against the governmental interest in sustained interrogation over multiple hours to obtain the critical information sought. This type of "particularized balancing" makes the grant of qualified immunity generally appropriate under these circumstances. *DiMeglio v. Haines*, 45 F. 3d at 806.

The Court finds that under the circumstances then existing during Padilla's detention and interrogation, Defendants are entitled to qualified immunity for Padilla's RFRA claims. There was then no "clearly established" federal law on these issues, and the courts were only then beginning to sort out the legal rights of those designated as enemy combatants. Moreover, the application of the statutory exception for a compelling state interest required the type of weighing and balancing that prevents a finding of "clearly established," settled law regarding enemy combatants under the RFRA.

-28-

Therefore, based upon the fact that there was not clearly established federal law on the Plaintiffs' statutory and constitutional claims at the time of the challenged actions by Defendants, the Court hereby finds that Defendants are entitled to qualified immunity on all of Plaintiffs' claims. There were at the time few "bright lines" or "apparent" legal standards to guide governmental officials in addressing the detention and treatment of persons designated as enemy combatants, and one cannot impose the duty on officials to "predict how the courts will resolve legal issues" or "sort out conflicting decisions . . . [and] open issues." *Anderson v. Creighton*, 483 U.S. at 640; *Francis v. Giacomelli*, 973 F. 3d at 196; *McIvey v. Stacey*, 157 F. 3d at 277; *Maciariello v. Sumner*, 973 F. 2d at 298. This conclusion appears to the Court to be particularly appropriate where the original detention decision was a direct order of the President of the United States, who is entitled to absolute executive immunity; the challenged interrogation methods were sanctioned at the time by the United States Department of Justice, which has sovereign immunity; and the enemy combatant designation was ultimately approved by Article III judges, who have absolute judicial immunity.

## C. Standing to Assert Claims for Declaratory and Injunctive Relief

Plaintiffs further assert claims for declaratory and injunctive relief against Defendant Gates, in his official capacity as the Secretary of Defense,  based upon a fear that he will be redetained as an enemy combatant at some unspecified time in the future and has continuing stigma and psychological harm arising from his designation as an enemy combatant. (Dkt. Entry 91 at 42-43). Defendant Gates challenges Plaintiffs' standing to assert these claims, arguing that Plaintiffs' alleged injuries are insufficiently concrete and imminent to satisfy Article III requirements of a "case" or "controversy."

Article III confines adjudication of disputes in the federal courts to actual "cases" and

"controversies". For a litigant to invoke the jurisdiction of a federal court, there must be an "injury in fact". This has been variously described as an injury which is "concrete," "distinct," "palpable," "actual" and "imminent" and not "conjectural" or "hypothetical." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-103 (1998); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Allen v. Wright*, 468 U.S. 737, 750 (1984). Any alleged threatened injury must be "real and immediate" and the plaintiff must be "immediately in danger of sustaining a direct injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Prior exposure to an alleged past wrong is an insufficient basis to provide injunctive relief unless there is a showing that there is "some cognizable danger of recurrent violation, something more than a mere possibility . . ." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Bryant v. Cheney*, 924 F.3d 525, 528 (4th Cir. 1991). Alleged psychological harm is insufficient to establish standing, and any stigma based injury must "seriously damage" plaintiff's "standing and associations in the community." *United States v. 5 S 351 Tuthill Road, Naperville, Illinois*, 233 F.3d 1017, 1022 (7th Cir. 2000); *Zepp v. Rehrmann*, 79 F.3d 381, 388 (4th Cir. 1996). The party asserting the claim carries the burden of establishing standing. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

Padilla claims a fear of redetention as an enemy combatant but alleges insufficient facts to suggest that such an event is actual or imminent. He was transferred to civilian control in January 2006 and was tried and convicted in an United States District Court in 2007 for various terrorism related charges. Padilla was sentenced to a prison term in excess of 17 years and is presently serving that sentence in a civilian prison. Based upon the allegations set forth in Plaintiffs' Third Amended Complaint, the Court concludes that he has failed to carry his burden of asserting sufficient facts to

show his that his redetention as an enemy combatant is concrete and imminent.[6] Further, in light of

Padilla's conviction on various terrorism related charges, including conspiracy to murder, kidnap and

maim persons outside the United States and providing material support to terrorists, it is hard to

conceive that his continuing designation as an enemy combatant stigmatizes him in a way that

damages his standing and associations in the community sufficient to establish standing under

Article III. Similarly, Padilla's alleged psychological injury arising from his continuing designation

as an enemy combatant does not satisfy Article III standing requirements. Therefore, the Court

grants Defendant Gates' Motion to Dismiss claims for declaratory and injunctive relief asserted

against him in his official capacity. (Dkt. Entry 139).

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' Motion to Dismiss (Dkt.

Entry 141) and **GRANTS** Defendant Gates' Motion to Dismiss (Dkt. Entry 139). In light of the

Court's decision dismissing this action, all other pending motions of Defendants to dismiss (Dkt.

Entry 166 and 248) are rendered moot.

---

[6] Plaintiffs assert that standing should be determined at the commencement of the suit and it is not proper to consider his subsequent conviction and years of civilian detention in evaluating his claimed fear of redetention. While it is true that generally standing is determined at the commencement of an action, the claims against Defendant Gates in his official capacity were not asserted until the Second Amended Complaint. (Dkt. Entry 78). At the time of the filing of the Second Amended Complaint, Padilla had been in civilian control for over two years and was serving his sentence arising from his terrorism related conviction in Miami. Standing is determined at the time the claim is filed, making consideration of the events at the time of the filing of the Second Amended Complaint appropriate. *See Daimler-Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Dupree v. Prudential Ins. Co. of America*, Case no. 99-8337-Civ.-JORDAN, 2007 WL 2263892 at *33 (S.D. Fla. Aug. 7, 2007); *Trepanier v. Ryan*, Case no. 00-C-2393, 2003 WL 21209832 at *6 (N.D. Ill. May 21, 2003).

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

February 17, 2011
Charleston, South Carolina